IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> DOWNEY FINANCIAL CORP., <br><br> Debtor. | ) <br> ) Chapter 7 <br> ) <br> ) CA. No. 08-13041 (CSS) <br> ) <br> ) **Hearing Date: July 17, 2009 11:00 am** <br> ) **Obj. Deadline: July 10, 2009 4:00 pm** <br> ) |

**INSUREDS' MOTION FOR DETERMINATION THAT STAY DOES NOT BAR USE OF INSURANCE PROCEEDS OR FOR STAY RELIEF TO THE EXTENT THAT IT DOES**

Maurice L. McAlister, Daniel D. Rosenthal, Brian E. Côté, Michael B. Abrahams, Michael D. Bozarth, Gary W. Brummett, James H. Hunter, G. Brent McQuarrie, Lester C. Small, Jane Wolfe and Cheryl E. Olson (together, the "Insureds"), defendants in litigation arising from their prepetition roles with chapter 7 debtor Downey Financial Corp. ("Downey"), by and through their undersigned counsel, and pursuant to section 362 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 4001, respectfully move this Honorable Court (the "Motion"), for entry of an order stating that the automatic stay does not bar the use of the insurance proceeds of the director and officer liability policy issued by National Union Fire Insurance Company to pay defense costs and expenses of the Insureds, or in the alternative, for entry of an order lifting the automatic stay for the limited purpose of accessing the insurance proceeds. Proposed forms of Orders are attached hereto. In support thereof, the Insureds state as follows:

**Preliminary Statement**

1. By this Motion, the Insureds seek a determination that the automatic stay does not bar them access to the proceeds of the A coverage under Downey's directors and officers liability policy with National Union in order to pay their ongoing defense costs in certain litigation and related matters arising out of their service as officers or directors of Downey. Any

sf-2690042

property interest that Downey has in the A proceeds is expressly subordinate to the Insureds' priority rights in the proceeds and extremely remote. Thus, the proceeds are not estate property subject to the stay. Alternatively, the Insureds seek stay relief to reach the proceeds to the extent stay relief is needed. Because any interest of the estate in the A coverage proceeds is so remote as to eliminate any justification for continued operation of the stay to deny the Insureds the funds they need to pay for their defense even if the stay does apply, the Insureds are entitled to stay relief for "cause."

## Facts

1. **The Policy**

2. The resolution of this Motion requires a review of key provisions of the insurance policy at issue. That is the subject of this section of the brief.

3. In 2007, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") issued its Executive and Organization Liability Insurance Policy No. 599-65-69 (the "Policy") for Downey covering Claim[s] made during the policy period July 1, 2007 to July 1, 2008 (the "Policy Period"). (Declaration of Dan Marmalefksy in Support of Insureds' Motion for Determination That Stay Does Not Bar Use of Insurance Proceeds or for Stay Relief to the Extent It Does (the "MD") ¶ 7 & Ex. A). Clause 1 of the Policy sets forth its coverages:[1]

> With respect to Coverage A, B and C, solely with respect to **Claims** first made against an **Insured** during the **Policy Period** . . . and reported to the **Insurer** . . . , this policy affords the following coverage:
>
> **COVERAGE A: EXECUTIVE LIABILITY INSURANCE**
>
> This policy shall pay the **Loss** of any **Insured Person** arising from a **Claim** made against such **Insured Person** for any **Wrongful Act** of such **Insured Person**, except when and to the extent that an **Organization** has **Indemnified** such **Insured Person**.
>
> **COVERAGE B: ORGANIZATION INSURANCE**

---

[1] Per page 1 of the Policy's Declarations, terms in bold are elsewhere defined in the Policy (at Clause 2 of the Policy, beginning at page 1).

> (i) **Organization** *Liability*. This policy shall pay the **Loss** of any **Organization** arising from a **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**.
>
> (ii) *Indemnification of an Insured Person*. This policy shall pay the **Loss** of an **Organization** arising from a **Claim** made against an **Insured Person** . . . for any **Wrongful Act** of such **Insured Person**, but only to the extent that such **Organization** has indemnified such **Insured Person**.

(MD, Ex. A at 1).[2]

4.     Clause 22 of the Policy specifically and unequivocally gives payment to an Insured under Coverage A priority over all other payments under the Policy. It says:

> In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this policy, then the **Insurer** shall in all events:
> (a) *first*, pay the **Loss** for which coverage is provided under *Coverage A* and Coveage C of this policy; then
>
> (b) *only after payment of Loss has been made pursuant to Clause 22(a) above*, with respect to whatever remaining amount of the **Limit of Liability** is available *after such payment [under Clause 22(a)]*, at the written request of the chief executive officer of the **Named Entity** [Downey], either pay or withhold payment of such other **Loss** for which coverage is provided under Coverage B(ii) of this policy; and then
>
> (c) only after payment of **Loss** has been made pursuant to Clause 22(a) and Clause 22(b) above, with respect to whatever remaining amount of the **Limit of Liability** is available after such payment [first under Clause 22(a) and then under Clause 22(b)], at the written request of the chief executive officer of the **Named Entity** [Downey], either pay or withhold payment of such other **Loss** for which coverage is provided under Coverage B(i) and D of this policy

(MD, Ex. A at 16 (emphasis added)).

5.     In this connection, Clause 19 specifically preserves the payment priority of Clause 22, emphasizing that the Policy is intended to benefit the Insureds even in the event of bankruptcy:

---

[2] The Policy includes in Clause 1 additional Coverages not applicable here: Coverage C – Outside Entity Executive Liability Insurance; and Coverage D – CrisisFund[SM] Insurance.

> **19.   Bankruptcy**
>
> Bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations hereunder.
>
> It is further understood and agreed that the coverage provided under this policy is intended to protect and benefit the **Insured Persons**. Further, if a liquidation or reorganization proceeding is commenced by the **Named Entity** and/or any other **Organization** (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law (collectively "**Bankruptcy Law**") then, in regard to a covered **Claim** under this policy, the **Insureds** hereby:
>
> (a) waive and release any automatic stay or injunction to the extent it may apply in such proceeding to the proceeds of this policy under such **Bankruptcy Law**; and
>
> (b) agree not to oppose or object to any efforts by the **Insurer** or any **Insured** to obtain relief from any stay or injunction applicable to the proceeds of this policy as a result of the commencement of such liquidation or reorganization proceeding.

(MD, Ex. A at 15). Although sub-clauses (a) and (b) may be unenforceable under bankruptcy law, that result does detract from the express preservation of the Insureds' rights to priority in payment as the primary beneficiaries of the Policy.

6.   The Policy provides for certain "retention" amounts that must be paid by others before the Policy provides coverage, but per Clause 6 (as restated in Endorsement #3), the retention does not apply in the event of a "Non-Indemnifiable Loss." (MD, Ex. A at Declarations, Endorsement #3). Policy Clause 2(s) defines that term as, "**Loss** for which an **Organization** has neither indemnified *nor is permitted to indemnify* an **Insured Person** *pursuant to law* or contract . . . ." (MD, Ex. A at 4 (emphasis added)).

7.   Finally, the Policy defines an "Insured Person" to include former officers and directors of Downey (Policy §§ 2(o), 2(j)), a "Loss" to include defense costs arising out of "Claim" (Policy § 2(p)), and a "Claim" to include written demand for payment, civil actions and civil, criminal, administrative or regulatory investigations, including any "Securities Claim," which includes claims alleging violations of law with respect to the purchase or sale of a security (Policy §§ 2(b), 2(y)). (MD, Ex. A at 2-5). The overall policy limit (the Policy's "Limit of

Liability") for all coverages is $10 million. (MD, Declarations, Item 3). The Policy is thus a "wasting" policy under which each payment reduces what is left under the Limit of Liability for further Losses of any kind.

## II. The Insureds and the Litigation

8. In 2007, the Insureds were officers or directors of Downey. Downey and its bank subsidiary, Downey Savings, collapsed in 2008.

### A. The Securities Class Action

9. In May and June 2008, shareholder class action complaints were filed in the United States District Court for the Central District of California against Downey and its then-chairman, chief executive officer and chief financial officer (three of the Insureds that bring this Motion). The complaints alleged that the defendants violated federal securities laws by making false statements in Downey's press releases and filings with the Securities and Exchange Commission. Specifically, they alleged, *inter alia*, that the defendants deliberately misrepresented Downey's underwriting and lending practices, the quality of its loan portfolio, and the adequacy of its loan loss reserves. The district court consolidated the class actions and appointed a Lead Plaintiff, which thereafter filed a consolidated complaint and then a first amended consolidated complaint. This matter is *In re Downey Securities Litigation*, United States District Court, Central District of California, Case No. CV-08-03262 JFW (RZx) (the "Class Action"). The district court granted the individual defendants' motions to dismiss the first amended consolidated complaint on all grounds asserted, with leave to amend. The lead plaintiff filed a second amended consolidated complaint, and the defendants have again moved for dismissal. That motion is set for hearing in July 2009. (MD ¶¶ 4-5).

### B. The Derivative Action

10. A purported shareholder derivative action was filed in California state court in June 2008, soon after the filing of the initial class action in federal court. A second derivative action was filed shortly thereafter. The complaints alleged that Downey's current and former directors, chief executive officer and chief financial officer (all of the Insureds that bring this

motion) had breached their fiduciary duties to Downey by causing it to file the aforementioned allegedly false press releases and SEC filings. The court consolidated these actions and ordered the filing of a consolidated amended complaint. This matter is *McDougall, Derivatively on Behalf of Downey Financial Corp. v. Rosenthal, et al.*, California Superior Court for Orange County, Lead Case No. 30-3008 00180029, Consolidated Case No. 30-2008 00087854 (the "Derivative Action"). However, it stayed the obligation of the defendants to respond to the forthcoming consolidated complaint until resolution of the motions to dismiss in the related Class Action, which defendants had indicated they would be filing. Prior to the deadline for filing of the consolidated complaint, on November 25, 2008 (the "Petition Date"), Downey filed this chapter 7 case (the "Case"), and the Derivative Action was automatically stayed pursuant to Code section 362(a). Montague Claybrook (the "Trustee"), the chapter 7 trustee in this Case, subsequently moved the state court to be substituted as the real party in interest in the Derivative Action on behalf of the Downey estate. The state court granted the motion. Since his substitution as the real party in interest, the Trustee to date has not lodged any consolidated complaint or taken any other action to prosecute the derivative claims. (MD ¶¶ 4, 6). Presumably, the Trustee hopes that the Policy's Coverage A will provide funds for any award or settlement he may achieve in the Derivative Action.

C.  **The Insureds' Claims for Loss Under the Policy Pre- and Postpetition**

11.  With respect to the Class Action and Derivative Action (and certain related matters) (together, the "Litigation"), the Insureds clearly each are an Insured Person who has a Claim for Loss consisting of his defense costs within the provisions of the Policy. Downey and the Insureds duly and timely put National Union on notice of the Litigation in accordance with the Policy for claims made during the Policy Period. (MD ¶ 8). But until Downey filed this Case, Downey was indemnifying the Insureds for their defense costs in accordance with its bylaws and applicable law because Downey had not exhausted the Retention under the Policy. (MD ¶ 9). To that point, Downey had indemnified the Insureds for fees and costs (by direct payment or retainer for counsel) in the amount of about $588,000, a sum far short of the Policy's

million-dollar Retention. (*Id.*). Thereafter, under applicable bankruptcy law Downey no longer could indemnify the Insureds on an ongoing basis because it cannot pay prepetition claims. Hence, at that point under Clause 6 of the Policy, Coverage A applied for the benefit of the Insureds without further need to satisfy the Retention because Downey is "[no longer] permitted to indemnify an **Insured Person**." (MD ¶ 10).

### D. Downey Will Never Exhaust the Retention

12. National Union has recognized its obligation to begin paying defense costs of the Insureds under Clause 6 of the Policy. However, it has deferred doing so without a finding by this Court that in advancing defense costs to the Insureds under the Policy under these circumstances, it will not be violating the automatic stay of Code section 362(a)(3), which prohibits the exercise of dominion and control over property of Downey's bankruptcy estate. (*Id.*). In the meantime, since the Petition Date, the Insureds have incurred over $800,000 in unpaid defense costs. (*Id.*).

13. Coverage B requires Downey to exhaust the Retention before the Policy covers indemnity by Downey of the Insureds. However, Downey has not exhausted the Retention and will not. To date the Insureds have not drawn any funds under the Policy, having proceeded prepetition under the Retention and been denied any postpetition payments by National Union. By the same token, as of the Petition Date, Downey itself had incurred no claim under Coverage B of the Policy for actually indemnifying the Insureds since it, too, was within the Retention when it filed the Case. Moreover, it is a virtual certainty that Downey will *never* actually indemnify the Insureds at all, let alone beyond the Retention amount. Since the Insureds did not file proofs of claim by the March 18, 2009 bar date in this Case (*see* D.I. 18, December 16, 2008 setting bar date) and, moreover, Downey's schedules reflect a hopelessly insolvent estate of $200.5 million in claims and just $13.6 million in assets (*see* D.I. 16, December 12, 2008, Summary Sheet), there is no realistic prospect that Downey will ever pay any further sums to the Insureds for actual indemnity.

**Relief Requested**

14. The Insureds respectfully contend that Coverage A proceeds are not protected by the automatic stay because those proceeds simply are not estate property, and they ask this Court to so find. Alternatively, the Insureds urge, even if the estate has some sort of interest in the Coverage A proceeds because the Insureds' use of them will diminish the aggregate of what is available under the Policy, that interest is both expressly subordinate to the Insureds' interests and so remote as to be outweighed by the Insureds' interest in being able to pay for the defense of the Litigation. Accordingly, they ask the Court to terminate the stay for cause to allow them to access the Coverage A proceeds even if the estate somehow has an interest in those funds.

**Basis for Relief Requested**

I. **The Stay Is Inapplicable**

15. The automatic stay of Code section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The central question is whether the *proceeds* of the Policy's A Coverage are estate property. If they are not, in making disbursements to the Insureds, National Union will not be violating the stay because it will not be exercising dominion and control over estate property.

16. The analysis must begin with the basic principle that "[t]he legislative history of the 1978 Bankruptcy Code makes clear that despite the broad scope of § 541(a) [that defines a creates the bankruptcy estate], it 'is not intended to expend [sic] the debtor's rights against others more than they exist at the commencement of the case." S. Rep. No. 95-989, at 82 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5868; *see also In re Vote*, 276 F.3d 1024, 1026 (8th Cir. 2002); *accord Demczyk v. Mut. Life Ins. Co. of N.Y. (In re Graham Square, Inc.)*, 126 F.3d 823, 831 (6th Cir. 1997); *Gendreau v. Gendreau (In re Gendreau)*, 122 F.3d 815, 819 (9th Cir. 1997); *Am. Bankers Ins. Co. v. Maness*, 104 F.3d 358, 364 (4th Cir. 1996) (in chapter 7 case, proceeds of individual debtor's postpetition insurance policy on property are not estate property even though underlying property belonged to estate since as postpetition contract between debtor and

insurance company, policy was debtor's property); *In re Sanders*, 969 F.2d 591, 593 (7th Cir. 1992) (estate takes property subject to burdens and limitations of state law rights). The result on this Motion follows from these principles because they mean that the estate cannot trump the Insureds' Coverage A priority under Policy Clause 22.

17.     There has been much reported litigation over whether the proceeds of a liability policy purchased by a debtor are estate property rather than property of those the policy protects. As currently distilled, the law is summarized in a recent Bankruptcy Court decision from this District. The rule is that the priority Coverage A proceeds committed contractually to benefit the Insureds are not estate property if, as here, the chance of any claim under the Policy for recovery of indemnification by the estate is remote even though the Policy is a wasting policy such that disbursement of Coverage A proceeds for the benefit of the Insureds will diminish whatever proceeds may be available to the estate under other contractually junior coverages of the Policy (including any under which the estate is the direct beneficiary):

> The Court concludes that when a debtor's liability insurance policy provides direct coverage to the debtor the proceeds are property of the estate, because the proceeds are payable to the debtor. Further when the liability insurance policy only provides direct coverage to the directors and officers the proceeds are not property of the estate. However, when there is coverage for the directors and officers and the debtor, the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution. Lastly, *when the liability policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds are not property of the bankruptcy estate. That is the situation here.*

*In re Allied Digital Techs. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004) (emphasis added); *see also, e.g., Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 382 B.R. 652, 686-89 (Bankr. D. Del. 2008) ("the estate's interests in the proceeds is defined by the terms of the policies and is in no way superior of other nondebtor parties intended to be benefited by the policies"); *Miller v. McDonald (In re World Health Alternatives, Inc.)*, 369 B.R. 805, 808-12 (Bankr. D. Del. 2007) (denying trustee's motion for preliminary injunction to enjoin prosecution

or settlement of action against debtor's former officers and directors that might deplete proceeds of policy similar to the Policy because proceeds of Coverage A equivalent are not estate property); *In re Laminate Kingdom LLC*, 2008 WL 1766637, at *2-5 (Bankr. S.D. Fla. Mar. 13, 2008) (finding proceeds of coverage equivalent to Policy's Coverage A are not estate property protected by stay); *In re Medex Reg'l Labs., Inc.*, 314 B.R. 716 (Bankr. E.D. Tenn. 2004) (proceeds of wasting policy covering officers and directors along with debtor not estate property where debtor's potential claims under policy for indemnifying officer and director defendants hypothetical and speculative); *In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 53 (S.D.N.Y. 2003) ("Adelphia does not have a property interest in the proceeds of the insurance policies yet" because "[i]t has not suggested that any of the Debtors has made any payments for which it would be entitled to indemnification coverage, or that any such payments are not contemplated" and "none of the Debtors [have] made or committed themselves to payments using their entity coverage").

18.  This result is not merely one of several possible choices, but rather is *compelled* by the fundamental concept noted above that the estate gets no greater rights than the debtor had under nonbankruptcy law. The filing of bankruptcy does not *ipso facto* entitle the Downey estate to go to the head of the class with respect to its rights under the Policy's terms; it must sit in the same row it occupied before it filed the Case.

19.  For the same reason, the rule of *Allied Digital* and its cohorts governs even though the estate (whether through a trustee or otherwise) hopes for augmentation for the benefit of its creditors generally in a suit against insureds in which it hopes to monetize its alleged claims against them under them, as the Trustee here obviously hopes to do by intervening in the Derivative Actions. The estate may not covert its contractually junior interests in the Policy by leapfrogging the Insureds' senior interests even though doing so would benefit all creditors of the estate. *Allied Digital*, 396 B.R. at 512; *World Healthcare*, 369 B.R. at 811; *Laminate Kingdom*, 2008 WL 1766637, at *2-5. As the court said in *Allied Digital*,

> The Trustee's real concern is that payment of defense costs may affect his rights as a plaintiff seeking to *recover from* the D & O Policy rather than as a potential defendant seeking to be *protected by* the D & O Policy. In this way, the Trustee is no different than any third party plaintiff suing defendants covered by a wasting policy. No one has suggested that such a plaintiff would be entitled to an order limiting the covered defendants' rights to reimbursement of their defense costs.
>
> The bottom line is that the Trustee seeks to protect the amount he may receive in his suit against the directors and officers by limiting coverage for the defense costs of the directors and officers. This is not what the directors and officers bargained for. In bringing the action against the directors and officers, the Trustee knew that the proceeds could be depleted by legal fees and he took that chance. The law does not support the Trustee's request to regulate defense costs.

306 B.R. at 513.

20. The Coverage A proceeds are not estate property because the Downey estate's interest in the Policy proceeds is expressly junior to Coverage A. The filing of this Case does not expand the estate's nonbankruptcy law rights to allow it to leapfrog the Insureds' rights under Coverage A and Clause 22 (along with Clause 19). *See, e.g., In re Vote*, 276 F.3d at 1026. Moreover, the estate's potential claims under the Policy for indemnifying the Insureds under Coverage B(ii) is both hypothetical and speculative; indeed, under the facts of this case it is wholly imaginary. And any rights to proceeds that the estate may have under Coverage B(i) for Losses in connection with Securities Claims is again, not only expressly junior to the Insureds' Coverage A rights, but also speculative at the moment. The Class Action is stayed and there has been no judgment in it. Therefore, the automatic stay of Code section 362(a)(3) does not apply to the disbursement by National Union of those proceeds to the Insureds in accordance with the Policy.

## II. Even If Applicable, The Stay Should Be Terminated

21. Even if the Court finds that the Downey estate somehow has an interest in the Coverage A proceeds that the automatic stay protects, the Insureds should get relief from the stay to access those funds from National Union. Under Code section 362(d)(1), the Court "shall" grant relief from the stay for "cause." 11 U.S.C. § 362(d)(1). "Cause" is not a defined term in

the Code, and courts have wide discretion to find cause on a case-by-case basis. As explained recently in *In re SCO Group, Inc.*:

> Cause [under section 362(d)(1)] is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay.

395 B.R. 852, 856 (Bankr. D. Del. 2007) (citing *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997); *In re Laguna Assocs., Ltd.*, 30 F.3d 734, 737 (7th Cir. 1994); *Am. Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 152 B.R. 420, 424 (Bankr. D. Del. 1993)). The Court has broad discretion to grant stay relief for cause. *In re Mid-Atlantic Handling Sys., LLC*, 304 B.R. 111, 130 (Bankr. D.N.J. 2003). Code section 362(g) places the burden of proof on the issue of cause on any party opposing relief from the stay, although the moving party must make a *prima facie* case for cause initially. *See, e.g., In re Brown*, 311 B.R. 409, 412 (Bankr. E.D. Pa. 2004); *In re Telegroup, Inc.*, 237 B.R. 87, 91 (Bankr. D.N.J. 1999).

22.  The nature of cause for stay relief means that the applicable test is a flexible one, too. *In re Cont'l Airlines, Inc.*, 152 B.R. at 424. The focus is the policies underlying the stay and the interests of the moving party and debtor. *Id.* In balancing the latter, the issues are: (1) whether the bankruptcy estate will suffer any prejudice through stay termination; (2) whether the hardship to the moving party if the stay remains in place outweighs the burden on the estate if relief is granted; and (3) the probability of the moving party's success on the merits. *In re W.R. Grace & Co.*, 2007 WL 1129170, at *2 (Bankr. D. Del. Apr. 13, 2007) (citing *In re Cont'l Airlines, Inc.*, 152 B.R. at 424; *In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992)).

23.  Application of this test in this situation dictates stay relief. The balance of the harms obviously favors the Insureds. The harm to them is present, palpable and oppressive. It goes without saying that the ability of the Insureds to defend themselves in the Litigation and related proceedings will be seriously jeopardized, if not altogether eliminated, if the Insureds cannot rely on the Coverage A that the Policy intended to benefit them first among Policy

insureds. In such circumstances—where there is a priority in coverage for insureds, the estate's interest is at best remote and there is obvious irreparable harm to the insureds in being unable to defend themselves in proceedings for which Coverage A-like proceeds would otherwise be available—courts have readily found that the insureds' interests outweigh those of the estate and granted stay relief for cause so that the insureds can draw upon the insurance to defend themselves. *See, e.g., Allied Digital*, 306 B.R. at 513-14; *Laminate Kingdom*, 2008 WL 1766637, at *9-13 (discussing "numerous" other cases in which stay relief has been granted).

24. By contrast, the harm to the estate is speculative and remote. As explained above, the estate's interest, if any, is both expressly junior to that of the Insureds and unlikely to materialize as to Coverage B. It also would seem in the estate's best interests that the Insureds be able to fully and actively defend themselves in the Class Action because their ability to develop defenses to the claims also likely will benefit the co-defendant estate. Thus, in this respect, the balance of the harms favors the Insureds because the estate's interests are aligned with them in being sure they are able to defend themselves vigorously.

25. Turning to probability of success on the merits, that factor favors the Insureds if judged by the parties' respective interests in the proceeds since the Insureds' rights in any nonbankruptcy forum plainly would be senior to those of Downey. At worst for the Insureds, the issue of probability of success on the merits is a standoff, and that is so only if the question is how the Insureds will fare in the Litigation. It is, after all, impossible to tell what the outcome of the Litigation will be at this stage, although the success of the Insureds' motion to dismiss in the Class Action perhaps foreshadow greater success for them in the longer run.

26. Finally, as a court of equity, *see* 11 U.S.C. § 105(a), this Court should be sensitive to the inequity of allowing the estate and Trustee to improve their prospects in the Derivative Action by using the stay to cripple the Insureds' defense of that action, not merely to preserve any interest the estate may have in the Policy's proceeds.

27. In summary, both the balance of the harms, any relevance of probability of success on the merits and fundamental equity all intersect at the granting of this motion. There is

"cause" for this Court to grant the Insureds (and National Union) stay relief so that the Insureds can reach the proceeds of Coverage A to pay defense costs in the Litigation.

## Conclusion

28.   The Downey estate's rights in the Policy did not grow or morph with the filing of its chapter 7 case. They remained junior to the Insureds' rights under Coverage A. Moreover, the estate's rights to reimbursement for indemnification not only are junior to the Insureds' Coverage A rights, but are extremely remote, if they exist at all since, among other things, the Retention has not been and probably will never be exhausted, the Insureds' did not file proofs of claim against Downey, and any judgment against the Insureds *might* be subject to the Policy's Exclusions. For these reasons, the proceeds of Coverage A simply are not estate property, and the automatic stay does not apply to the Insureds' rights to access them for the Litigation and any related proceedings. Alternatively, the Insureds have shown cause for granting stay relief to draw on the proceeds even if the stay does apply in light of the foregoing facts and their need to be able to defend themselves with the proceeds for which they bargained as part of their tenure with Downey.

*(Remainder of Page Intentionally Left Blank)*

Dated:  June 8, 2009
        Wilmington, Delaware

ASHBY & GEDDES

*/s/ Stacy L. Newman*

William P. Bowden (No. 2553)
Stacy L. Newman (No. 5044)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

and

MORRISON & FOERSTER LLP
Melvin R Goldman
Adam A. Lewis
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000

Dan Marmalefsky
James Oliva
555 West Fifth Street
Los Angeles, California 90013-1024
Telephone (213) 892-5200

*Attorneys for defendants Maurice L. McAlister, Daniel D. Rosenthal, Brian E. Côté, Michael B. Abrahams, Michael D. Bozarth, Gary W. Brummett, James H. Hunter, G. Brent McQuarrie, Lester C. Small, Jane Wolfe and Cheryl E. Olson*