## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| DOWNEY FINANCIAL CORP., | : | Case No. 08-13041-(CSS) |
| | : | |
| | : | |
| Debtor. | : | **Hearing Date:  January 21, 2010 at 9:30 a.m.** |
| | : | **Objection Deadline:  January 14, 2010 at 4:00 p.m.** |

## CHAPTER 7 TRUSTEE'S OBJECTION TO MOTION OF THE
## RECEIVER OF DOWNEY SAVINGS & LOAN ASSOCIATION, F.A.,
## SEEKING AN ORDER GRANTING RELIEF FROM AUTOMATIC STAY

Montague S. Claybrook, the chapter 7 trustee (the "Trustee") for the estate of Downey

Financial Corp. (the "Debtor"), hereby responds and objects to the motion of the Federal Deposit

Insurance Corporation as receiver (the "Receiver") for Downey Savings & Loan, F.A., ("DSL"

or "Downey Savings") seeking an order granting relief from automatic stay in support thereof

states as follows.

## I.    SUMMARY

The Receiver seeks both to annul[1] the automatic stay in this bankruptcy proceeding to

validate its post bankruptcy petition filing of a tax form 56-F with the Internal Revenue Service

("IRS") and to lift the automatic stay to permit it to file a tax return with the IRS that competes

with the tax return already filed by the Trustee as well as take any number of actions related to

the tax refund given the broad scope of the Receiver's proposed order..  The Receiver downplays

the significance of its motion and the impact the requested relief will have on the bankruptcy

estate.  The Form 56-F is not simply an innocent notice to the IRS of the Receiver's appointment

as receiver for DSL.  Instead, the Form 56-F informs the IRS that the Receiver intends to act on

behalf of the Consolidated Tax group (normally the role of the common parent – the Debtor)

with regard to tax matters and the Receiver argues empowers it to attempt to reduce or eliminate the Debtor's tax losses.

The Receiver's attempt to file a competing tax return serves absolutely no other purpose than to reduce or eliminate what may be the bankruptcy estate's single biggest asset – its worthless stock losses arising from its lost investment in DSL and the tax refund resulting therefrom. The Debtor's tax returns, which are already filed, assert as an alternative basis for tax refund the very same theory the Receiver wants to pursue in its own tax refund, i.e., that a refund is due as a result of the net operating loss of DSL. Therefore, no additional refund would result from the Receiver's proposed tax refund claim.

Under well established law, the Receiver has failed to meet its burden to establish that it is entitled to annul the stay with regard to the post-petition filing of the Form 56-F or to lift the automatic stay to file a competing tax return that will, as a matter of tax law, reduce or eliminate estate property.

The Receiver's argument, at its essence, is that because it may have otherwise enforceable rights under non-bankruptcy law, "cause" exists for this Court to grant relief from the stay. However, the Receiver offers no argument – indeed it has none – as to why it should enjoy most favored status. Bankruptcy often delays and otherwise affects a non-debtor party's rights under non-bankruptcy law. For example, a creditor may not garnish a debtor's bank account to satisfy its debt. See 11 U.S.C. § 362(a)(1), (3) and (6); see also Solfanelli v. Corestates Bank, N.A., 203 F.3d 197, 203 (3d Cir. 2000) (creditor willfully violated stay by garnishing bank account without relief from stay and not in accordance with prior court stipulation). A non-debtor party may not refuse to perform its obligations under an executory

---

[1]  The Receiver's Motion seeks "*nunc pro tunc*" relief from the stay. Section 362 of the Bankruptcy Code speaks in terms of "annulling" the stay.

contract if such act would interfere with a debtor's rights under that contract. 11 U.S.C. § 362(a)(3); In re Broad Stripe, LLC, 402 B.R. 646, 657 (Bankr. D. Del. 2008) (requiring non-debtor party to process debtor's system participation form and member participation agreement for certain programming rights). Nor may a landlord, otherwise permitted under state law to engage in self-help because rent was not paid by its tenant/debtor in bankruptcy, be allowed to do so after a bankruptcy filing. 11 U.S.C. § 362(a)(1) (3) and (6); In re Atlantic Bus. & Cmty. Dev. Corp., 901 F.2d 325, 328 (3d Cir. 1990) (landlord's self-help actions post-petition violated automatic stay even though debtor/tenant possessed a tenancy at sufferance). May a non-debtor party enforce its rights under state law and proceed in an administrative proceeding to revoke a debtor's dealer franchise? Section 362(a)(3) and the automatic stay prohibits such piecemeal dismemberment of the debtor. See In re Krystal Cadillac Oldsmobile GMC Truck, Inc., 142 F.3d 631, 638 (3d Cir. 1998) (franchisor's actions before administrative tribunal and court were taken to obtain possession of debtor's franchise agreement and thus violated stay).

The Receiver goes to great lengths to argue that it is not "seeking to recover a claim or exercise its rights against Downey Financial Corp." Receiver Motion at 2. What is clear – and not once stated in their motion – is that the Receiver's requested relief is an attempt to directly and adversely affect a $314 million asset of the Debtor's bankruptcy estate. While the Receiver admits that the tax return it intends to file will "compete" with the returns already filed by the Trustee, at not one point does the Receiver explain to the court that if the court were to grant the relief requested, the Receiver's tax return would claim DSL's operating losses and reduce or eliminate for all purposes the Debtor's $1.7 billion net operating loss. This is disingenuous on the Receiver's part.

PH1 2447946v7 01/14/10

Moreover, the Receiver's motion contains many misstatements many of which can only be attributed to the fundamental misinterpretation of the Debtor's tax return such that the Receiver does not appreciate the fact that the Trustee's filed tax return claims the Debtor's losses as the basis for the requested refund. For example:

1.      The Receiver boldly states that Downey Savings paid all the taxes. Receiver Motion at 2, ¶ 27. To the contrary, the Debtor paid all of the taxes and, as required by a Tax Sharing Agreement between the parties, DSL meticulously reimbursed Downey Financial for taxes paid by the latter. This is the sin quo non of a debtor-creditor relationship.

2.      While on the one hand stating that it does not want the Court to get to the merits, the Receiver nonetheless attempts to construct an argument that the tax refund belongs to it and not to the Debtor's estate. The Receiver's arguments and suggested conclusions are wrong for two fundamental reasons: (1) the Receiver ignores the fact that the Debtor has its own losses for which it is entitled to a tax refund, and (2) the Receiver relies on cases that do not involve a tax sharing agreement like the agreement existing in this case.

3.      The Receiver complains that the Trustee amended the Debtor's 2008 tax return. Receiver Motion at 3, n.3. The Trustee has not done so. What the Trustee has done – as a result of the Internal Revenue Service's decision not to process the Trustee's tentative refund because the receiver filed a Form 56-F, in part, and as requested by the Receiver itself – is to file amended returns to state a tax refund claim in the aggregate amount of approximately $314 million for taxes previously paid by the Debtor in tax years 2003 through 2007.

4.      The Receiver states that "were it not for Downey S&L's losses, DFC's stock holdings would not be deemed 'worthless' at all." Receiver Motion at 4, ¶2. The Receiver's statement is not supportable. The Debtor incurred its losses as a result of its lost investment in

its subsidiary, not because of net operating losses of Downey Savings. There is no provable direct relationship between the Debtor's losses and any net operating losses of Downey Savings. The Debtor has its own tax losses, which are property of the estate by statute and under Supreme Court precedent.

5.  The Receiver asserts that DSL "incurred almost all of [those] losses" Receiver Motion at 13, ¶29. Again, it must be stressed that the Trustee claimed the Debtor's losses on the 2008 return and not those of any other party.

6.  The foundation of the Receiver's motion is that it has some tax right flowing from 26 U.S.C. § 6402(k), which the Receiver claims gives it a basis to file a competing return on behalf of the Debtor and the other members of a consolidated tax group. Section 6402(k) is inapplicable because the Trustee's tax return is based on the Debtor's losses.

7.  The Receiver's true intentions are demonstrated in its motion when on the one hand it asserts that the Trustee, of course, would be entitled to any "remaining" refund after application of the DSL's losses, Receiver Motion at 21, ¶49, while on the other hand, the Receiver admits that because the amount of the refund is capped, the amount of the refund would be exactly the same whether the return is filed utilizing the Debtor's losses or the losses of DSL. Receiver Motion at 14, ¶33. Thus, the Receiver's intention is to leave no refund "remaining" for the estate because Downey Savings losses are large enough to capture the entire refund.

8.  Finally, with the exception of a single reference in a footnote that acknowledges that a tax sharing agreement may have some bearing on the issues before the Court, the Receiver ignores that agreement to which it is bound. The Tax Sharing Agreement clearly sets forth that the Debtor has the sole and exclusive authority to determine the tax treatment for the consolidated tax group and to file claims for refund.

PH1 2447946v7 01/14/10

Accordingly, the Receiver's Motion should be denied.

## II.  FACTUAL BACKGROUND

### A.  The Receivership and Bankruptcy

1.    On November 21, 2008 (the "Receivership Date"), the Director of the Office of Thrift Supervision ("OTS"), by order number 2008-49, appointed the FDIC as the Receiver of Downey Savings, a federally chartered savings association, and took possession of Downey Savings.  Downey Savings is a wholly-owned subsidiary of the Debtor.

2.    Immediately after its appointment, the Receiver sold substantially all of the former assets of Downey Savings to U.S. Bank National Association ("U.S. Bank") pursuant to a purchase and assumption agreement, dated as of November 21, 2008 (the "Purchase and Assumption Agreement").

3.    On November 25, 2008 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court (the "Bankruptcy Case"). Immediately upon the filing of the Petition, the automatic stay in the Debtor's Bankruptcy Case prohibits any entity, including the Receiver, from taking any action to obtain possession of property of the Debtor's bankruptcy estate or to exercise control over such property.

### B.  The Post-Petition Form 56-F Filing

4.    Three days after the Petition Date, on November 28, 2008, the Receiver filed a Form 56-F, Notice Concerning Fiduciary Relationship of Financial Institution ("Form 56-F"), with the IRS, notifying the IRS of the appointment of the FDIC as receiver of Downey Savings. A copy of Form 56-F with transmittal letter, is attached hereto as **Exhibit A**.  Although Mr. James F. Vordtriede marked the box on the Form 56-F stating that a copy of the form "has" been sent to the common parent of the group (as required by the IRS regulation upon which the

Receiver relies), it appears that Mr. Vordtriede did not send the form until March 12, 2009, three and a half months later. He also sent the form to "Downey Financial Corporation" in Newport Beach addressed to "Sir or Madam" when he knew that Montague Claybrook was appointed as Trustee of the Downey Financial Corp. bankruptcy estate and that he was represented by counsel both of whom were located at an address other than Newport Beach, California. To date, the Receiver has not sent the form to the Trustee.

5.      The post-petition filing of the Form 56-F has prevented the Debtor's bankruptcy estate from receiving the Debtor's tax refund, thus prejudicing the estate.

6.      On September 15, 2009, the Trustee, on behalf of the Debtor's bankruptcy estate, filed a 2008 consolidated tax return (the "2008 Tax Return"). A copy of the 2008 Tax Return is not attached due to its voluminous nature, but will be made available to the Court. A copy of the 2008 Tax Return was provided to the Receiver on September 25, 2009. The 2008 Tax Return claimed a worthless stock deduction in the amount of the Debtor's lost investment in Downey Savings of $1,750,597,505.

7.      On or about September 16, 2009, the Trustee filed a Form 1139, Corporation Application for Tentative Carryback Refund, for a tentative carryback refund claim (the "Tentative Carryback Refund") with the IRS pursuant to Section 6411 of title 26 of the Internal Revenue Code. The Tentative Carryback Refund sought to carryback the Debtor's worthless stock deduction as the Debtor's net operating loss to recover income taxes previously paid by the Debtor as a present tax refund. The Form 1139 sought a Tentative Carryback Refund of approximately $145,000,000 for the tax years ending December 31, 2006 and December 31, 2007.

PH1 2447946v7 01/14/10

8.     By letter dated October 26, 2009, attached hereto as **Exhibit B**, the IRS stated that they "cannot process" the Form 1139 and the Trustee's Tentative Carryback Refund. The IRS advised the Trustee that the:

> Form 1139, Corporation Application for Tentative Carryback Refund, cannot be processed. [The Trustee's] application does not contain the signature of the FDIC. The FDIC filed Form 56-F, Notice Concerning Fiduciary relationship of Financial Institution, with the Service.

9.     Accordingly, the filing of the Form 56-F has resulted in the Receiver exercising control of the estate's property, because the IRS will not process the return without the Receiver's signature.

10.     Subsequent to the Trustee's filing of the Form 1139, President Obama signed the Worker, Homeownership and Business Assistance Act of 2009 on November 6, 2009,[2] which permits the Trustee to carryback the Debtor's loss on the 2008 tax return for up to five years, instead of the previous two year carryback rule.

11.     On December 31, 2009, because the Receiver filed the improper post-petition Form 56-F filing, thereby triggering the IRS to decide not to process the Trustee's tentative refund request, and to take advantage of the additional three years of carryback under the 2009 Act, the Trustee, on behalf of the Debtor's bankruptcy estate, filed a Form 1120X, U.S. Federal Income Tax Claims for Refunds for Overpayments in Tax, for the Taxable Years Ending December 31, 2003, 2004, 2005, 2006, and 2007 (the "Amended Returns"). The Trustee's Amended Returns claimed refunds arising from the Debtor's worthless stock deduction in the Debtor's investment in Downey Savings of $19,707,343.36; $31,758,454.81; $116,256,584.75; $107,928,565.43; and $38,684,249.85 for those respective years, for a total of $314,335,197.20. Copies of the Amended Returns are not attached due to their voluminous nature, but will be

PH1 2447946v7 01/14/10

made available to the Court. Copies of the Amended Returns have been provided to the Receiver.

12. By letter dated December 30, 2009, attached hereto as **Exhibit C**, the Trustee, by his attorneys, sent a letter to the Receiver's counsel requesting that the Receiver "withdraw the IRS Form 56-F that was filed post-petition." The Trustee informed the Receiver's counsel that the post-petition filing of the Form 56-F was an act to obtain possession of property of the bankruptcy estate and to exercise control over property of the bankruptcy estate in violation of 11 U.S.C. § 362.

13. To date, the Receiver has not withdrawn the Form 56-F.

**C.    The Tax Sharing Agreement**

14. Prior to the Receivership Date and Petition Date, the Debtor and Downey Savings, among others, were parties to that certain Termination and Amendment Number 1 to Tax Sharing Agreement, effective February 29, 2000 (the "Tax Sharing Agreement"). A copy of the Tax Sharing Agreement is attached hereto as **Exhibit D**.

15. The Tax Sharing Agreement provides, in relevant part:

A U.S. consolidated income tax return will be filed by Financial[3] for each taxable year for which this Agreement is in effect and for which members of the Affiliated Group[4] are required or permitted to file a consolidated tax return.

****

Financial shall prepare and file consolidated returns, and any other returns, documents or statements required to be filed with the Internal Revenue Service with respect to the determination of the tax liability of Financial and the Affiliated Group members for all taxable periods commencing with the tax period applicable as of the date of the execution of this Agreement.  Financial shall have the right, in its sole discretion: (i) to determine (A) the manner in which such returns shall be prepared and filed, including, without

---

[2] 26 U.S.C. §§ 6511 & 172(b)(1)(H) (as amended by § 13 of the Worker, Homeownership, and Business Assistance Act of 2009) (Pub. L. No. 111-92, 123 Stat. 29840 (the "2009 Act")).

[3] The Debtor is referred to as "Financial" in the Tax Sharing Agreement.

[4] "Affiliated Group" shall include those corporations included in the filing of Financial's consolidated tax return for federal income tax purposes, including Downey Savings.  Tax Sharing Agreement, Section 2.1(b).  See id., Section 1.3 ("'Affiliated Group' shall have the meaning assigned in Section 1504(a) of the Code").

limitation, the manner in which any item of income, gain, loss, deduction or credit shall be reported; provided, however, that Financial shall consider in good faith any treatment proposed by the Affiliated Group members, (B) whether any extensions of the statute of limitations may be granted and (C) the elections that will be made pursuant to the Code on behalf of any member of the consolidated group (it being agreed, however, that Financial shall not unreasonably withhold its consent to any elections which members of the Affiliated Group desire to make); (ii) to contest, compromise or settle any adjustment or deficiency proposed, asserted or assessed as a result of any audit of any such returns; (iii) to file, prosecute, compromise or settle any claim for refund; and (iv) to determine whether any refunds to which the consolidated group may be entitled shall be paid by way of refund or credited against the tax liability of the consolidated group.

Tax Sharing Agreement, Section 2.1c.; 2.4a.  (emphasis and footnotes added).

16.     The Tax Sharing Agreement is property of the Debtor's bankruptcy estate pursuant to Section 541 of the Bankruptcy Code.

17.     Thus, the Tax Sharing Agreement in effect between the members of the Consolidated Group grants the Debtor sole discretion to prepare and file tax returns, including amended returns, with the IRS.  The Tax Sharing Agreement provides, to the extent relevant, that a tax refund caused by a net operating loss carryback by the common parent, i.e., the worthless stock loss of the Debtor attributable to its investment in DSL, belongs to the Debtor.

18.     The Receiver's motion fails to address the significance of the Tax Sharing Agreement.  The cases upon which the Receiver relies to support its assertion that it is entitled to the tax refund recognize that had there been a tax sharing agreement between the parties, such agreement would control and alter the outcome of the cases.  See Capital Bankshares, 957 F.2d 203, 207-08 (5th Cir. 1992) (finding that the tax refund was property of the bankrupt subsidiary because of the "absence of" a written or implied contrary tax sharing agreement between the parent and the subsidiary); In re Revco D.S., Inc., 111 B.R. 631, 639 (Bankr. N.D. Ohio 1990) (no evidence of any agreement that the parent corporation had the right to keep the refund was presented); Fed. Deposit Ins. Corp. v. Mercer Bancorp, Inc., No. 89-0849, 1990 WL 515173, *2

(W.D. Mo. Dec. 5, 1990) ("if the parties had such an [implied tax allocation] agreement, then it would control which of the two [parties] is entitled to the refund proceeds."); <u>Jump v. Manchester Life & Cas. Mgmt. Corp.</u>, 438 F. Supp. 185 (E.D. Mo. 1997) <u>aff'd</u> 579 F.2d 449, 454 (8th Cir. 1978) (Eight Circuit recognized that a tax allocation agreement would control between bankrupt subsidiary and parent holding company); <u>In re Fla. Park Banks, Inc.</u>, 110 B.R. 986, 988-89 (Bankr. M.D. Fla. 1990) (no written or implied tax sharing agreement providing for the allocation of the tax refund existed between the debtor parent and the subsidiary).

19.     It is also clear that a tax sharing agreement will control and govern the consolidated group's respective rights to any tax refund. <u>In re First Cent. Fin. Corp.</u>, 269 B.R. 481, 500 (Bankr. E.D.N.Y. 2001) <u>aff'd</u> 377 F.3d 209 (2d Cir. 2004).

20.     Thus, the Tax Sharing Agreement, and the cases cited by the Receiver in its motion, contradict the Receiver's position that it may file a return, choose what losses to take when seeking a refund and that it is entitled to any tax refund. The Receiver's cases turned on the fact that the Court did not find that a written or implied tax sharing agreement existed between the parent and the subsidiary. Here, there is a formally executed written agreement binding on the Receiver. The Tax Sharing Agreement provides for the Debtor's right to determine the manner in which the tax returns shall be prepared and filed, the elections made pursuant to the Code, and any claim for refund.

### D.     The Debtor's Tax Losses And Tax Return

#### 1.     The Receiver Has Not Claimed That The Trustee's Tax Return Was Improper Or Not Permitted By Law.

21.     It is significant that the Receiver does not challenge the legitimacy of the tax return filed by the Trustee. Indeed in its motion, the Receiver admits that: (1) the Internal Revenue Code section 1501 authorizes affiliated groups to file consolidated income tax returns;

PH1 2447946v7 01/14/10

(2) consistent with § 1501, the Secretary for the Treasury Department promulgated regulations that allow a parent holding company to file a consolidated tax return as agent for its subsidiaries, see Treas. Reg. § 1.1502-77; (3) since 1998, the Debtor, DSL and their affiliates elected to file consolidated tax returns under § 1501 of the Revenue Code; and (4) the Debtor and DSL are parties to a tax sharing agreement. Receiver Motion at 11-12, ¶24. The Receiver does not allege that the tax return as filed by the Debtor was in contravention of the Internal Revenue Code or the Tax Sharing Agreement. Instead, the Receiver asks this Court to allow it to file a "competing" tax return.

22.     The Trustee filed the Debtor's Federal income tax returns in accordance with section 1501 et seq. of the Revenue Code. The Debtor's returns were based on the net operating loss attributable to the Debtor's worthless stock investment in its wholly owned subsidiary. The Debtor's claim for refund, including statutory interest through December 31, 2009 totals $314,335,197.20.

23.     The Receiver claims it is authorized to file a competing tax return pursuant to Revenue Code section 6402(k). Putting aside the fact that the automatic stay, as well as the Tax Sharing Agreement, prevent the filing of such a competing return, Revenue Code section 6402(k) is inapplicable because it applies only where "the refund is attributable to losses or credits of such insolvent corporation." See 26 U.S.C. § 6402(k) (emphasis added) (insolvent corporation referring to the financial institution in receivership). Because the tax return filed with the IRS seeks a refund attributable to the Debtor's losses – not the losses of DSL – Revenue Code section 6402(k) is inapplicable.

24.     Under Treas. Reg. section 1.1502-77(a), as the common parent of the Consolidated Group, the Debtor is the sole agent authorized under the Treasury's regulations to

PH1 2447946v7 01/14/10

act in its own name with respect to all matters relating to the consolidated tax liability of each member (or successor thereof) of the Consolidated Group. In accordance with Revenue Code section 165(g)(3), the Debtor reported a worthless stock loss deduction in an amount equal to its investment basis[5] in its stock in DSL. The Debtor's investment basis in DSL as of the date of worthlessness, based on the Debtor's existing books and records, was $1,750,597,505. <u>See</u> Treas. Reg. section 1.1502-32. This amount is permitted to be claimed as a worthless stock loss attributable to the Debtor's unrecovered investment in DSL in accordance with section 165(g)(3) of the Revenue Code and Treas. Reg. sections 1.165-5(d), 1.1502-80(c)(1)(i) and 1.1502-19(c)(1)(iii). The Debtor, as the common parent of the consolidated group, had the exclusive right to claim a worthless stock loss with respect to its stock in DSL or, alternatively, to use DSL's net operating loss in computing the consolidated group's taxable income for the 2008 tax year.[6]

25. Significantly, the Trustee did not file a return claiming its worthless stock loss as the only basis for a tax refund. Instead, the returns filed by the Trustee also assert an alternative right to a refund based on the net operating loss of DSL pursuant to Revenue Code. Thus, the Debtor has included in its tax returns the very relief that the Receiver wants to assert in a "competing" tax return.

## III. Preliminary Issues Raised By Receiver's Motion

The Receiver's motion raises a number of issues that should be addressed before addressing the fact that the Receiver has failed to meet its burden to either annul the stay or to lift

---

[5]  Treas. Reg. § 1.1502-32(a).

[6]  <u>See</u> <u>Textron, Inc. v. US</u>, 561 F.2d 1023 (1st Cir. 1977) (parent allowed deduction for worthless stock and debt of subsidiary under facts of case).

the stay for the purpose of filing a competing return. The following preliminary issues are raised in the Receiver's motion:

1.      Does this Court have jurisdiction to enforce the automatic stay?

2.      Is the Receiver subject to the restrictions of the automatic stay?

3.      Is the tax refund property of the Debtor's bankruptcy estate?

**A.    This Court Has Jurisdiction To Enforce The Automatic Stay And The Receiver Has Consented To Such Jurisdiction As A Matter Of Law And Fact.**

The Receiver implies throughout its motion that this Court does not have jurisdiction over disputes between the Debtor and the Receiver, even as those disputes relate to property of the bankruptcy estate. At the outset, the Receiver admits that the Court has jurisdiction to adjudicate the motion pursuant to 28 U.S.C. §§ 127 and 1334 and that the motion is a core proceeding. See Receiver Motion at 17, ¶40. Thus, the Receiver has conclusively admitted that this Court has jurisdiction over the Receiver and its motion.

Moreover, the subject matter of the pending motion – the Debtor's property interest in its losses, the tax refund and stay relief – places the Receiver squarely within the jurisdiction of this Court. As the United States Supreme Court explains "[a] bankruptcy court's *in rem* jurisdiction permits it to 'determin[e] all claims that anyone, whether named in the action or not, has to the property or thing in question. The proceeding is 'one against the world.'" Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 448 (2004) (quoting 16 J. Moore, et al., Moore's Federal Practice § 108.70[1], p. 108-106 (3d ed. 2004)). Further, 28 U.S.C. §1334 provides:

> **(b)** Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district court, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

14

      * * * *

      **(e)** The district court in which a case under title 11 is commenced
or is pending shall have exclusive jurisdiction –
             **(1)** of all the property, wherever located, of the debtor as of
the commencement of such case, and of property of the estate;

28 U.S.C. § 1334(b) and (e) (emphasis added).  Thus, this Court has exclusive jurisdiction over

the property of the Debtor's estate, which includes the tax losses and refund claimed by the

Trustee.

      Finally, the Receiver's reference to any other statute as a basis for a claim that this Court

lacks jurisdiction is to no avail.  The Third Circuit has held that Section 1334 "alters the effect"

of a federal statute's grant of "exclusive" jurisdiction to another court.  In <u>Brock v. Morysville</u>

<u>Body Works, Inc.</u>, 829 F.2d 383, 385 (3d Cir. 1987), the Secretary of Labor petitioned the Third

Circuit, in its original jurisdiction, seeking summary enforcement of an Occupational Safety and

Health Administration ("<u>OSHA</u>") citation against a chapter 11 debtor.  The source of the Third

Circuit's jurisdiction was 28 U.S.C. § 660, which, the Third Circuit held, "grants us original and

exclusive jurisdiction."  <u>Id.</u> at 385.  That did not answer the question, however, as the Third

Circuit looked at 28 U.S.C. § 1334(b) and ruled that "section 1334(b) alters the effect of the

jurisdictional grant of section 660(b) by expressly rendering it non-exclusive…."  <u>Id.</u>  Likewise,

this Court, according to the express terms of Sections 1334(b) and (e), has jurisdiction over the

Debtor's property.

      In fact, a District Court which otherwise has Title 12 jurisdiction over a dispute between

a parent holding company in bankruptcy and the FDIC as receiver for a failed subsidiary,

recently permitted the related bankruptcy proceeding to proceed, and stayed the Title 12

proceeding.  That court found that "[t]o the extent any of [the debtor's] claims here relate to

property that may be considered part of the bankruptcy estate, this Court is barred from making

any determinations as to the ownership of that property." Washington Mutual, Inc. v. Federal Deposit Ins. Corp., Civ. Action No. 09-533, 5 (D.D.C. Jan. 7, 2010) (a copy of the Court's opinion is attached hereto as **Exhibit E**). The Washington Mutual court further reasoned that the "automatic stay functions as a quasi-jurisdictional statute that precludes proceedings, without leave of the bankruptcy court, in nonbankruptcy courts that otherwise have concurrent jurisdiction." Id. at 6. The court also found that the automatic stay applies to acts to obtain possession of property of the estate. Id.

Finally, the Receiver has submitted to the jurisdiction of this Court because it filed a proof of claim. When a creditor files a claim in bankruptcy, it thereby subjects itself to the jurisdiction of the bankruptcy court. See Katchen v. Landy, 382 U.S. 323, 335 (1966); Grandfinanciera v. Nordberg, 492 U.S. 33, 58-59 (1989); and Langenkamp v. Culp, 498 U.S. 42, 44-45 (1990). Courts have routinely found that the FDIC's filing of a claim subjected itself to jurisdiction of the bankruptcy court notwithstanding the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). See, e.g., In re Tamposi Family Inv. Props., 159 B.R. 631 (Bankr.. D. N.H. 1993); In re Cont'l Fin. Res., 149 B.R. 260 (Bankr. D. Mass. 1993), aff'd, No. 93-10318-H, slip op. (D. Mass. May 24, 1993); In re All Season's Kitchen, 145 B.R. 391 (Bankr. D. Vt. 1992); In re Purcell, 141 B.R. 480 (Bankr. D. Vt. 1992), aff'd, 150 B.R. 111 (D. Vt. 1993).[7] Here, the Receiver has filed a proof of claim that asserts a claim to the tax refunds and, thus, has submitted to the jurisdiction of this Court as a matter of law.

---

[7] It is also black letter law that "a party is deemed to have consented to jurisdiction if the party actually litigates the underlying merits or demonstrates a willingness to engage in extensive litigation in the forum." In re Texas Eastern Transmission Corp., 15 F.3d 1230, 1236 (3d Cir. 1994), cert. denied, 513 U.S. 915 (1994). Indeed, "appearing and seeking affirmative relief from the court 'is the paradigm of waiver to the court's in personem jurisdiction.'" Grupke v. Linda Lori Sportswear, Inc., 174 F.R.D. 15, 18 (E.D.N.Y. 1997) (citation omitted). The docket is replete with evidence of the Receiver's engagement in this bankruptcy case and, therefore, its submission to the jurisdiction of this Court.

PH1 2447946v7 01/14/10

Accordingly, this Court should ignore the Receiver's repeated assertions that it is not subject to the jurisdiction of this Court.

## B.     THE RECEIVER MAY NOT VIOLATE THE AUTOMATIC STAY

The Receiver would have this Court believe that it is not subject to the automatic stay based on the anti-injunction provision in Title 12.   See 12 U.S.C. § 1821(j).   The Receiver, however, fails to point out that the Third Circuit Court of Appeals specifically found that "injunctive relief is appropriate where that remedy is imposed by statute, automatically and by operation of law, without any action by the court."   Gross v. Bell Sav. Bank PA SA, 974 F.2d 403, 407 (3d Cir. 1992).  The Third Circuit cites with favor In re Lane, 136 B.R. 319, 320-21 (D. Mass. 1992) (RTC has no power to foreclose on an asset when a bankruptcy stay is in effect) and In re Colonial Realty Co., Civ. Action No. 3:91-200X(JAC), 1991 U.S. Dist. LEXIS 19014, *5 (D. Conn. Dec. 30, 1991) (automatic stay under the Bankruptcy Code overrides FIRREA's anti-injunction provision) (parentheticals supplied by Third Circuit Court of Appeals in Gross).   See Gross, 974 F.2d at 407.  Thus, the Third Circuit has rejected the Receiver's argument.   See also In re Competrol Acquisiting P'ship, L.P., 176 B.R. 723, 730 (Bankr. D. Del. 1994) (Walsh, J.) (finding FDIC as receiver of failed bank violated automatic stay when it attempted to take possession of debtor's marina post-petition, reasoning "[i]n this Circuit, acts in violation of the automatic stay have no force or effect and can accord the party who has violated the automatic stay no additional property rights or interests that it did not enjoy prior to the commencement of the bankruptcy case.").

Other courts have also found that the automatic stay applies to the FDIC, as well as other government entities.  See, e.g., In re Colonial Realty Co., 980 F.2d 125, 134 (2d Cir. 1992).  In addition, the automatic stay applies equally to actions taken by a receiver to exercise control over

the debtor's estate.  In re Hull, No. 02-10216, 2003 WL 22000599, * 2 (Bankr. D. Del. Aug. 19, 2003) (citing Underwood v. Hilliard (In re Rimsay, Ltd.), 98 F.3d 956, 961 (7th Cir. 1996)).

Thus, it is clear that the Receiver is subject to the automatic stay and is required to obtain relief from the stay.  See also Sunshine Dev., Inc. v. Fed. Deposit Ins. Corp., 33 F.3d 106, 113-14 (1st Cir. 1993). ("we are confident that the automatic stay does not violate FIRREA's anti-injunction provision because it arises directly from the operation of a legislative enactment, not by court order").

### C.     The Tax Refund And The Debtor's Losses (The Source Of The Refund) Claimed By The Debtor Is Unequivocally Property Of The Estate

It is beyond dispute that both the Debtor's loss associated with its lost investment, as well as the tax refund based on those losses, are assets of the Debtor's estate.  Section 541(a)(1) of the Bankruptcy Code provides in pertinent part:

> (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate.  Such estate is comprised of all the following property, wherever located and by whomever held:
> (1) Except as provided in subsection (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

11 U.S.C. §541(a)(1).

Courts have consistently held that "federal tax refunds themselves have long been defined as property for purposes of bankruptcy" pursuant to 11 U.S.C. § 541(a)(1).  In re Harchar, No. 98-13277, 2006 WL 3196846, *9 (Bankr. N.D. Ohio Oct. 4, 2006) (the debtor's federal tax refund was 'property of the estate' because § 541(a)(1) is "expansive and includes all of a debtor's legal and equitable interests in property").  See also Borman v. Raymark Indus., Inc., 942 F.2d 1031, 1035 (3d Cir. 1991) (estate property does not have to be in a debtor's possession for § 362(a)(3) to apply); Williams v. Johnson (In re Williams Bros. Asphalt Paving Co.), 56 F.3d 66 (6th Cir. 1995) (debtor's anticipated refund was property of the estate).

PH1 2447946v7 01/14/10

Loss-carryback refund claims for losses incurred by a debtor in tax years prior to the filing of a bankruptcy petition also are property of a debtor's bankruptcy estate. Segal v. Rochelle, 382 U.S. 375, 380-81 (1966). Loss-carryback refund claims are "sufficiently rooted in the prebankruptcy past . . . that it should be regarded as 'property' [of the estate]." Segal, 382 U.S. at 381. The Court in In re Roy Glenn explained the holding in Segal that "as of the date the petition was filed[,] the debtors had a property interest in the refund claim because § 70a(5) of the Bankruptcy Act vested in the trustee the debtors' title to the property." In re Roy Glenn, 207 B.R. 418, 421 (E.D. Pa. 1997) (finding that the debtor's refund was "sufficiently rooted in the pre-bankruptcy" life of the debtor that it was property of the estate). A debtor's interest in a carryback of a NOL "constitutes property of the estate within the scope of 11 U.S.C. § 541(a)(1) and is entitled to the protection of the automatic stay imposed pursuant to 11 U.S.C. § 362(a)(3)." In re Southeast Banking Co., No. 91-14561, 1994 WL 1893513, *2 (Bankr. S.D. Fla. July 21, 1994) (finding that a transfer of the debtor's common stock would impair or eliminate the value of the debtor's interest in the NOL and constituted an exercise of control over property of the debtor's estate in violation of § 362(a)(3)).

Furthermore, Judge Mary Walrath of this Court recently followed Segal in In re Flying J, Inc., a copy of which is attached as **Exhibit F**, and held that a tax loss for a current tax year, and a corresponding tentative refund claim for previous tax years, are property of the debtor's estate when the debtor files for bankruptcy relief before the end of the current tax year. In re Flying J, Inc., No 08-133484, 9 [D.I. 2451] (Walrath, J.) (Bankr. D. Del. Dec. 28, 2009) (citing Segal v. Rochelle, 382 U.S. 375, 380 (1966)). In In re Flying J, Inc., the "loss-carryback refund claim . . . [was] 'sufficiently rooted in the pre-bankruptcy past'" that it was property of the debtor's bankruptcy estate for purposes of setoff under 11 U.S.C. § 553. In re Flying J, at *9; see also In

re Magna Entm't Corp., Bankr. Case No. 09-10720, slip op. at p.2 (Bankr. D. Del. Mar. 17, 2009) (Walrath, J.)(restricting trading of claims and equity interests in debtors noting "The Debtors' net operating loss carry forwards and certain other carry forwards ("NOLs") are property of the Debtors' estates and are protected by section 362(a) of the Bankruptcy Code to the extent set forth herein[.]").

The Debtor's tax refund is property of the Debtor's estate pursuant to 11 U.S.C. § 541(a)(1) and is entitled to protection under 11 U.S.C. § 362(a)(3). The Trustee claimed the Debtor's own losses on the 2008 Tax Return. The Amended Returns carry back the Debtor's losses to obtain taxes previously paid. Any tax refund generated from the carryback of the Debtor's losses is property of the estate. In line with the Supreme Court and this Court's precedent in Segal and In re Flying J, Inc., a tax refund resulting from the Debtor's loss is "sufficiently rooted in the pre-bankruptcy past" to make it property of the estate.

## IV. The Receiver Failed To Meet Its Burden To Establish Either That This Court Should Annul The Automatic Stay As Applied To The Filing Of The 56-F Form Or That Cause Exists To Permit The Receiver To File A Competing Tax Return

The Receiver's motion seeks both retroactive relief from the automatic stay stemming from its post-petition filing of the Form 56-F with the IRS as well as prospective relief to permit it to take whatever action it deems necessary to "protect its tax rights." The standard applicable to annulling a stay "*nunc pro tunc*" and the standard used to determine whether a Court should lift a stay are different. The Receiver fails to meet its burden to establish that it is entitled to either relief.

### A. The Receiver Has Failed To Meet Its Burden To Annul The Automatic Stay With Regard To The FDIC's Post-Petition Filing Of The Form 56-F

The Receiver failed to meet its burden to establish that retroactive stay relief should be granted with regard to the Receiver's post-petition filing of the Form 56-F. At the outset, it is

noteworthy that while the Receiver states it filed "one or more" Forms 56-F: (1) the Receiver does not attach the filed form(s) to its motion or supporting declarations so that the Court and parties may review the specific form(s) the post-petition filing of which the Receiver asks this Court to bless, and (2) the Trustee is only aware of the filing of a single such form and no Form 56-F has been sent to the Trustee as required by very regulation upon which the Receiver relies.

The failure to provide the Court and parties with copies of the actual form(s) filed with the IRS was not likely a mere oversight. Indeed, a review of the Form 56-F form that was obtained by the Trustee reveals that the Form 56-F is not merely an innocent notice to the IRS that the FDIC has been appointed as the receiver for DSL. Instead, the Form 56-F states that the Receiver intends to act as if it is the Debtor or the common parent of the consolidated tax group. See Form 56-F at line 16, **Exhibit A**. In addition, the Form 56-F actually filed with the IRS represents that the Receiver sent a copy of the form to the common parent, when in fact, the form was not sent to the Debtor until many months later. See letter from the Receiver to Downey Financial Corp. dated March 12, 2009, **Exhibit A**.

Beyond the fact that the Receiver asks the Court to authorize the filing of a form without providing the Court and parties with the form it intends to file or did file, it is clear that the Receiver is not entitled to *nunc pro tunc* authorization to file the form. Initially, the Trustee submits that the attempt to obtain "*nunc pro tunc*" relief is a tacit admission by the Receiver that the submission of the 56-F form violates the stay. The Third Circuit adopts the general principle that any action taken in violation of the automatic stay is *void ab initio*. See Raymark Indus., Inc. v. Lai, 973 F.2d 1125, 1131 (3d Cir. 1992) ("actions taken in violation of the automatic stay are without effect"). The Trustee recognizes, however, that a bankruptcy court is permitted to

"annul" the stay and grant retroactive stay relief to cure violations pursuant to § 362(d). In re Siciliano, 13 F.3d 748, 751 (3d Cir. 1994), remanded to 167 B.R. 999 (Bankr. E.D. Pa. 1994).

Retroactive stay relief, however, is a "quite extraordinary" remedy and "should therefore not be commonly available." In re Siciliano, 167 B.R. at 1007. See also Phoenix Bond & Indem. Co. v. Shamblin (In re Shamblin), 890 F.2d 123, 126 (9th Cir. 1989) ("Any equitable exception to the automatic stay [such as annulling the stay] should be narrow and applied only in extreme circumstances"); In re Murray, 193 B.R. 20, 22 (Bankr. E.D. Cal. 1996) (the Court denied retroactive stay relief because the creditor "nonchalantly and continuously acted in violation of the stay").

"Extraordinary relief" to lift the automatic stay will be not be granted if the creditor took such action "[1] [with] its knowledge of the debtor's bankruptcy filing; [or] [2] the debtor is [not] guilty of some inequitable conduct, such as abusive and/or repetitive bankruptcy filings."[8] In re Siciliano, 167 B.R. at 1008 (the Court reviewed the rather narrow category of cases in which retroactive stay relief has been deemed appropriate). See In re Franklin Sav. Ass'n, 31 F.3d 1020, 1023 (10th Cir. 1994) (the Court denied the Director of the OTS' request for retroactive stay relief nunc pro tunc because retroactive stay relief is "probably available only to claimants who were honestly ignorant of the bankruptcy," and the Director knew of the debtor's bankruptcy); In re Am. Tissue, No. 01-10370, 2007 WL 4178949, *8 (Bankr. D. Del. Nov. 20,

---

[8]  The Receiver does not assert that the Debtor engaged in inequitable conduct.  Although the Receiver appears to complain that it did not know in advance that the Debtor would claim its own losses as a basis for a tax refund, such complaint does not constitute an allegation that the Debtor engaged in any inequitable conduct.  A debtor engages in "inequitable conduct" in the context of a lift stay request "when the debtor either encourages a creditor to proceed notwithstanding the stay or lies in wait for the outcome of an action by one of its creditors and only asserts its status as a bankruptcy debtor after an unsatisfactory outcome becomes known." In re Glendenning, 243 B.R. 629, 637 (Bankr. E.D. Pa. 2000) (quoting In re Siciliano, 167 B.R. at 1007-08).  The Debtor did not "lie in wait" and did not wait to inform the Receiver of the bankruptcy.  The Receiver has been actively engaged in the Debtor's bankruptcy case and the Trustee claimed the Debtor's losses on the consolidated tax return as specifically permitted by the Tax Sharing Agreement entered into with DSL.

2007) (refusing to grant retroactive stay relief because the defendants knew that the debtors were in bankruptcy and the transfers were instrumental in the bankruptcy proceedings); In re Hawk, 314 B.R. 312, 317 (Bankr. D.N.J. 2004) (retroactive stay relief denied because the creditor was aware of the debtor's bankruptcy and did not move for relief before the creditor violated the stay); In re Kim, No. 02-20654, 2008 WL 442120, *8 (Bankr. D.N.J. Feb. 14, 2008) (retroactive relief of the stay is not permitted if the creditor was aware or had knowledge of the debtor's bankruptcy).

Further, retroactively annulling the stay should require a greater showing than "good reason" because otherwise, creditors will be tempted to pursue claims regardless of the stay. See Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 977 (1st Cir. 1997) ("[u]ndoing the stay retroactively should require a measurably greater showing [than good reason]" because "creditors . . . will be tempted to pursue claims against bankruptcy heedless of the stay").

Here, the Receiver had knowledge of the Debtor's bankruptcy. On November 24, 2008, before the Debtor even filed for bankruptcy protection, it filed a Form 8-K with the Securities Exchange Commission (the "SEC") stating "[a]s the result of the closure of [Downey Savings] and institution of the [Receivership], the [Debtor] intends to file, no later than November 26, 2008, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") a voluntary petition seeking relief under Chapter 7 of [the Bankruptcy Code]. The Debtor expects that the Bankruptcy Court will promptly appoint a bankruptcy trustee." See Downey Financial Corp., Current Report (Form 8-K), at 1 (Nov. 24, 2008), attached hereto as **Exhibit G**. Subsequently, on November 26, 2008, the Debtor filed another Form 8-K with the SEC stating "[o]n November 25, 2008 [the Debtor] filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (Case Number 08-13041), seeking relief under

Chapter 7 of [the Bankruptcy Code]." <u>See</u> Downey Financial Corp., Current Report (Form 8-K), at 1 (Nov. 26, 2008), attached hereto as **Exhibit H**. Both publicly filed Form 8-Ks were filed before the Receiver filed its Form 56-F on November 28, 2008.

It is also clear that the Receiver had on-going knowledge of the Debtor's bankruptcy, but chose not to withdraw the 56-F form. The Receiver filed an entry of appearance in this bankruptcy proceeding on December 12, 2008. [D.I. 15]. Notwithstanding the Receiver's knowledge of the Debtor's bankruptcy proceeding, the Receiver failed to even notify the Debtor of the existence of the filed Form 56-F, until March 12, 2009 and at no point "has" the Receiver sent the 56-F form to the Trustee even though the regulations applicable to the Form 56-F, upon which the Receiver relies, require the Receiver to notify the Debtor of the 56-F form filing before or upon the actual filing. Treas. Reg. § 301.6402-7(d)(2).

The Trustee has requested that the Form 56-F be withdrawn because its filing has prevented the IRS from processing the Debtor's tax returns and its filing was itself a violation of the stay. However, the Receiver refuses to withdraw the form. Retroactive stay relief is not available to the Receiver because it acted and continues to act with regard to the Form 56-F with knowledge of the bankruptcy proceeding.

Finally, the Form 56-F is not, as represented by the Receiver, simply a notice to the IRS of its appointment as Receiver of DSL. Instead, it is the foundational basis of the Receiver's alleged "tax rights" that arguably include the (1) ability to disregard the Debtor's losses for tax years 2003 through 2008; (2) power to act with the taxing authorities as if the Receiver is the Debtor in that the Receiver may assert that it is the agent for the consolidated tax group; (3) potentially deconsolidate the tax group for its own benefit and to the detriment of the Debtor; (4) reduce or eliminate the Debtor's losses by filing a consolidated tax return that does not state the

Debtor's losses as the basis for the refund; and (5) communicate directly with the IRS without the knowledge of the Debtor and without this Court's supervision concerning its competing tax return.

Considering that the Debtor's tax return protects the interest of the bankruptcy estate and the interests of the Receiver and the fact that the Receiver filed and refused to withdraw the Form 56-F, the Receiver has failed to demonstrate its entitlement to such a "quite extraordinary" remedy that should "not be commonly available." In re Siciliano, 167 B.R. at 1007. This Court should deny the Receiver's request that the stay be annulled.

**B.     No Cause Exists To Lift The Stay To Allow The Receiver To File A Competing Tax Return**

At the outset, the Receiver admits that it may not file a competing tax return unless it is able to annul the automatic stay as that stay applies to the Receiver's post-petition filing of the Form 56-F. Specifically, the Receiver admits that "the submission to the IRS of a specific form, a 'Form 56-F,' is required in order for the FDIC-R, as fiduciary, to exercise its Tax Rights." See Receiver Motion at 5, ¶4. Because the Form 56-F was filed in violation of the stay and the stay should not be annulled, the Form 56-F is void *ab initio* as noted above. Thus, there is no purpose to lifting the stay to allow the Receiver to file competing tax returns because the filing of competing tax returns is premised on the void 56-F form. However, even if the Court were to allow the filing of the 56-F form, it is clear that the FDIC has not met its burden to have the stay lifted for the purpose of filing a competing return.

**1.     Standard applicable to lifting the automatic stay.**

Section 362(d) of the Bankruptcy Code provides that the Court shall grant relief from the automatic stay for "cause." 11 U.S.C. § 362(d)(1). In order to establish cause for relief under section 362(d)(1), "the party seeking relief from the stay must show that 'the balance of

hardships from not obtaining relief tips significantly in [its] favor.'" In re RNI Wind Down

Corp., 348 B.R. 286, 300 (Bankr. D. Del. 2006) (quoting Atl. Marine, Inc v. Am. Classic

Voyages, Co. (In re Am. Classic Voyages, Co.), 298 B.R. 222, 225 (D. Del. 2003) (itself quoting

In re FRG, 115 B.R. 72, 74 (E.D.Pa.1990)).[9]

Interestingly, it should not be overlooked that the Receiver is not moving to lift the stay

pursuant to 11 U.S.C. § 362(d)(2), which would have required the Receiver to establish that the

"debtor does not have an equity [interest] in such property." Failure by the Receiver to move

pursuant to 11 U.S.C. § 362(d)(2) is a tacit admission that the Debtor does, in fact, have an

equity interest in its losses and corresponding tax refund. In any case, the Receiver does not

---

[9]  The Receiver suggests that this Court use a three-prong test to determine whether the stay should be lifted.  The Receiver, however, alters the language of the three-prong test used by some courts to determine if a stay should be lifted in order to allow the continuation of litigation in a forum other than the Bankruptcy Court.  Specifically, the Receiver cites to In re The SCO Group, Inc., 395 B.R. 852, 859-860 (Bankr. D. Del. 2007) (granting relief for "cause" to allow litigation in another forum that commenced three years prior to debtor's Chapter 7 continue) and quoting Izzarelli v. Rexene (In re Rexene Prods. Co.), 141 B.R. 574, 577-78 (Bankr. D. Del. 1992) (finding relief from the stay for "cause" to permit the continuation of litigation in another forum because the movants filed the lawsuit six months prior to the debtor's bankruptcy petition, there was a risk of duplicative litigation, and a geographic burden existed).  The Receiver states in its motion that the applicable test is "(1) whether any great prejudice to either the bankrupt estate or the debtor will result from granting the relief, (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor, and (3) the probability of the creditor prevailing on the merits."  Receiver Motion at 19-20, ¶ 48.  The Receiver has altered the ending of the first prong by stating "will result from granting the relief," rather than use the language used by the Courts which state the end of the first prong as "will result from continuation of the civil suit."  See, e.g., In re The SCO Group, Inc., 395 B.R. at 857 (Bankr. D. Del. 2007) (quoting In re Rexene Prods. Co., 141 B.R. at 576.  Regardless of the test used, the Receiver has not established that it is entitled to lift the stay.

Even if this court were to engage in the three-prong test, each factor weighs against granting relief.  First, the estate would suffer great prejudice by granting such relief because the Debtor's tax loss - by definition under applicable tax law - would be reduced or effectively eliminated.  See Treas. Reg. §§ 1.1502-19; 1.1502-32; 1.1502-80.  Furthermore, and as already evidenced by the IRS' response to the Trustee's tentative carry back return, the filing of competing returns will only delay the payment of a refund.  Second, the Receiver has not suffered and will not suffer any legally cognizable prejudice.  The Trustee, as permitted by the Tax Sharing Agreement and applicable law, has already filed a return claiming in the alternative the very relief requested by the Receiver.  Nothing further can be done to "perfect" the Receiver's rights.  Third, the Receiver has little chance of prevailing (again, this takes the test out of context as the "prevailing" has to do with "prevailing" in non-bankruptcy litigation).  Revenue Code section 6402(k), upon which the Receiver relies, is not applicable because the Trustee has claimed the Debtor's losses for taxes previously paid by the Debtor.  Finally, the Receiver spends precious little time discussing the effect of the Tax Sharing Agreement, instead giving it short shrift in one footnote.  In summary, if the Receiver has any right to the tax refund, it has a "claim" as evidenced by the proof of claim filed by the Receiver, which can be determined and resolved through the claims resolution process.

meet its burden with respect to 11 U.S.C. § 362(d)(1) because it cannot demonstrate that "cause" exists to grant relief from the stay.

### 2. The Receiver has not, and cannot, demonstrate "cause."

The Receiver has not, and cannot, show that the "the balance of hardships from not obtaining relief tips significantly in its favor" because the Debtor's estate will be greatly prejudiced if the stay is lifted and the Receiver will suffer no prejudice if the stay remains in place.

### a. The Debtor's Estate Will be Greatly Prejudiced if the Stay is Lifted.

The Revenue Code does not permit a parent corporation and its subsidiary to take double losses. <u>Garvey, Inc. v. U.S.</u>, 1 Cl. Ct. 108, 113 (Cl. Ct. 1983). Thus, any tax return filed by the Receiver, acting as agent for the Debtor and the rest of the Consolidated Tax Group, will necessarily reduce or eliminate the Debtor's worthless stock losses. Thus, the very act of filing of the Receiver's return is an attempt to reduce or eliminate an asset of the estate. The Receiver admits in its motion that the losses it intends to assert in a separate tax return exceed the amount needed to make a refund claim against taxable income over tax years 2003 through 2007. Specifically, the Receiver states: "It is the FDIC-R's understanding that because of certain caps placed on the amount of tax refund that may be remitted, the amount of the refund is the same regardless of whether a claim is made based on a worthless stock theory or a theory that seeks to carryback Downey S&L's NOLs." Receiver Motion at 14, ¶33. The Receiver is stating that its losses are great enough to create a claim to the entire tax refund claimed by the Debtor. Thus, it appears that the Receiver plans to completely eliminate the Debtor's losses and take for itself the entire refund.

PH1 2447946v7 01/14/10

Lifting the stay prejudices the Debtor's estate, as well as non-Receiver creditors, because once lifted, the Receiver may assert that this Court has surrendered its control over the Receiver. As the First Circuit Court of Appeals warned in <u>Sunshine Dev., Inc.</u>, 33 F.3d at 114:

> once the bankruptcy court grants the FDIC relief from the automatic stay, however, the court surrenders the preferred position that Congress carved out for it. At that juncture, FIRREA's anti-injunction provision comes into play. Thereafter, without the automatic stay in place, the bankruptcy court, like any other court, is prevented from taking "any action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as conservator or receiver."

<u>Id.</u> at 114. The Trustee respectfully states that it will be greatly prejudiced if this Court loses its authority to have some control over one of the Debtor's largest creditors, which is actively attempting to remove assets from the bankruptcy estate. This is particularly true given the breadth of the proposed order submitted by the Receiver.

In addition, the Debtor's estate is greatly prejudiced because the lifting of the automatic stay would interfere with the orderly administration of the Debtor's estate and permit the Receiver to recover a greater percentage of its claims than similarly situated creditors. <u>In re DBSI, Inc.</u>, 407 B.R. at 167. In <u>In re DBSI</u>, relief from the stay was denied because the debtor had numerous unresolved issues in its bankruptcy, and the amount of assets in the estate was unclear. <u>Id.</u> Furthermore, the Court noted that the movant would suffer little hardship because it would only have to wait a few months to recover any amount owed to it. <u>In re DBSI, Inc.</u>, 407 B.R. at 167. The Receiver has already filed a proof of claim in this bankruptcy proceeding asserting a claim to the tax refund proceeds. That claim should be addressed in the normal bankruptcy process – not outside the bankruptcy such that the Receiver receives an unfair advantage over other creditors.

PH1 2447946v7 01/14/10

Finally, the filing of a competing tax return creates a situation in which the IRS has received multiple tax returns seeking the same refund.  It is easy to see that competing returns will only serve to delay the payment of the refund into the escrow account.  That can only delay liquidation of the estate.

> **b.**  **The Receiver will suffer no hardship if the stay is not lifted and, therefore the balance of hardships does not significantly tip in its favor.**

The Receiver has not and will not suffer any legally cognizable prejudice.  A party moving to lift the automatic stay does not establish hardship that considerably outweighs the Debtor's hardship if the movant fails to provide evidence that requested relief will resolve the reason for relief in a more efficient manner.  In re Swann Gasoline Co., 46 B.R. 640, 641-42 (Bankr. E.D. Pa. 1985).  In In re Swann Gasoline, a creditor sought relief from the stay to permit it to bring its tax claims against the debtor in another court.  Id. at 640.  The Court noted that the creditor's desire to bring non-existent litigation was irrelevant for the purposes of 11 U.S.C. § 362.  Id. at 641.  Furthermore, any tax liability determination made in another forum would not have a res judicata or collateral estoppel effect as to the Court's determination under 11 U.S.C. § 505.  Id. at 642.  Lastly, the Court would still have to determine the priority of any potential tax claim under 11 U.S.C. § 507.  Id.  Therefore, judicial economy would not be enhanced by relief from the stay.  Id.

The reasoning in In re Swann applies to the Receiver's competing tax return.  First, the Receiver claims that the filing of a competing tax return and the resulting decision by the IRS with regard to whom it pays the refund will not be determinative of ownership of the tax refund.  Assuming that is true, no efficiency is gained by permitting the filing of a competing tax return.  Second, while the Trustee vigorously disputes the Receiver's position, the Receiver argues that

any refund received by the Trustee is held in trust for the benefit of the Receiver.  See Receiver Motion at 23, ¶ 52.  If the Receiver is correct, then no purpose would be served by granting the motion.  The Receiver cannot simultaneously claim that it is prejudiced unless it is permitted to file a competing tax return.[10]

More importantly, the Trustee asserted as an alternative argument in the Debtor's 2008 Return and each of the 2003-2007 amended returns the very relief sought by the FDIC: the assertion of a claim for tax refund based on the net operating losses of DSL.  The Trustee asserted that alternative argument in case of the unlikely event the Trustee's worthless stock loss claim is denied by the IRS.  Furthermore, and as requested by the Receiver, the Trustee would place any such federal income tax refunds resulting from such losses in the escrow account previously approved by this Court.  Thus, the Receiver has suffered no legally cognizable prejudice.  On the other hand, were this court to grant the relief requested, the Receiver would file a claim for refund seeking to reduce or eliminate the Debtor's $1.7 billion worthless stock loss, thus greatly prejudicing the Debtor's bankruptcy estate.

Accordingly, the Receiver has not met its burden and cannot establish that any hardship tips significantly in its favor.  This Court should deny the Receiver's motion.

**WHEREFORE**, the Trustee, respectfully requests the entry of an Order by the Court denying the Receiver's motion to annul the stay with regard to the post-petition filing of the Form 56-F and denying the Receiver's motion to lift the automatic stay in order to permit the Receiver to file a tax return competing with the tax returns already filed by the Trustee, and for such other relief as may be just and proper.

---

[10]  Any cases referred to by the Receiver that suggest that a parent company holds any refund in trust if the subsidiary's losses are used in a return are inapplicable to these facts.  First, the Tax Sharing Agreement established a quintessential debtor-creditor relationship between the two entities.  Second, and as stated numerous times herein, and it cannot be stressed enough, it was the Debtor's losses that were used on the 2008 Return, not the subsidiary's.

PH1 2447946v7 01/14/10

Respectfully submitted,

**FOX ROTHSCHILD LLP**

   */s/ Sheldon K. Rennie*       
Sheldon K. Rennie (DE Id. No. 3772)
919 North Market Street, Suite 1300
Wilmington, DE  19801-3046
Tel (302) 654-7444/Fax (302) 656-8920
srennie@foxrothschild.com

     -and-

Michael Menkowitz
William H. Stassen
2000 Market Street, Twentieth Floor
Philadelphia, PA  19103-3291
Tel (215) 299-2897/Fax (215) 299-2150
mmenkowitz@foxrothschild.com

     -and-

Raymond M. Patella
1301 Atlantic Avenue
Midtown Building - Suite 400
Atlantic City, NJ 08401
Tel (609) 572-2254/Fax (609) 348-6834
rpatella@foxrothschild.com

Attorneys for Montague S. Claybrook,
Chapter 7 Trustee for the estate of Downey
Financial Corp.

Date: January 14, 2010

31