# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
In re:                                    Chapter 7

DOWNEY FINANCIAL CORP.,                   Case No. 08-13041 (CSS)

      Debtor.
              **Re: Docket Nos. 286, 298, 302**
---------------------------------------------------------X

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF DOWNEY SAVINGS AND LOAN ASSOCIATION, F.A., SEEKING AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY

  The Federal Deposit Insurance Corporation (the "FDIC"), as Receiver ("FDIC-R" or the "Receiver") of Downey Savings and Loan Association, F.A. ("Downey S&L"), by its undersigned counsel, respectfully submits this Reply Memorandum of Law in Further Support of the Motion for Relief From the Automatic Stay (the "Reply"), seeking entry of an order lifting the automatic stay pursuant to § 362(d) of Title 11 of the United States Code (the "Bankruptcy Code"), to the extent that it is deemed to apply and may be required, so that the FDIC-R may exercise certain of its rights (the "Tax Rights") pursuant to Section 6402(k) of Title 26 of the United States Code (the "Internal Revenue Code") and 26 C.F.R. § 301.6402-7 ("Treas. Reg. § 301.6402-7") (Docket # 286) (the "Lift Stay Motion").

  In support thereof, the FDIC-R asserts as follows:

## PRELIMINARY STATEMENT

1. Both the Trustee[1] and an "Ad Hoc Committee of Bondholders" (the "Ad Hoc Committee") object to the FDIC-R Lift Stay Motion (respectively, the "Trustee's Objection," Docket # 298, and the "Ad Hoc Committee's Objection," Docket # 302). Neither objection has merit.[2] Among other things:

### A. The FDIC-R Has Satisfied Its Burden for Stay Relief

2. The FDIC-R has fully established that the balance of the hardships is decidedly in its favor. Unlike the Trustee, the FDIC-R is not seeking to score a knockdown through the IRS administrative process. To the contrary, under Treas. Reg. § 301.6402-7(j), any remittal by the IRS of the refunds to the FDIC-R will not constitute a determination of "ownership." It is the FDIC-R's stated intent to deposit in the Escrow Account any refunds it may receive through its alternate tax return, to allow the issue of ownership to be resolved through court proceeding. The DFC estate cannot be prejudiced under such circumstances.

### B. The Stay Should Be Lifted With Respect to the Form 56-F

3. The FDIC-R moved for stay relief regarding the Form 56-F only because of the threats contained in the Trustee's December 30, 2009 letter. The issues concerning the Form 56-F are fully developed in the FDIC-R's Objection (Docket # 299) (the "Objection") to the Motion of the Chapter 7 Trustee of Downey Financial Corp. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Finding the Federal Deposit

---

[1] Unless otherwise stated, all capitalized terms used but not defined herein have the meanings ascribed to them in the FDIC-R's Lift Stay Motion.

[2] While the Ad Hoc Committee identifies its constituent members (*see* Ad Hoc Committee Objection footnote 1), it has not filed a statement under Rule 2019 of the Federal Rules of Bankruptcy Procedure ("Rule 2019"), raising serious questions about its right to be heard. Of particular note is the retention by the Ad Hoc Committee of the same counsel for which the Trustee sought *nunc pro tunc* retention earlier in this case, until that retention application was withdrawn by the Trustee.

Insurance Corporation as Receiver for Downey Savings and Loan Association, F.A., Violated the Automatic Stay (Docket # 298) (the "Automatic Stay Motion"), and the FDIC-R incorporates in its entirety the Objection and the accompanying declaration in support thereof (Docket # 303). As established in the FDIC-R's Objection, submission of the Form 56-F is not a stay violation; that claim is a red herring, as demonstrated by the Trustee's two-month failure to take any action regarding the Form 56-F after learning of its filing by the FDIC-R. Had the Form 56-F been the stay violation the Trustee pretends, he would have acted with alacrity, not delayed two months before making the Automatic Stay Motion. Moreover, it is no surprise that a Form 56-F was filed – the FDIC-R is instructed under applicable tax law and regulations to file a completed Form 56-F with the IRS promptly upon the FDIC-R's appointment as receiver of a failed depository institution. *See* 26 U.S.C. §§ 6036 & 6903; 26 C.F.R. § 301.6903-1. Lastly, the Form 56-F may be the foundational step for the FDIC-R to file tax returns under Treas. Reg. § 301.6402-7, but it does not itself constitute the filing of tax returns. Rather than file any such tax returns, the FDIC-R instead made the Lift Stay Motion for stay relief in order to do so. No basis for the Trustee to object exists under these facts.

        C.     <u>The Tax Sharing Agreement Supports the FDIC-R</u>

4.     The Trustee takes the FDIC-R to task for failing to discuss the effect of the Tax Sharing Agreement on the issue of the ownership of the tax refunds.[3] There was, in fact, no reason to do so previously, but in any event, and again as described in the Objection, the Tax Sharing Agreement fully supports the position of the FDIC-R. The Tax Sharing Agreement comports with the common law rule and the 1998 Policy

---

[3] A copy of the Tax Sharing Agreement is annexed as Exhibit "A" to the accompanying Reply Declaration of Melanie L. Cyganowski, sworn to January 19, 2010 (the "Reply Cyganowski Declaration").

3

Statement of the four banking regulators.[4] Under the Policy Statement, when the parent files a consolidated tax return, it acts as a mere agent for a banking subsidiary, and any refund due the banking subsidiary is the property of that subsidiary, not of the agent/parent. Indeed, DFC took pains to ensure that the Tax Sharing Agreement complied with the Policy Statement.

### D. Having Paid No Taxes, DFC is Not Entitled to Any Refund

5. Contrary to the evidence, the Trustee repeatedly asserts that DFC paid all taxes, and that Downey S&L merely reimbursed DFC for such payments. DFC, however, was a shell company that was funded by Downey S&L.[5] As such, the *opposite* procedure was utilized – Downey S&L remitted a check to DFC so that its parent could remit the payment, as agent, to the IRS on its behalf. Downey S&L, not DFC, was the source of all payments. DFC's mere act of "paying" the taxes as an agent on behalf of the Consolidated Group does not enhance its role; once an agent, always an agent. Even if a bankruptcy filing can change rights, or more accurately, limit them, as the Trustee argues, it has no effect upon *ownership* interests. The Trustee's effort to affect the FDIC-R's ownership rights should not be countenanced.

### E. The Jurisdictional Debate is Without Substance

6. In an action brought by the Trustee against the FDIC-R in the United District Court for the District of Columbia, No. 09-cv-01247-JR, the Trustee asserts:

> This Complaint ... shall not be deemed a consent to the jurisdiction of this Court. The claims set forth herein are subject to the exclusive jurisdiction of the Bankruptcy Court and Plaintiff reserves and asserts all rights in connection therewith. To the extent the Bankruptcy Court

---

[4] A copy of the Policy Statement is annexed to the Reply Cyganowski Declaration as Exhibit "B."
[5] *See* Downey Financial Corp., Annual Report (Form 10-K), at 1 (Feb. 29, 2008) (stating that DFC was "funded by the Bank and presently operates as the Bank's holding company")

4

> denies jurisdiction with regard to the claims asserted in this complaint, Plaintiff reserves his rights with regard to pursuing these claims in this Court.

*See* Complaint, at n. 1, No. 09-cv-01247-JR (D. D.C. July 07, 2009) (Docket #1). This statement was made in a case where the Trustee is acting as plaintiff and in which he moved the court for relief to protect what he termed a valuable property right. Plainly, in that case, the Trustee saw nothing either untoward or unusual in asking for relief from the court (an $80 million plus judgment) yet at the same time reserving rights, if any, regarding the jurisdiction of that same court. The FDIC-R has done nothing different here. The fact is that the FDIC-R and the Trustee are two fiduciaries that have rights under two distinct – and potentially conflicting – statutory regimes, *i.e.*, Title 11 and Title 12 of the United States Code, and neither fiduciary wants to relinquish any rights it may assert under the respective sections. To simultaneously reserve all of his rights with respect to jurisdiction and fault the FDIC-R for doing so is disingenuous on the part of the Trustee.

7. In sum, there is no downside risk to the DFC estate if the FDIC-R files its tax returns in accordance with tax law. The FDIC-R is not looking to prejudice the estate and has proposed steps to ensure that the parties' rights concerning ownership of the tax refunds are protected. The Trustee cannot use the automatic stay as a weapon to deny the FDIC-R its rights of ownership of the tax refund at issue – ownership rights which will be determined by Court ruling if the FDIC-R's Lift Stay Motion is granted.

# ARGUMENT

## I. CAUSE EXISTS TO LIFT THE STAY TO PERMIT THE FDIC-R TO EXERCISE ITS TAX RIGHTS

8. Contrary to the assertion of the Trustee, as established in the FDIC-R's moving papers, the relief that the FDIC-R seeks in its Lift Stay Motion will not result in any hardship or prejudice to the Debtor's estate. More fundamentally, however, the exercise by the FDIC-R of its Tax Rights will not harm the Debtor's estate because – as will be demonstrated once the proper procedural framework for adjudication is instituted – it simply does not implicate "property" of the estate. The refunds are the property of the FDIC-R, not the Trustee. On the other hand, if the stay relief is not granted, unquestionably the Trustee will argue that the FDIC-R's property rights have been substantially limited.[6]

### A. Exercise By the FDIC-R of Its Tax Rights Will Not Prejudice the Debtor's Estate

9. In submitting a Form 56-F to the IRS[7] and moving this Court for stay relief to permit the FDIC-R to exercise its Tax Rights, the FDIC-R does not seek to "one-up" the Trustee. As the FDIC-R has made abundantly clear, any tax refund that the IRS remits to the FDIC-R pursuant to Treas. Reg. § 301.6402-7 is not a determination of ownership, and the FDIC-R proposes to deposit any such refund that it receives into the Escrow Account, where it shall remain subject to court order after a judicial determination of ownership. In short, the FDIC-R seeks only to maintain the parties on

---

[6] Needless to say, the FDIC-R does not admit that in the absence of the filing of alternative consolidated tax returns, the Trustee's conduct can adversely affect the FDIC-R's ownership of the refund. Bankruptcy cannot affect ownership. The Trustee, however, has not agreed with this view, requiring that the FDIC-R file its Lift Stay Motion to preserve its rights, and avoid any assertion that the FDIC-R, by not acting, has in any way waived its rights to the tax refunds in issue.

[7] The submission of the Form 56-F and its effect – or, rather, the lack thereof – on the Debtor's estate is set forth in detail in the FDIC-R's Objection to the Automatic Stay Motion.

equal footing pending future determination of the ownership of the tax refund, either by adversary proceeding before this Court or litigation before another tribunal with requisite jurisdiction.

10. The Trustee overstates the potential for a "slippery slope" should the Court grant the FDIC-R relief from the automatic stay. *See* Trustee's Objection, at 28 (citing to *Sunshine Dev., Inc. v. FDIC*, 33 F.3d 106, 114 (1st Cir. 1993)). This Court may fashion the stay relief in a way in which it deems appropriate. *See In re Myers*, 491 F.3d 120, 128 (3d Cir. 2007) ("[B]ankruptcy courts have 'wide latitude in crafting relief from the automatic stay, including the power to grant retroactive relief from the stay'....") (citation omitted).

**B.　The FDIC-R Will Suffer Substantial Hardship If It Cannot Exercise Its Tax Rights, and This Hardship Outweighs Any Alleged Detriment to the Debtors' Estate**

11. The Trustee's actions demonstrate that he, not the FDIC-R, seeks to gain an advantage with respect to the tax refund in issue, to prejudice the FDIC-R. In causing the tax return to be filed (original and as amended) based on DFC's alleged and "exclusive" deduction for its purported lost investment in Downey S&L, the Trustee has taken overt steps to eviscerate a claim to a refund based on the NOLs of Downey S&L, thereby seeking to directly and adversely affect the FDIC-R's property rights.[8] For this reason, mere agreement to put any tax refund that the Trustee receives into escrow,

---

[8] The Trustee's reliance on his "alternative ground" for refund (*i.e.*, based on Downey S&Ls NOLs) is no consolation in this regard, as this "backup" theory of recovery does little in the way of ameliorating the Trustee's apparent intent (as demonstrated by his refusal to agree to the stipulation proposed by the FDIC-R) to treat remittance of any tax refund to the Debtor's estate as conclusive of ownership. Recognizing that his worthless stock treatment is shaky at best, the Trustee is simply hedging his bets – if the IRS disagrees with the Trustee's worthless stock theory, the refund will not be denied because Downey S&L's NOLs provide a refund in the same amount, and thus the Trustee will "win" in any event. This hedging is not an ameliorative tactic, but rather one that seeks to undermine the FDIC-R's ownership rights to the refund.

7

without any corresponding stipulation that reserves the parties' rights to the refund, fails to adequately preserve the FDIC-R's bona fide claim to ownership. The relief that the FDIC-R seeks in its Lift Stay Motion is necessary to level the playing field until an appropriate determination of ownership can be made.

12. In apparent recognition of the fact that he seeks to prejudice the FDIC-R's rights, the Trustee makes the simplistic statement that bankruptcy changes parties' rights, citing entirely distinct cases and circumstances. Even accepting as true that a debtor's filing for bankruptcy protection delays or otherwise affects a non-debtor party's rights under non-bankruptcy law, bankruptcy does not change a non-debtor party's *ownership* rights. The mere filing for bankruptcy does not confer upon DFC ownership rights in the tax refunds that it did not have before this case commenced. *See, e.g., SEC v. Sherman*, 406 B.R. 883, 887 (C.D. Cal. 2009) ("It is well established that a trustee cannot avoid his obligation to return funds he held in trust for a third party by filing for bankruptcy."). Nor should "[t]he remaining ... creditors [] be permitted to share in monies in which the debtor has no direct financial interest and which it would not have been permitted to retain for its own use."[9] *See In re Columbia Gas Systems Inc.*, 997 F.2d 1039, 1061 (3d Cir. 1993).

13. As explained in the Objection, the Trustee's reliance on cases such as *In re Flying J. Inc.*, No. 08-133484 MFW (Bankr. D. Del. December 28, 2009), and *Segal v. Rochelle*, 382 U.S. 375, 380 (1996), to support his proposition that any tax refund generated from the carryback of the Debtor's loss is "sufficiently rooted in the pre-bankruptcy past" to make it property of the estate is misplaced. *See* Objection, ¶¶ 65-66.

---

[9] This takes on added significance in the case at bar given that the Bondholders may be structurally subordinated to the creditors of Downey S&L, and thus the FDIC-R. *See* Downey Financial Corp., Prospectus Supplement (To Prospectus dated December 1, 2000), at S-14.

8

In citing to these cases, the Trustee skirts the fundamental issue: the fact that DFC, as a mere agent for Downey S&L, holds any such refunds *in trust* for Downey S&L and *has no equitable interest in the refund*. Without this requisite equitable interest, the refund cannot constitute "property" of the estate.

14. In light of the foregoing, and the lack of corresponding prejudice that the grant of stay relief will have on the Debtor's estate – particularly given its questionable (at best) property interest in the tax refunds and the fact that the FDIC-R has agreed to deposit any refunds that it may receive into the Escrow Account – the hardship that denial of stay relief will pose on the FDIC-R considerably outweighs any alleged hardship to the Debtor. The Lift Stay Motion should be granted.

C. **The FDIC-R Has Met Its Burden to Establish That This Court Should Annul the Automatic Stay as Applied to the Filing of the Form 56-F**

15. As the Trustee acknowledges, the Third Circuit recognizes a bankruptcy court's power to retroactively rehabilitate even *void ab initio* stay violations by exercising its power to "annul" under § 362(d) of the Bankruptcy Code. *See In re Siciliano*, 13 F.3d 748, 751 (3d Cir. 1994), *remanded to* 167 B.R. 999 (Bankr. E.D. Pa. 1994); *Myers*, 491 F.3d 120. The decision to annul the automatic stay is a matter left to the discretion of the bankruptcy court, and may be reversed only for abuse of that discretion. *Myers*, 491 F.3d at 128. There is no exhaustive list of factors that a court may consider when making this determination. *See id.* at 129.

16. The case law cited by the Trustee on this point is inapposite. Each of the cases cited by the Trustee involves attempts to divest the debtor's estate of property or to

9

evade the Bankruptcy Court and the strictures of the Bankruptcy Code.[10] Unlike the factual situations in the cases cited by the Trustee, in filing the Form 56-F, the FDIC-R has merely provided statutorily authorized notice to the IRS of the Downey S&L receivership. The FDIC-R has not acted to collect a debt, nor has it commenced a separate legal proceeding. Indeed, it would be height of folly for one arm of the Government (the IRS) not to know what another arm of the government (the FDIC-R) was doing. Yet, this is the very position that the Trustee appears to advance. The Trustee appears to appreciate the perfunctory nature of the Form 56-F, given his two-month delay in asserting that its submission constitutes a stay violation. Under these circumstances, and even assuming *arguendo* that the Court could determine that the filing of the Form 56-F violated the stay, exercise of the Court's discretion to retroactively annul the violation would be warranted.

## II. EXERCISE OF THE TAX RIGHTS DOES NOT AFFECT "PROPERTY" OF THE ESTATE PROTECTED BY THE AUTOMATIC STAY UNDER 11 U.S.C. § 362

17. The Trustee claims that DFC and Downey S&L are parties to a debtor-creditor, rather than agency, relationship. This assertion is infirm both as a matter of fact and as a matter of law. As already explained at length in the FDIC-R's Objection, the issue of whether a principal-agent relationship exists – and the corresponding issue of

---

[10] *See Raymark Industries, Inc. v. Lai*, 973 F.2d 1125 (3d Cir. 1992) (Bankruptcy Court could enjoin state court proceeding); *In re Shamblin*, 890 F.2d 123 (9th Cir. 1989 ) (a tax deed obtained from the state court by deceit); *In re Murray*, 193 B.R. 20 (Bankr. E.D. Cal. 1996) (the IRS actively continued to assess the tax liabilities of the debtor); *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 31 F.3d 1020 (10th Cir. 1994) (OTS sought to extract money from the debtor); *Shubert v. Premier Paper Prods., LLC (In re Am. Tissue)*, 2007 Bankr. LEXIS 4004 (Bankr. D. Del. Nov. 20, 2007) (parties who were "instrumental" in the bankruptcy proceedings effected a post-petition transfer of debtor's property); *In re Hawk*, 314 B.R. 312 (Bankr. D.N.J. 2004) (creditor filed an action in state court in express contravention of terms of confirmed Chapter 13 plan); *Kim v. Upper Darby Twp. (In re Kim)*, 2008 Bankr. LEXIS 429 (Bankr. D. N.J. Feb. 14, 2008) (judicial sale of the debtor's property); and *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969 (1st Cir. 1997) (post-petition entry of a state court default judgment).

whether the Debtor's estate has an equitable interest, as opposed to mere legal title, in the tax refund – is just one of the myriad complex issues that must be resolved by way of a plenary proceeding, rather than a motion. *See* Objection, ¶ 58. Nevertheless, the Trustee's assertions cannot go unaddressed, especially since the FDIC-R has a bona fide claim of ownership to the tax refund such that the refunds do not constitute "property" of the Debtor's estate subject to the operation of the automatic stay under § 362. As further elaborated on below (and set forth in greater detail in the Objection at ¶¶ 58 to 72), these issues, once they become ripe for decision, will be decided in favor of the FDIC-R.

### A. DFC Is a Mere Agent of Downey S&L, and Therefore Has No Equitable Interest in the Tax Refund

18. A bankruptcy estate includes all property of the debtor, but only to the extent of the debtor's equitable interest in such property. *See* 11 U.S.C. § 541(d). As demonstrated in both the FDIC-R's Lift Stay Motion and the Objection, to the extent that the Trustee receives any tax refund on account of his amended returns, he does so as agent only, and holds the funds in trust for Downey S&L – the DFC estate thereby obtains no equitable interest in the property. *See Beiger v. IRS*, 496 U.S. 53, 59 (1990). A trust *res* does not become "property" of the agent/trustee's estate upon its filing of a bankruptcy petition. *See Columbia Gas*, 997 F.2d at 1059. This exclusion of a trust *res* from estate property applies equally to constructive trusts and to express trusts. *See Columbia Gas*, 997 F.2d at 1059; *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994) (quoting *Columbia Gas*); *see also* 5 Collier on Bankruptcy ¶ 541.11[7] (15th ed. rev. 2009).

19. As a common parent filing consolidated tax returns on behalf of the Consolidated Group in accordance with applicable Treasury Regulations,[11] DFC (and the Trustee in DFC's shoes) serves merely as an agent for the Consolidated Group.[12] *See* 26 C.F.R. § 1.1502-77(a)(1)(i); *see also* Policy Statement, Reply Cyganowski Declaration, Ex. B. Indeed, as required by the Policy Statement issued by the four federal bank regulatory agencies in 1998, the parent that files consolidated returns on behalf of a bank subsidiary acts solely as *agent* for the bank subsidiary with respect to tax matters and the bank subsidiary's share of the tax refund remains, at all times, *property of the bank subsidiary*:

> a parent company that receives a tax refund from a taxing authority obtains these funds *as agent for the consolidated group on behalf of the group members*. Accordingly, an organization's tax allocation agreement or other corporate policies *should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent*.

*See* Policy Statement, Reply Cyganowski Declaration, Ex. B. (emphasis added).

---

[11] As explained in the Lift Stay Motion and Objection, DFC, as agent, may be replaced by, *inter alia*, the FDIC-R, in its capacity as a fiduciary for a failed depository institution. *See* 26 U.S.C. § 6402; 26 C.F.R. § 301.6402-7; 26 C.F.R. § 1.1502-77(g). The Trustee's assertion of a claim for a refund based upon DFC's losses, rather than Downey S&L's losses, does not divest the FDIC-R of its rights under § 6402 of Title 26 of the United States Code. Any purported losses that DFC incurred due to its "worthless stock" in Downey S&L are purely derivative of Downey S&L's losses. *See In re Prudential Lines Inc.*, 114 B.R. 27, 31 (Bankr. S.D.N.Y. 1990). Indeed, the type of loss that the Trustee claims could not have occurred "but for" Downey S&L's losses. *See id.* As a result, any refund remitted to DFC is "attributable" to losses of an insolvent corporation within the scope of § 6402(k). In any event, the theory of recovery put forth before the IRS is irrelevant, as, under the express language of § 6402(k), the IRS has the discretion to pay a refund to the fiduciary of an insolvent corporation "to the extent that *the Secretary determines* that the refund is attributable to losses or credits of such insolvent corporation." *See* 26 U.S.C. § 6402(k) (emphasis added).

[12] The Trustee *expressly* acknowledges this fact in the attachment to his amended claim for refund, stating, among other things, that "[t]he filing of a bankruptcy petition by a common parent of an affiliated group of corporations does not terminate *the parent's status as agent for the group*." *See* Claims for Refund for Overpayments in Federal Income Tax for the Calendar Years Ending December 31, 2003, 2004, 2005, 2006 and 2007 (a copy of which is annexed as Exhibit "C" to the Reply Cyganowski Declaration, to be filed under seal or as otherwise directed by the Court).

### B. The Tax Sharing Agreement Does Not Alter DFC's Status as Mere Agent of Downey S&L

20. As the FDIC-R has already established in its moving papers, and the Trustee concedes by not challenging, a refund that is attributable to the earnings and payment history of one member of an affiliated group is owned by that member. *See* Objection, at ¶ 68 (citing cases).

21. The Trustee baldly asserts, however, that the existence of a tax sharing agreement necessarily alters this common law rule. Rather, this common law rule is altered only if the terms of the agreement *override* the rule, and even then the court must look to the economic reality of the transaction rather than the words used in the agreement to determine if the parties intended a relationship contrary to the rule. *See BSD Bancorp, Inc. v. FDIC*, Case No. 93-12207-A11, at 10-11 (S.D. Cal. 1995) (a copy of the opinion is attached as Exhibit "D" to the Reply Cyganowski Declaration). In other words, a tax sharing agreement only alters the common law rule if it embodies a *contrary* agreement of the parties. *See, e.g., Franklin Savings Corp. v. Franklin Savings Assoc. (In re Franklin Savings Corp.)*, 159 B.R. 9 (Bankr. D. Kan. 1993) (interpreting the use of the words "reimbursement" and "credits" in a tax sharing agreement to form a contrary agreement).

22. The Tax Sharing Agreement in this case contains no such contrary agreement, nor could it – as a regulated entity, Downey S&L's Tax Sharing Agreement had to conform to the Policy Statement. The cases to which the Trustee cites in support of his argument that a tax sharing agreement alters the common law rule are thus of no avail in this instance. *See* Trustee's Objection, ¶¶ 18-19.

23. In fact, the Tax Sharing Agreement reinforces, rather than undermines, the principal-agent relationship between Downey S&L and DFC, and is replete with provisions that preserve Downey S&L's ownership interests in its share of any refund that is remitted to the Consolidated Group. Among other things:

- the Tax Sharing Agreement fully preserves the rights of the Consolidated Group members had they filed separately, providing that "[i]n no instance shall the allocation of tax liability to any member of the Affiliated Group pursuant to this Agreement be less favorable than the tax liability which would result from such member filing a separate tax return." *See* Tax Sharing Agreement, Reply Cyganowski Declaration, Ex. A at § 2.1(d); *compare id.* at § 2.1(e) ("Estimated tax payments made by members of the Affiliated Group shall not exceed the amount which would be due and currently payable to taxing authorities if such Affiliated Group member had filed a separate tax return");

- the Tax Sharing Agreement fully preserves each member's NOLs, providing that "[i]f any Affiliated Group member would have benefited from a carryback of an unused loss or tax credit on a separate-return basis, such benefit shall be reflected in the allocation of taxes pursuant to this Agreement." *See id.* at § 2.1(g); and

- in the event that the consolidated tax liability is adjusted for any taxable period such that a refund is paid to the Consolidated Group, § 2.1(h) of the Tax Sharing Agreement requires that DFC remit to each member "its

share of the refund," as determined under the Tax Sharing Agreement. *See id.* at § 2.1(h) (emphasis added).

24. These provisions of the Tax Sharing Agreement are consistent with the dictates of the Policy Statement. This is to be expected, as engaging in any practice that is not consistent with the Policy Statement has the potential to be viewed by bank regulators as an "unsafe and unsound" practice. *See* Policy Statement, Reply Cyganowski Declaration, Ex. B. If a bank is adjudged by regulators to operate in an "unsafe and unsound" manner, the bank and its parent holding company may be subject to informal or formal regulatory enforcement action. *See id.*

25. Indeed, in recognition of this fact, DFC *did* ensure that the Tax Sharing Agreement complied with the 1998 Policy Statement, and that DFC's actual tax sharing practices in turn complied with the Tax Sharing Agreement. In a Memorandum dated December 2, 1998 from DFC's Director of Regulatory Affairs, Lillian Gavin, to the DFC Tax Director and certain members of executive management, Ms. Gavin stated her belief that "[DFC's] existing tax sharing agreement complies with the newly issued guidance" but nonetheless requested further review of the attached guidance to determine "if any revisions [to the Tax Sharing Agreement] are necessary." (A copy of the Memorandum is attached as Exhibit "E" to the Reply Cyganowski Declaration.) No changes were thereafter made.

26. This course of conduct is hardly the "sin quo non of a debtor-creditor relationship" that the Trustee claims. *See* Trustee's Objection, ¶1. To the contrary, it is quite apparent that DFC acknowledged and adhered to its status as mere agent for Downey S&L with respect to tax matters – a relationship that the Trustee has

15

acknowledged – and its corresponding duty to turn over tax refunds to Downey S&L, consistent with the Tax Sharing Agreement, the Policy Statement, and applicable statutory and common law. The Tax Sharing Agreement underscores, not undermines, the principal-agent relationship between DFC and Downey S&L that common law requires.

### C. The Trustee's Claim for Refund Based on DFC's Purported Loss Does Not Affect Downey S&L's Ownership Rights

27. Contrary to prior practice, the directives contained in the Policy Statement, the terms of the Tax Sharing Agreement, and the fact that a touchstone of a principal-agent relationship is that an agent is a fiduciary for its principal,[13] the Trustee nonetheless filed a claim for a refund on behalf of the Consolidated Group that sought to carryback DFC's purported NOLs, without previously consulting with the FDIC-R as required by the Tax Sharing Agreement[14] or subsequently notifying the FDIC-R of his actions. In so acting, the Trustee abrogated his duties as agent to Downey S&L and acted adversely to the FDIC-R's interests.

28. Nevertheless, the theory that forms the basis for the Trustee's claim for refund – worthless stock – does not change the fact that Downey S&L, not DFC, is the proper owner of the tax refund. Obviously, a taxpayer is only entitled to receive a refund to the extent that it previously paid any taxes "to refund." *As established by the FDIC-R in its moving papers, however, DFC never paid any taxes.* DFC merely collected tax

---

[13] *See, e.g., Jack Eckerd Corp. v. Dart Group Corp.*, 621 F.Supp. 725, 732 (D. Del. 1985).

[14] *See* Tax Sharing Agreement, Reply Cyganowski Declaration, Ex. A, § 2.4(b) (requiring that DFC "promptly notify the members of the Affiliated Group of any tax liability or refund issue, and shall advise and consult in good faith with such members with respect to contest, compromise or settlement thereof"); *see also id.* §§ 2.4(a)(i)(A) (requiring DFC to "consider in good faith any treatment proposed by the Affiliated Group members"); 2.4(a)(i)(C) (providing that "[DFC] shall not unreasonably withhold its consent to any elections which members of the Affiliated Group desire to make"); 2.5 (setting forth DFC's duty of cooperation at all times during which the Tax Sharing Agreement is in force).

16

payments from members of the Consolidated Group and then remitted these payments to taxing authorities. As such, DFC is not entitled to a tax refund under any theory. Income taxes were assessed due to Downey S&L's operations, and it is Downey S&L that paid the "overpayments" on which any refund may be based. As such, any claim for refund is attributable to Downey S&L's earnings history and its funding of tax payments, not DFC's. Downey S&L, not DFC, is the owner of any refund of amounts previously paid.

29. Tellingly, the Trustee has not provided a single piece of evidence to refute the evidence submitted by the FDIC-R that demonstrates that Downey S&L funded substantially all of the tax payments made by the Consolidated Group in all relevant years by paying its share of the tax liability (and, generally speaking, more than those amounts) to DFC.[15] The Trustee nevertheless repeatedly claims that "the Debtor paid all of the taxes and . . . [Downey S&L] meticulously reimbursed [DFC] for taxes paid by the latter." *See* Trustee's Objection, ¶1. This is a mischaracterization of the process by which taxes were paid by the Consolidated Group. According to information available to the FDIC-R and the Trustee, under the process utilized, DFC would simply collect checks from members of the Consolidated Group in payment of their individual taxes, and then use these payments to write one check (or permit a wire transfer of the funds it thus received) to the applicable tax authority as agent for the group. *See* Email from Karen Buck to Jeff De Lapp *et al.* (a copy is attached to the Reply Cyganowski Declaration as Exhibit "F").

---

[15] *See* Declaration of Stephen H. Wasserman, sworn to January 4, 2010 (the "Wasserman Declaration")(Docket # 288).

30. In the Third Circuit, "mere conduits" like DFC only hold the funds at issue in trust for the appropriate beneficiary.[16] *See, e.g., In re Penn Cent.*, 486 F.2d 519, 523-34 (3d Cir. 1973)(collecting railroad was merely a receiving and transmitting agent and held monies owed to other railroads in trust until the monies were transmitted); *Columbia Gas*, 997 F.2d at 1059 (stating that "Congress intended that when a debtor is a mere conduit for funds to travel from one party to another, it lacks an equitable interest in the monies"); *cf. In re Lenox Healthcare, Inc., et al.*, 343 B.R. 96, 104 (Bankr. D. Del. 2006)(insurance company was not a "mere conduit" because the debtor reimbursed the company for its advance payment of employee claims, and thus the transfers did not merely flow through the insurance company to the health care providers).

31. The simple fact that, in the interest of administrative convenience, DFC wrote the checks to the IRS, does not change Downey S&L's underlying ownership rights. *See Bob Richards*, 473 F.2d at 265; *see also Columbia Gas*, 997 F.2d at 1062 ("Columbia's property rights in the refunds should not depend on the government's role, if any in routing this money to the proper recipient").

## CONCLUSION

32. By reason of the foregoing, and the prior proceedings and papers previously filed by the FDIC-R in this case, the Lift Stay Motion should be granted.

---

[16] According to the Third Circuit in *Columbia Gas*, federal common law provides a "more expansive" definition of constructive trust and "imposes a trust when an entity acts as a conduit, collecting money from one source and forwarding it to its intended recipient." *See Columbia Gas*, 997 F.2d at 1056. In that case, the Third Circuit placed significance on the fact that federal law defines the parameters of § 541(d) of the Bankruptcy Code and reasoned that whether refunds were held in trust and therefore excluded from the bankruptcy estate "sufficiently implicates important federal interests to warrant the application of federal common law." *See id.* at 1055. The Second Circuit's opinion in *In re First Central Financial Corporation* reflects a far more restrictive view of constructive trust than the Third Circuit. *See First Cent.*, 377 F.3d 209 (2d Cir. 2004)(holding that in the absence of overreaching or breach of fiduciary duty in the creation or implementation of the tax sharing agreement, the agreement will be given effect and a constructive trust will not be imposed). In any event, *First Central* is distinguishable because the Tax Sharing Agreement here does not alter the common law rule, but rather reinforces the existence of a principal-agent relationship.

Dated: January 19, 2010

BAYARD, P.A.

*/s/ Daniel O'Brien*

Neil B. Glassman (No. 2087)
Charlene D. Davis (No. 2336)
Daniel A. O'Brien (No. 4897)
222 Delaware Ave., Suite 900
Wilmington, Delaware 19899
Tel.: (302) 655-5000
Fax: (302) 658-6395

-and-

OTTERBOURG, STEINDLER,
HOUSTON & ROSEN, P.C.
Peter Feldman
Melanie L. Cyganowski
(Admitted *Pro Hac Vice*)
230 Park Avenue
New York, New York 10169
Tel.: (212) 661-9100
Fax: (212) 682-6104

*Counsel for the Federal Deposit Insurance Corporation, in its Capacity as Receiver*