## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DOWNEY FINANCIAL CORP., | ) | |
| | ) | Case No. 08-13041 (CSS) |
| Debtor. | ) | Jointly Administered |
| | ) | |

### OPINION[1]

CROSS & SIMON LLC
Christopher P. Simon
913 North Market Street
Wilmington, DE  19801-1380

LOWENSTEIN SANDLER PC
Michael S. Etkin
Ira M. Levee
65 Livingston Avenue
Roseland, NJ  07068

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
Willow E. Radcliffe
Eli R. Greenstein
100 Pine Street, Suite 2600
San Francisco, CA  94111

Stacey M. Kaplan
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210

Lead Counsel for Lead Plaintiff
And the Putative Class

FOX ROTHSCHILD LLP
Sheldon K. Rennie
919 North Market Street, Suite 1300
Wilmington, DE  19899

Michael G. Menkowitz
William H. Stassen (Argued)
2000 Market Street, 10th Floor
Philadelphia, PA  19103-3291

Raymond M. Patella
1301 Atlantic Avenue
Midtown Building – Suite 400
Atlantic City, NJ  08401

Attorneys for Montague S. Claybrook
Chapter 7 Trustee for the Estate of
Downey Financial

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

ASHBY & GEDDES
William P. Bowden
Stacy L. Newman
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899

MORRISON & FOERSTER LLP
Melvin R. Goldman
Adam A. Lewis (Argued)
425 Market Street
San Francisco, CA  94105-2482

Dan Marmalefsky (Argued)
James Oliva
555 West Fifth Street
Los Angeles, CA  90013-1024

Attorneys for defendants Maurice
L. McAlister, Daniel D. Rosenthal,
Brian E. Côté, Michael B. Abrahams,
Michael D. Bozarth, Gary W. Brummett,
James H. Hunter, G. Brent McQuarrie,
Lester C. Smull, Jane Wolfe and
Cheryl E. Olson

DRAPER & GOLDBERG, PLLC
Brian Arban
Adam Hiller
Michelle Berkeley-Ayres
1500 North French Street, 2nd Floor
Wilmington, DE  19801

OTTERBOURG STEINDLER
HOUSTON & ROSEN, P.C.
Williams M. Silverman
Melanie L. Cyganowski (Argued)
Jeffrey K. Cymbler
230 Park Avenue
New York, NY  10169

Attorneys for Federal Deposit
Insurance Corporation

Dated:  May 7, 2010

Sontchi, J. _Clfohn Shtl_____

## **INTRODUCTION**

The first issue before the Court is whether the proceeds of a directors and officers

(D&O) liability insurance policy are property of the estate.  If the policy proceeds are

property of the estate, the Court must decide: (1) whether cause exists to lift the

automatic stay to allow the insured directors and officers to access the policy proceeds;

and (2) whether the trustee's various professional responsibility claims are properly before the Court.

For the reasons set forth below, the Court holds that the policy proceeds in this case are not property of the estate.  Moreover, even if the policy proceeds were property of the estate, the Court would find that cause exists to lift the automatic stay.  Finally, the Court finds that the Trustee's professional responsibility claims are not properly before the Court.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## STATEMENT OF FACTS

A group of eleven former officers and directors (the "Insureds")[2] of chapter 7 debtor Downey Financial Corp. ("Debtor") move this Court for entry of an order stating that the automatic stay does not bar the use of the proceeds of a liability insurance policy, or in the alternative, for entry of an order granting stay relief for the purpose of accessing the insurance proceeds.[3]

---

[2] The former directors and officers are Maurice L. McAlister, Daniel D. Rosenthal, Brian E. Côté, Michael B. Abrahams, Michael D. Bozarth, Gary W. Brummett, James H. Hunter, G. Brent McQuarrie, Lester C. Smull, Jane Wolfe, and Cheryl E. Olson.

[3] Insureds' Motion for Determination that Stay Does Not Bar the Use of Insurance Proceeds or for Stay Relief to the Extent that it Does [D.I. 161] (hereinafter "Insureds' Motion").

**1. The Liability Insurance Policy**

In July 2007, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") issued Executive and Organization Liability Policy No. 599-65-69 (the "Policy").[4]  The Policy covers Claims (as defined below) made from July 7, 2007 to July 1, 2008 (the "Policy Period").  The Policy's overall limit for all Loss under the Policy is, in the aggregate, $10 million.[5]  The Policy provides the following coverages relevant to this motion:

> With respect to Coverage A, B and C, solely with respect to **Claim**s first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy affords the following coverage:

> **COVERAGE A: EXECUTIVE LIABILITY INSURANCE**

> This policy shall pay the **Loss** of any **Insured Person** arising from a **Claim** made against such **Insured Person** for any **Wrongful Act** of such **Insured Person**, except when and to the extent that an **Organization** has indemnified such **Insured Person**. Coverage A shall not apply to **Loss** arising from a **Claim** made against an **Outside Entity Executive**.

> **COVERAGE B: ORGANIZATIONAL INSURANCE**

> (i) *Organization Liability*: This Policy shall pay the **Loss** of any **Organization** arising from a **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**.

---

[4] A copy of the Policy can be found in Exhibit A of the Declaration of Dan Marmalefsky in Support of Insureds' Motion for Determination that Stay Does Not Bar Use of Insurance Proceeds or for Stay Relief to the Extent that It Does [D.I. 161] (hereinafter "Marmalefsky Declaration").

[5] *Id.*

(ii) *Indemnification of an Insured Person*: This policy shall pay the **Loss** of an **Organization** arising from a **Claim** made against an **Insured Person** (including an **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**, but only to the extent that such **Organization** has indemnified such **Insured Person**.[6]

Clause 2(b) of the Policy defines "Claim" to include any "Securities Claim,"[7] and Clause 2(y) defines "Securities Claim" to include securities class actions and shareholder derivative actions.[8]  Clause 2(p) defines "Loss" to include "Defense Costs,"[9] which are in turn defined as "reasonable and necessary fees, costs, and expenses consented to by

---

[6] Marmalefsky Decl., Ex. A [D.I. 161].

[7] *Id.* at 2.

[8] "Securities Claim" is defined in the Policy as follows:

> (y) "**Securities Claim**" means a **Claim**, other than an administrative or regulatory proceeding against, or investigation of an **Organization**, made against any **Insured**:
>
> > (1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:
> >
> > > (a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization**; or
> > >
> > > (b) brought by a security holder of an **Organization** with respect to such security holder's interest in securities of such **Organization**; or
> >
> > (2) brought derivatively on the behalf of an **Organization** by a security holder of such **Organization**.
>
> Notwithstanding the foregoing, the term "**Securities Claim**" shall include an administrative or regulatory proceeding against an **Organization**, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**.

*Id.* at 5.

[9] *Id.* at 4.

the Insurer . . . resulting from the investigation, adjustment, defense and/or appeal of a

Claim against an Insured."[10]    Clause 2(p) defines "Insured" to include any "Insured

Person," or, with respect to a Securities Claim, an "Organization."    Clause 2(t) defines

"Organization" to include Downey Financial Corp. ("Downey" or "Debtor") and its

subsidiaries, and Clause 2(o) defines "Insured Person" to include former officers and

directors of Downey or its subsidiaries.[11]

Clause 22 of the Policy, titled "Order of Payments," provides the following chain

of priority among the different coverages:

> In the event of **Loss** arising from a covered **Claim** for which payment is due
> under the provisions of this policy, then the **Insurer** shall in all events:
>
> > (a) first, pay **Loss** for which coverage is provided under Coverage
> > A and Coverage C of this policy; then
> >
> > (b) only after payment of **Loss** has been made pursuant to Clause
> > 22(a) above, with respect to whatever remaining amount of the
> > **Limit of Liability** is available after such payment, at the written
> > request of the chief executive officer of the **Named Entity**, either
> > pay or withhold payment of such other **Loss** for which coverage is
> > provided under Coverage B(ii) of this policy; then
> >
> > (c) only after payment of **Loss** has been made pursuant to Clause
> > 22(a) and Clause 22(b) above, with respect to whatever remaining
> > amount of the **Limit of Liability** is available after such payment, at
> > the written request of the chief executive officer of the **Named
> > Entity**, either pay or withhold payment of such other **Loss** for
> > which coverage is provided under Coverages B(i) and D of this
> > policy.

---

[10] *Id.* at 2.

[11] *Id.* at 4–5.

…

The bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this policy pursuant to this Clause 22.[12]

Clause 19 preserves this chain of priority in the event of bankruptcy:

Bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations hereunder.

It is further understood and agreed that the coverage provided under this policy is intended to protect and benefit the **Insured Persons**. Further, if a liquidation or reorganization proceeding is commenced by the **Named Entity** and/or any other **Organization** (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law (collectively "**Bankruptcy Law**") then, in regard to a covered **Claim** under this policy, the **Insureds** hereby:

(a) waive and release any automatic stay or injunction to the extent it may apply in such proceeding to the proceeds of this policy under such **Bankruptcy Law**; and

(b) agree not to oppose or object to any efforts by the **Insurer** or any **Insured** to obtain relief from any stay or injunction applicable to the proceeds of this policy as a result of the commencement of such liquidation or reorganization proceeding.[13]

The Policy further provides that a $1 million retention (the "Retention"), similar to a deductible, must be paid by others before the Policy will provide coverage.[14]

However, the Policy also provides that "[n]o Retention amount is applicable to . . . Non-Indemnifiable Loss."  Clause 2(s) defines "Non-Indemnifiable Loss" as "**Loss** for which

---

[12] *Id*. at 16.

[13] *Id*. at 15.

[14] *See id*. at Endorsement #3 (modifying Clause 6 of the Policy, *id*. at 9).

an **Organization** has neither indemnified nor is permitted or required to indemnify an

**Insured Person** pursuant to law or contract."[15]

In sum, this is a so-called "wasting" or "burning candle" policy, where payment

for any Loss covered under the Policy necessarily reduces the amount of proceeds

available to cover subsequent Losses.  The Policy provides three types of coverage:

1. Direct coverage to the directors and officers for Losses arising from covered
   Claims (Coverage A);

2. "Entity coverage," which covers organizational liability arising from covered
   Securities Claims (Coverage B(i)); and

3. "Indemnification coverage," which covers the costs the organization incurs
   indemnifying the directors and officers (Coverage B(ii)).

Prior to a bankruptcy filing, the Policy requires the officers and directors to first seek

indemnification from the organization for their defense costs.  The organization will

only be entitled to indemnification coverage under the Policy after it has exhausted the

$1 million Retention—that is, after it has paid $1 million in indemnification costs to the

Insureds.   However, once the organization files for bankruptcy, the officers and

directors' defense costs become "Non-Indemnifiable Loss[es]."[16]  Because the Retention

does not apply to Non-Indemnifiable Losses, once the organization files for bankruptcy,

---

[15] *Id.* at 4.

[16] This is so because a "Non-Indemnifiable Loss" includes any "Loss for which an Organization has
neither indemnified nor is permitted to indemnify an Insured Person pursuant to law or contract."
Policy, Clause 2(s).  Once an organization files for bankruptcy, the Bankruptcy Code prohibits the debtor
from indemnifying the officers and directors on an ongoing basis.  *See* 11 U.S.C. § 362(a)(3).  Thus, once an
organization files for bankruptcy, defense costs incurred by officers and directors become covered Losses
for which the organization is not permitted to indemnify the officers and directors "pursuant to law."

the Retention ceases to apply, and the officers and directors may seek coverage for their defense costs directly from the insurer under Coverage A, without regard to whether the $1 million Retention has been satisfied.

### 2. The Securities Class Action

In May and June 2008, two shareholder class action complaints were filed in the United States District Court for the Central District of California against the Debtor, its then-chairman, then-CEO, and then-CFO (three of the Insureds), alleging various violations of federal securities laws.  The district court consolidated these class actions and appointed a Lead Plaintiff (the consolidated class action will hereinafter be referred to as the "Securities Class Action").[17]  On November 25, 2008, the Debtor commenced this bankruptcy proceeding. The district court subsequently dismissed the FACC with leave to amend;[18] in the Second Amended Consolidated Complaint (SACC), the Debtor was not named as a defendant.[19]  On August 21, 2009, the district court dismissed the Lead Plaintiff's SACC with prejudice.[20]   Thus, the Securities Class Action is now terminated.

---

[17] *See In re Downey Securities Litigation*, United States District Court, Central District of California, Case No. CV-08-03261 JFW (RZx).

[18] Order Granting Mot. to Dismiss First Am. Consolidated Compl., No. 08-3261 (C.D. Cal. Mar. 18, 2009) [D.I. 66].

[19] Second Amended Consolidated Complaint, No. 08-3261 (C.D. Cal. Aug. 21, 2009) [D.I. 73].

[20] Order Granting Mot. to Dismiss Case Second Am. Consolidated Compl., No. 08-3261 (C.D. Cal. Aug. 21, 2009) [D.I. 83].

### 3.  The Derivative Action

In June 2008, two shareholder derivative actions were filed in California state court against the Debtor, as a nominal defendant, and the Debtor's then-current CEO, CFO, and directors (all of the Insureds).  The court consolidated these two shareholder derivative actions (the consolidated shareholder derivative action will hereinafter be referred to as the "Derivative Action"),[21] and ordered the filing of a consolidated amended complaint.  However, due to the substantial overlap between the Derivative Action and the Securities Class Action, the parties agreed to stay the defendants' response until the resolution of the motions to dismiss in the Securities Class Action.[22] Morrison & Foerster ("Morrison") appeared on behalf of both the Debtor, as the nominal defendant, and the Insureds for the purpose of agreeing to this stipulated stay order.  When the Debtor commenced this bankruptcy proceeding, any claim against the Debtor as a nominal defendant in the Derivative Action was stayed.  The trustee, on behalf of the Debtor's estate, has subsequently been substituted as the real party in interest in the Derivative Action.[23]  However, the trustee has still not filed a consolidated complaint, or taken any other action, in the Derivative Action.[24]

---

[21] *McDougall, Derivatively on Behalf of Downey Financial Corp. v. Rosenthal, et al.*, California Superior Court for Orange County, Lead Case No. 30-3008 00180029, Consolidated Case No. 20-2008 00087854.

[22] Supplemental Decl. of Dan Marmalefsky, Ex. B [D.I. 200].

[23] *Id.* at ¶ 15.

[24] *Id.*

**4.  The Bank Failure and the Insureds' Claims for Loss Under the Policy**

On November 21, 2008, the Office of Thrift Supervision (OTS) closed Downey Savings & Loan Association, F.A. ("Downey S&L") and appointed the FDIC as receiver of Downey S&L.[25]   Downey S&L was the principal subsidiary of the Debtor, and all eleven Insureds were also directors or officers of Downey S&L.  On November 25, 2008, the Debtor filed a voluntary petition seeking relief under Chapter 7 of the United States Bankruptcy Code in this Court.[26]   Prior to filing for bankruptcy, the Debtor was indemnifying the Insureds for their defense costs — specifically, the Debtor had indemnified the Insureds in the amount of $588,000.[27]   However, because the Debtor had not yet exhausted the Policy's $1 million Retention, the Debtor had made no claims for indemnification coverage under the Policy.  The Debtor ceased indemnifying the Insureds once it filed for bankruptcy.[28]

## ANALYSIS

The threshold issue is whether the Policy proceeds are property of the estate.  If the proceeds are not property of the estate, then National Union would not be violating the automatic stay by paying the Insureds' defense costs.  If, however, the proceeds are property of the estate, then the Court must decide: (1) whether to grant the Insureds

---

[25] Objection of the Federal Deposit Insurance Corporation to Insureds' Motion for Determination that Stay Does Not Bar Use of Insurance Proceeds or for Stay Relief to the Extent that it Does, at 8 [D.I. 194] (hereinafter "FDIC Objection").

[26] Chapter 7 Voluntary Petition, Downey Financial Corp. [D.I. 1].

[27] Insureds' Motion, ¶ 11 [D.I. 161].  As Morrison represented the Insureds in the Securities Class Action, the $588,000 in defense costs was paid to Morrison.

[28] *Id.*

relief from the automatic stay to access the Policy proceeds; and (2) whether to address the trustee's claim that Morrison & Foerster has an unwaivable conflict of interest.

### 1. The Policy Proceeds

A debtor's liability insurance policy is considered property of the estate.[29] "However, the courts are in disagreement over whether the proceeds of a liability insurance policy are property of the estate."[30] Cases determining whether the proceeds of a liability insurance policy are property of the estate are controlled by the language and scope of the specific policies at issue.[31]

---

[29] *See e.g., Acands, Inc. v. Travelers Cas. and Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) ("It has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate" (citing *Estate of Lellock v. The Prudential Ins. Co. of Am.*, 811 F.2d 186, 189 (3d Cir. 1987)); *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1399 (5th Cir. 1987); *In re SN Liquidation, Inc.*, 388 B.R. 579, 583–584 (Bankr. D. Del. 2008) ("Insurance policies purchased and paid for by a debtor are property of the estate."); *In re World Health Alternatives, Inc.*, 369 B.R. 805, 809 (Bankr. D. Del. 2007) ("It is clear that insurance policies purchased and paid for by a debtor are property of the estate."); *In re Allied Digital Technologies Corp.*, 306 B.R. 505, 509 (Bankr. D. Del. 2004) ("In fact an overwhelming majority of courts have concluded that liability insurance policies fall within § 541(a)(1)'s definition of estate property.") (internal quotations omitted) (citing *In re Matter of Vitek, Inc.*, 51 F.3d 530, 533 (5th Cir. 1995)).

[30] *In re Allied Digital*, 306 B.R. at 509; *see In re SN Liquidation*, 388 B.R. at 584 ("Who owns the proceeds of an insurance policy presents a more complicated issue and requires a more careful analysis."); *In re CyberMedica, Inc.*, 280 B.R. 12, 16 (Bankr. D. Mass. 2002) (observing that "courts are in disagreement on whether or not insurance *proceeds* are property of the estate.") (emphasis in original); *e.g., In re Adelphia Communications Corp.*, 298 B.R. 49 (S.D.N.Y. 2003) (holding that the proceeds of a liability insurance policy were not property of the estate); *In re First Central Financial Corp.*, 238 B.R. 9 (Bankr. E.D.N.Y. 1999) (same); *but see In re Circle K Corp.*, 121 B.R. 257 (Bankr. D. Ariz. 1990) (holding that the proceeds of a liability insurance policy were *not* property of the estate).

[31] *See In re Allied Digital*, 306 B.R. at 509 (stating that cases determining whether the proceeds of a liability policy are property of the estate "are controlled by the language and scope of the policy at issue not by broad, general statements."); *In re Medex Regional Laboratories, LLC*, 314 B.R. 716, 720 (Bankr. E.D. Tenn. 2004) ("In making its determination, the court must analyze the facts of each particular case, focusing primarily upon the terms of the actual policy itself.") (internal quotations omitted); *In re CyberMedica*, 280 B.R. at 16 ("Whether the proceeds of a D&O liability insurance policy is property of the estate must be analyzed in light of the facts of each case.").

When a debtor's liability insurance policy only provides direct coverage to the debtor, courts generally hold that the proceeds are property of the estate.[32]  Conversely, when the liability insurance policy only provides direct coverage to the directors and officers, courts generally hold that the proceeds are not property of the estate.[33]  When the liability insurance policy provides direct coverage to both the debtor *and* the directors and officers, "the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution."[34]

Here, the Policy provides coverage to both the debtor and the directors and officers.  Specifically, the Policy provides: (1) direct coverage to the Insureds for damages and defense costs; (2) indemnification coverage to the Debtor; and (3) entity coverage to the Debtor.  Therefore, the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate, but only to the extent that the Policy's indemnification coverage or entity coverage actually protects the estate's other assets from diminution.

---

[32] *In re Allied Digital*, 306 B.R. at 512; *In re SN Liquidation, Inc.*, 388 B.R. at 584.

[33] *See e.g., In re Matter of Vitek, Inc.*, 51 F.3d at 535 ("[W]hen a debtor corporation owns a liability policy that *exclusively* covers its directors and officers, . . . the proceeds of that D&O policy are *not* part of the debtor's bankruptcy estate.") (emphasis in original); *In re Allied Digital*, 306 B.R. at 512 (finding that "when the liability insurance policy only provides direct coverage to the directors and officers the proceeds are not property of the estate.").

[34] *Id.*

a. <u>Entity Coverage</u>

The Policy in this case provides entity coverage, which covers losses arising from Securities Claims made against the Debtor. In *In re Allied Digital Technologies Corp.*, this Court stated:

> [W]hen there is coverage for the directors and officers and the debtor, the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution.[35]

Where a liability insurance policy includes entity coverage, but there are no covered Securities Claims outstanding, courts have generally held that the insurance proceeds are not property of the estate.[36]

In *Allied Digital*, the Court noted that all securities claims against the debtor had already been adjudicated or were barred by the applicable statute of limitations. The Court reasoned that because "[t]he Trustee has made no credible showing that the direct coverage of Allied Digital under Clause B(i) for securities claims has any

---

[35] *Id.*

[36] *E.g., In re Allied Digital*, 306 B.R. at 513 (holding that the policy proceeds were not property of the estate because "[t]he Trustee has made no credible showing that the direct coverage of Allied Digital under Clause B(i) for securities claims has any continuing vitality"); *In re Medex*, 314 B.R. at 722–723 (holding that liability insurance proceeds were not property of the estate because there were no covered securities claims outstanding, which meant that the debtor "no longer enjoy[ed] any direct 'entity coverage' under the Policy."). The court's reasoning in *In re First Central Financial Corp.* is instructive:

> In this case, the estate is in no need of protection. During the eighteen months this bankruptcy case has been pending, there have been no claims filed against the Debtor which would implicate the narrow scope of the Policy's entity coverage. Indeed, no one has stepped forward to express any interest in suing the Debtor for a violation of securities laws. Nor has the Trustee intimated that any action against the Debtor is imminent or likely. We are skeptical that any individual or entity will ever emerge to assert such claims prior to the expiration of the discovery period in December, 1999.

238 B.R. at 17–18.

continuing vitality,"[37] the depletion of the policy proceeds would not have an adverse effect on the estate.   Similarly, in *Adelphia*, which also involved a D&O policy with entity coverage, the court emphasized that "none of the Debtors [have] made or committed themselves to payments using their entity coverage."[38]   Thus, the court concluded, the debtor had no property interest in the policy proceeds.[39]

In this case, a Securities Class Action was filed against the Debtor in federal court within the policy period.   However, the district court dismissed the plaintiffs' Second Amended Consolidated Complaint as to all the Insureds, with prejudice, on August 21, 2009.[40]   Moreover, the lead plaintiff in the Securities Class Action filed,[41] and this Court approved,[42] a motion allowing the lead plaintiff to dismiss the Securities Class Action as to the Debtor, and to withdraw the lead plaintiff's proof of claim.   Thus, the Securities Class Action is now terminated as to the Insureds and the Debtor.[43]   The Derivative Action was stayed as to the Debtor (as a nominal defendant) when the Debtor filed this bankruptcy proceeding.

---

[37] *In re Allied Digital*, 306 B.R. at 512–513.

[38] *In re Adelphia*, 298 B.R. at 53.

[39] *Id.*

[40] Order Granting Mot. to Dismiss Case Second Am. Consolidated Compl., No. 08-3261 (C.D. Cal. Aug. 21, 2009) [D.I. 83].

[41] Motion to Approve Stipulation Modifying the Automatic Stay, to the Extent Necessary, to Permit Lead Plaintiff to Dismiss the Securities Litigation With Prejudice as to the Debtor and Withdrawing Lead Plaintiff's Class Proof of Claim [D.I. 261].

[42] Order Approving Stipulation Modifying The Automatic Stay To The Extent Necessary, To Permit Lead Plaintiff To Dismiss The Securities Litigation With Prejudice As To The Debtor And Withdrawing Lead Plaintiff's Class Proof Of Claim [D.I. 271].

[43] Judgment, No. 08-3261 (C.D. Cal. August 27, 2009).

Accordingly, because there are no longer any covered Securities Claims pending against the Debtor,[44] the Debtor no longer enjoys any direct entity coverage.  Therefore, the Court finds that the Policy's entity coverage is no longer protecting the estate's other assets from diminution.

b.  Indemnification Coverage

In *Allied Digital*, the Court held that "when the liability policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds are not property of the bankruptcy estate."[45] *Allied Digital* involved a liability insurance policy that was nearly identical to the Policy in this case—both policies, in fact, were issued by the same insurer (National Union). The liability insurance policy in *Allied Digital*, like the Policy at issue here, provided direct coverage to the directors and officers for covered claims and defense costs, as well as indemnification coverage to the debtor.[46]   In determining whether indemnification had occurred, or was hypothetical or speculative, the Court noted that there had been no "actual payment of indemnified costs."[47]   Moreover, the trustee in *Allied Digital* had "neither indemnified nor intend[ed] to indemnify the directors and

---

[44] The Derivative Action was not stayed as to the individual directors and officers, however.

[45] *In re Allied Digital*, 306 B.R. at 512; *see In re SN Liquidation*, 388 B.R. at 584 (adopting *Allied Digital*'s analysis); *but see In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 420 (Bankr. E.D. Pa. 1995) ("Proceeds available for the Debtor's liability exposure are not segregated from the proceeds available to the directors and officers. Thus, the Debtor is indeed an insured and has a sufficient interest in the Proceeds as a whole to bring them into the estate.").

[46] *In re Allied Digital*, 306 B.R. at 510.

[47] *Id.* at 510 (emphasizing that the policy only provides indemnification coverage to the extent that the debtor "*has indemnified* the Directors and Officers of such Loss . . . .").

officers."[48]   Thus, the Court concluded that indemnification was purely hypothetical.[49]

Similarly, in *In re World Health Alternatives, Inc.*, this Court held that the policy proceeds

were not property of the estate because the debtor did not have a right to any Coverage

A proceeds, and there were no indemnification claims against the debtor.[50]

In this case, there has also been no "actual payment of indemnified costs."  The

Trustee argues that "[i]ndemnification by [the Debtor] has in fact occurred, and there

has been more than just a request be the directors and officers for indemnification."[51]

The Trustee relies on the following passage from *SN Liquidation*:

> Unlike the situation in *Allied Digital,* indemnification is not merely
> speculative in this case, but the defendants have made a formal request for
> indemnification . . . [and d]epletion of the insurance proceeds which
> results from indemnification for defense costs would adversely affect the
> Debtor's estate.[52]

While the Debtor had, in fact, indemnified the Insureds in the amount of $588,000 prior

to filing this bankruptcy proceeding, it had still not exhausted the Policy's $1 million

Retention.  Therefore, no indemnification *for which the Debtor would be entitled to coverage*

*under the Policy* has occurred.  Unless the Debtor would be entitled to coverage under

---

[48] *Id.* at 508.

[49] *Id.* at 512–513 ("The policy in question provides direct coverage to the directors and officers for claims and defense costs (which are real), and indemnification coverage to the company for amounts paid to the directors and officers (which is hypothetical)).

[50] *In re World Health,* 369 B.R. at 811.

[51] Chapter 7 Trustee's Objection to Motion of Directors and Officers for Determination that Stay Does Not Bar use of Insurance Proceeds or for Stay Relief to the Extent that It Does ("Trustee's Objection") [D.I. 193], at 8.

[52] *In re SN Liquidation*, 388 B.R. at 584.

the Policy, indemnification would not "adversely affect the Debtor's estate," because such indemnification would not deplete the Policy proceeds.

Similarly, in *Adelphia*, the district court held that the proceeds of a liability insurance policy that provided indemnification coverage and entity coverage were not property of the bankruptcy estate.[53]  The court in *Adelphia* concluded that the debtor did not have a property interest in the policy proceeds yet because "it has not been suggested that any of the Debtors has made any payments for which it would be entitled to indemnification coverage, or that any such payments are now contemplated."[54]  It is significant that the district court specifically addressed payments "for which [the debtor] would be entitled to indemnification coverage," because in this case, as indicated above, the Debtor had also not made any indemnification payments for which it would be entitled to indemnification coverage under the Policy.

Moreover, like in *Allied Digital*, the trustee in this case has not continued to indemnify the Insureds.[55]  This makes it extremely unlikely that any indemnification for which the Debtor would be entitled to coverage will ever occur.  In fact, it's even *less* likely than it was in *Allied Digital* that the Debtor will ever have a claim for indemnification coverage.  In *Allied Digital*, the liability insurance policy did not require the debtor to exhaust a retention amount before indemnification coverage kicked in.[56]

---

[53] *In re Adelphia*, 298 B.R. at 53–54.

[54] *Id*. at 53.

[55] Insureds' Motion, ¶ 11 [D.I. 161].

[56] *See In re Allied Digital*, 306 B.R. at 510 (describing the terms of the liability insurance policy at issue).

That means the indemnification coverage would have kicked in had the trustee paid just $1 in indemnification costs. Nevertheless, the Court concluded that the payment of even $1 in indemnification costs was sufficiently unlikely that the policy proceeds were not property of the estate. Here, the trustee would need to pay $412,000 in indemnification costs just to exhaust the Retention. So unlike in *Allied Digital*, where the relevant determination was the likelihood that the trustee would pay *any* indemnification costs, here the relevant determination is the likelihood that the trustee will pay *over $412,000* in indemnification costs. The Insureds have not, post-petition, sought indemnification from the Debtor for its defense costs.[57] The trustee has also given no indication that he plans to indemnify the Insureds.[58] Finally, the Insureds did not even file a proof of claim by the bar date.[59] Therefore, it's extraordinarily unlikely that the trustee will ever pay over $412,000 in indemnification costs—which, again, is the minimum amount that the trustee would have to pay indemnifying the Insureds to be entitled to indemnification coverage under the Policy.

Therefore, in light of both *Allied Digital* and *Adelphia*, the Court finds that indemnification in this case is hypothetical or speculative, and that the Policy's indemnification coverage, like its entity coverage, is no longer protecting the estate's other assets from diminution.

---

[57] Insureds' Motion, ¶ 11 [D.I. 161].

[58] *Id.*

[59] *Id.* at ¶ 13.

c. <u>Priority</u>

Section 541(a) "is not intended to expand the debtor's rights against others beyond what rights existed at the commencement of the case."[60]   Courts generally closely examine the debtor's rights under the terms of the liability insurance policy at issue[61] in order to determine whether holding that the policy proceeds are property of the estate would improperly "expand the debtor's rights against others beyond what rights existed at the commencement of the case."   In this case, the Policy provides a clear chain of priority among the three types of coverages.  Clause 22 of the Policy, titled "Order of Payments," provides:

> In the event of **Loss** arising from a covered **Claim** for which **Payment** is due under the provisions of this policy, then the **Insurer** shall in all events:

>> (a) first, pay **Loss** for which coverage is provided under Coverage A and Coverage C of this policy; then

>> (b) only after payment of **Loss** has been made pursuant to Clause 22(a) above, with respect to whatever remaining amount of the **Limit of Liability** is available after such payment, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of such other **Loss** for which coverage is provided under Coverage B(ii) of this policy; then

---

[60] *In re Bank-Line Group, LLC*, 359 B.R. 566 (Bankr. D. Del. 2007) (quoting 5 *Collier on Bankruptcy* § 541.04 (15th ed. 2006)); *see also Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 492 (B.A.P. 3d Cir. 1997) (stating that "without explicit federal preemption, the trustee does not have greater rights in the property of the estate than the debtor had before filing for bankruptcy.").

[61] *See In re Allied Digital*, 306 B.R. at 509 (stating that the cases examining whether the proceeds of D&O policies are property of the estate "are controlled by the language and scope of the policy at issue not by broad, general statements"); *accord In re SN Liquidation*, 388 B.R. at 584; *In re World Health*, 369 B.R. at 811.

> (c) only after payment of **Loss** has been made pursuant to Clause 22(a) and Clause 22(b) above, with respect to whatever remaining amount of the **Limit of Liability** is available after such payment, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of such other **Loss** for which coverage is provided under Coverages B(i) and D of this policy.
>
> …
>
> The bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this policy pursuant to this Clause 22.[62]

To the extent the Trustee has *any* interest in the Policy, his interest is limited to Coverages B(i) and B(ii).  However, Clause 22 clearly provides that Coverages B(i) and B(ii)—entity and indemnification coverages, respectively—are, under all circumstances, junior to Coverage A, which provides direct coverage to the Insureds.  Indeed, Clause 22 explicitly states that the Policy's priority scheme is not affected by a bankruptcy filing.  This is significant because were the Court to hold that the Policy proceeds are property of the estate and, thus, subject to the automatic stay, the trustee would have "greater rights in the [Policy proceeds] than the debtor had before filing for bankruptcy."[63]  Prior to bankruptcy, there was no means by which the Debtor's interests in Coverages B(i) or B(ii) could become superior to, or even equal to, the Insureds' interest in Coverage A.[64]  Were the Court to hold that the Policy proceeds are property of the estate, however, there *would* be a means by which the trustee's interests in

---

[62] Marmalefsky Decl., Ex. A [D.I. 161].

[63] *Integrated Solutions*, 124 F.3d at 492.

[64] Clause 22 of the Policy expressly provides that the chain of priority applies "in all events." Marmalefsky Decl., Ex. A, at 16 [D.I. 161].

Coverages B(i) and B(ii) could become at least equal to the Insureds' interest in Coverage A. Specifically, the trustee's interests in Coverages B(i) and B(ii) would become at least equal to the Insureds' interest in Coverage A if the Court ruled that the Policy proceeds were property of the estate and refused to grant stay relief.

In response, the trustee would likely argue that his rights would not be expanded if the Court held that the policy proceeds are property of the estate, because the Court can preserve contractual priority by granting stay relief. However, this argument assumes that courts will always grant stay relief, which may not be the case. Stay relief cannot be guaranteed, and so filing for bankruptcy would expose the Insureds to the risk—however remote—of an adverse ruling on stay relief. Because this risk is not present prior to bankruptcy, filing for bankruptcy would necessarily expand the trustee's rights in the Policy proceeds.

Thus, in light of the foregoing, the Court holds that the Policy proceeds are not property of the estate.

**2. Relief From the Automatic Stay**

Even if the Policy proceeds were property of the estate cause exists to lift the automatic stay to allow the Insureds to access the Policy proceeds. Section 362(d)(1) of the Bankruptcy Code provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . . .[65]

Courts conduct a "fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay."[66]  This Court has adopted a three-prong to determine whether to grant relief from the stay:

1. Whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay;

2. Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and

3. The probability of the creditor prevailing on the merits.[67]

The party requesting relief from the stay has the burden of proof "on the issue of the debtor's equity in property,"[68] while the party opposing stay relief has the burden of proof on all other issues.[69]

The first factor the Court must consider is whether lifting the stay will result in any great prejudice to the estate or the debtor.[70]  It is difficult to see how lifting the stay in this case would result in any great prejudice to the Debtor.  Even if the Debtor's

---

[65] 11 U.S.C. § 362(d)(1).

[66] *In re The SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007); *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997); *In re Continental Airlines, Inc.*, 152 B.R. 420, 424 (Bankr. D. Del. 1993)).

[67] *In re W.R. Grace & Co.*, 2007 WL 1129170, at *2 (Bankr. D. Del. 2007) (citing *In re Continental Airlines*, 152 B.R. at 424 and *In re Rexene Products Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992)); *accord The SCO Group*, 395 B.R. at 857 (adopting a nearly identical three-prong test).

[68] 11 U.S.C. § 362(g)(1).

[69] *Id.* at § 362(g)(2).

[70] *In re W.R. Grace & Co.*, 2007 WL 1129170 at *2; *accord The SCO Group*, 395 B.R. at 857–858.

interest in the Policy proceeds is not sufficiently speculative and remote to bring the proceeds outside of the bankruptcy estate, the Debtor's interest is almost certainly not strong enough that it would suffer "great prejudice" from a lifting of the stay. The Policy provides coverage for up to $10 million, while the Insureds are requesting stay relief to collect only $880,000 in defense costs. In addition, seeing as the Securities Class Action has been dismissed, there is no chance that lifting the stay would allow the Insureds to run up unlimited defense costs and ultimately exhaust the Policy coverage. In fact, the Insureds have likely incurred all or nearly all the defense costs that they will ever incur in the Securities Class Action, which means that at this point, the Insureds likely know exactly how much they will be seeking coverage for under the Policy. Therefore, this prong cuts in the Insureds' favor.

The second factor the Court must consider is whether "the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor."[71] This prong also cuts in the Insureds' favor. As discussed above, lifting the stay would likely not cause any hardship to the Debtor. By contrast, the Insureds would suffer a very real—and easily identifiable—hardship if the stay is not lifted. Specifically, the Insureds would have to pay the $880,000 in defense costs, as well as any defense costs incurred subsequent to the filing of this motion, out of their own pockets.

---

[71] *W.R. Grace & Co.*, 2007 WL 1129170, at *2; *accord The SCO Group*, 395 B.R. at 858–859.

In *In re CyberMedica*, the liability insurance policy provided direct coverage to the directors and officers for covered claims and defense costs, as well as indemnification and entity coverage to the debtor.[72]   The court concluded that cause existed to lift the stay, reasoning:

> "[The directors and officers] may suffer substantial and irreparable harm if prevented from exercising their rights to defense payments. [The directors and officers] are in need *now* of their contractual right to payment of defense costs and may be harmed if disbursements are not presently made to fund their defense of the Trustee's Complaint. Additionally, the harm to the Debtor if relief from stay is granted is speculative given the fact that there are presently no claims for indemnification nor entity coverage . . . ."[73]

In *Allied Digital*, the Court held that the policy proceeds were not property of the estate, but noted that even if the proceeds were property of the estate, cause existed to lift the stay.[74]   As in *CyberMedica*, the Court noted that the harm to the directors and officers from not lifting the stay was real—the directors and officers had incurred $200,000 in defense costs for which they were entitled to coverage—whereas the harm to the estate was purely hypothetical.[75]   The Court also observed that "any payment of defense costs will remove any indemnification claim the Individual Defendants would have against Allied Digital, and Allied Digital is entitled to indemnification proceeds only when and to the extent it has indemnified the directors and officers."[76]

---

[72] *In re CyberMedica, Inc.*, 280 B.R. at 14.

[73] *Id.* at 18.

[74] *In re Allied Digital*, 306 B.R. at 513.

[75] *Id.* at 514.

[76] *Id.*

As discussed above, this case also presents a situation where the harm to the directors and officers from not lifting the stay is real and identifiable, whereas the harm to the estate from lifting the stay is purely hypothetical.  In addition, like in *Allied Digital*, payment of the Insureds' $880,000 in defense costs would remove any indemnification claim the Insureds might have against the Debtor for those defense costs.  Therefore, the second prong also favors the Insureds.

The third factor the Court must consider is the probability of the Insureds' success on the merits.[77]  As this Court stated in *In re The SCO Group*, "[e]ven a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case."[78]  This factor clearly favors the Insureds because they have already won on the merits—the Securities Class Action has been dismissed, and the case is terminated.  Moreover, because the Derivative Action was based on the same alleged wrongdoings as the Securities Class Action,[79] the fact that the Securities Class Action was dismissed makes it likely that the Insureds will succeed on the merits in the Derivative Action as well.  Therefore, as all three factors favor the Insureds, the Court should grant stay relief to allow the Insureds to access the Policy proceeds.

The FDIC, as receiver for Downey S&L, argues that if the Policy proceeds are property of the estate, the Insureds are nevertheless barred from collecting the Policy

---

[77] *W.R. Grace & Co.*, 2007 WL 1129170, at *2.

[78] *In re The SCO Group*, 395 B.R. at 859.

[79] The cases were similar enough that the parties agreed to stay the Derivative Action pending the outcome of the Insureds' motion to dismiss the Securities Class Action.  Supplemental Decl. of Dan Marmalefsky, ¶ 11.

proceeds because they failed to file a proof of claim by the bar date.[80]   However, the Insureds are not seeking to collect under the Policy's indemnification coverage—that is, they are not seeking to have the Debtor indemnify them for their defense costs.[81]   The Insureds are trying to collect under Coverage A of the Policy, which provides direct coverage to the Insureds for losses arising from a covered Claim.   By failing to file a proof of claim by the bar date, the Insureds simply waived their right to collect indemnification payments from the Debtor.[82]   In *In re CHS Elecs., Inc.*, the court noted that if the proceeds of a liability insurance policy were considered property of the estate at all, only "the [p]roceeds necessary to satisfy the Debtor's indemnification claims could be considered property of the estate."[83]   Because the Insureds are not seeking to access the Policy proceeds necessary to satisfy the Debtor's (currently non-existent) indemnification claims, the Insureds' failure to file a proof of claim does not prevent them from accessing the proceeds necessary to cover their defense costs under Coverage A.   Therefore, the Insureds' failure to file a proof of claim by the bar date does not automatically relieve National Union of its obligation to pay the Insureds' defense costs under Coverage A.

In conclusion, even if the Policy proceeds were property of the estate, the Court would find that cause exists to lift the automatic stay.

---

[80] FDIC Objection, ¶ 21.

[81] Insureds' Motion, ¶¶ 11–13.

[82] *In re Anderson*, 348 B.R. 652, 657 (Bankr. D. Del. 2006).

[83] *In re CHS Elecs., Inc.*, 261 B.R. 538, 544 (Bankr. S.D. Fla. 2001).

### 3.  Professional Responsibility Claims

The trustee advances several professional responsibility claims, alleging that Morrison—the Insureds' counsel in the current matter—has an unwaivable conflict of interest in its continued representation of the Insureds.[84]   According to the trustee, Morrison's alleged conflict of interest arises from the firm's representation of the Debtor in two civil proceedings in California.[85]  Because of this alleged unwaivable conflict of interest, the trustee argues that Morrison "should be disqualified and is not entitled to reimbursement of fees from the National Policy."[86]   Morrison disputes all of the trustee's conflict of interest claims,[87] and, in any event, contends that these claims are not properly before the Court.[88]

The Court finds that the issue of whether Morrison has an unwaivable conflict of interest is not properly before the Court.  The issue before the Court is whether the Policy proceeds are property of the estate, and if they are, whether stay relief is appropriate.  With regard to the first question, the Policy proceeds are either property of the estate or they are not, regardless of who is the ultimate recipient of the

---

[84] *See generally* Trustee's Objection at 12-21.

[85] *Id.*  Specifically, the Trustee points to: (1) Morrison's alleged representation of the Debtor in the Derivative Action, which is technically still pending in California state court, and (2) Morrison's past representation of the Debtor in the Securities Class Action, which was dismissed by a federal district court in California in August 2009.  *Id.*

[86] *Id.* at 18.

[87] Insureds' Combined Reply In Support of Their Motion for Determination that Stay Does Not Bar the Use of Insurance Proceeds or for Stay Relief to the Extent that it Does [D.I. 199], ¶¶ 29–30.

[88] *Id.* at ¶ 25.

proceeds.[89]  Significantly, the Court's analysis of whether the Policy proceeds are property of the estate is not affected by whether Morrison had a conflict of interest in its representation of the Insureds.  Moreover, because the Policy proceeds in this case are not property of the estate, the Court has no basis on which to deny Morrison access to the proceeds.  The Court is only considering whether the *Insureds* are entitled to the Policy proceeds.  Whether *Morrison* is entitled to the proceeds is between Morrison and National Union.  National Union has every incentive to refuse to pay out the Policy proceeds if there are legitimate conflict of interest claims, and the Court would not be preventing National Union from pursuing those claims if it declined to address the merits of the conflict of interest claims.

Thus, the Court concludes that the trustee's professional responsibility claims are not properly before the Court.  Therefore, the Court need not address the merits of the trustee's various conflict of interest claims.

## CONCLUSION

For the reasons set forth above, the Court will grant the Insureds' Motion for Determination That Stay Does Not Bar the Use of Insurance Proceeds or for Stay Relief to the Extent That It Does.[90]

---

[89] *Id.*

[90] On May 3, 2010, the Court entered an order granting the Insured's Motion with an opinion to follow [D.I. 381].  No further order is necessary nor will be issued.