# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
In re:

DOWNEY FINANCIAL CORP.,

             Debtor.

---------------------------------------------------------x

Chapter 7

Case No. 08-13041 (CSS)

Hearing Date: 2/10/2011 @ 11:00 a.m.

Responses Due: 1/18/2011 @ 4:00 p.m.

## OBJECTION OF INDENTURE TRUSTEE WILMINGTON TRUST COMPANY TO PROOF OF CLAIM OF THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR DOWNEY SAVINGS AND LOAN ASSOCIATION, F.A.

Wilmington Trust Company (the "Indenture Trustee"), in its capacity as indenture trustee with respect to certain 6 1/2% Senior Notes due July 1, 2014 issued by debtor Downey Financial Corp. ("DFC" or "Debtor"), objects to the allowance of the Proof of Claim of the Federal Deposit Insurance Corporation as Receiver (the "FDIC-Receiver") for Downey Savings and Loan Association, F.A., Newport Beach, California ("Downey Bank"), dated October 24, 2009 (the "Proof of Claim"), and requests that the Court enter an order under sections 105(a) and 502(b)(1) of the United States Bankruptcy Code (the "Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") disallowing and expunging the Proof of Claim in its entirety.[1]  In support thereof, the Indenture Trustee states as follows:

### PRELIMINARY STATEMENT

1.       In its Proof of Claim, the FDIC-Receiver asserts claims, as a successor to Downey Bank, exceeding $2 billion, a portion of which it asserts is entitled to superpriority. (Proof of Claim ¶¶ 2-4.) These claims purportedly arise from the Debtor's alleged obligation to

---

[1] A copy of the Proof of Claim is attached hereto as Exhibit 1.

maintain and guarantee the capital of its wholly-owned subsidiary, Downey Bank; the Debtor's receipt (and anticipated receipt) of tax-related refunds that the FDIC-Receiver claims belong to it as receiver of Downey Bank, and not to the Debtor's estate; a purported right of setoff against certain funds that the Debtor had on deposit with Downey when the Debtor filed its petition; and miscellaneous other facts that the FDIC-Receiver assertedly is still investigating.

2. The FDIC-Receiver has no right to the amounts it claims. The Debtor had no legal or contractual obligation to maintain Downey Bank's capital and, thus, the FDIC-Receiver is not entitled to recover shortfalls in Downey Bank's capital from the Debtor's estate. Indeed, the FDIC-Receiver has provided no evidence at all to support the existence of any such obligation on the Debtor's part. Likewise, there is absolutely no basis for the FDIC-Receiver's claim that it is entitled to set off its purported claims against the Debtor's deposits at Downey Bank, which have already been transferred to the Chapter 7 trustee. In asserting these baseless claims, the FDIC-Receiver is simply wasting the resources of the Court and of the Debtor's estate.

3. Nor are there any grounds for the FDIC-Receiver's other claims. Pursuant to a tax-sharing agreement between the Debtor and Downey Bank, the tax-related refunds are property of the Debtor's bankruptcy estate and do not belong to the FDIC-Receiver. Moreover, the FDIC-Receiver has not asserted a valid basis for a claim under the tax sharing agreement either. The FDIC-Receiver also has failed to provide any basis for the additional claims it says it may assert based on facts it may discover in the future. The Indenture Trustee reserves its right to object to such additional claims if and when the FDIC-Receiver seeks to assert them.

## JURISDICTION

4. The Court has jurisdiction over this objection pursuant to 28 U.S.C. §§ 1334(b) and (e), and 157(b)(1). This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) and (O). Venue is proper in this district under 28 U.S.C. § 1409. The statutory predicates for relief are Code §§ 105(a) and 502 and Bankruptcy Rule 3007.

## BACKGROUND

5. Downey Bank, a savings association within the meaning of 12 U.S.C. § 1813(b) and 12 U.S.C. § 1462(4), was a wholly owned subsidiary of the Debtor. On November 21, 2008, the Office of Thrift Supervision ("OTS") appointed the FDIC as receiver of Downey Bank. Immediately after its appointment as receiver, the FDIC-Receiver sold substantially all the assets of Downey Bank.

6. On November 25, 2008, the Debtor filed a voluntary petition under Chapter 7 of the Code (the "Petition"). Montague Claybrook was appointed as Chapter 7 Trustee (the "Chapter 7 Trustee") of the Debtor on November 25, 2008.

7. The FDIC-Receiver filed its Proof of Claim on October 29, 2009.

8. Wilmington Trust Company is the trustee under an Indenture, dated as of November 15, 2000, with the Debtor, as issuer of the 6 1/2% senior notes due July 1, 2014, and under the First Supplemental Indenture thereto, dated as of June 23, 2004.

## RELIEF REQUESTED

9. By this Objection, the Indenture Trustee seeks entry of an order under Code sections 105(a) and 502(b) and Bankruptcy Rule 3007 disallowing and expunging the FDIC-Receiver's Proof of Claim for all purposes in this case. Alternatively, to the extent the Court allows any portion of the FDIC-Receiver's Proof of Claim, (1) the Indenture Trustee will

seek to equitably subordinate those claims based on the FDIC-Receiver's unfair and inequitable conduct directed toward Debtor, its creditors and shareholders, and (2) such claims may be subject to setoff based on claims of the Debtor against Downey Bank.

**BASIS FOR RELIEF REQUESTED**

**I.     The Capital Maintenance Claim**

10.     The Proof of Claim includes a claim aggregating approximately $1.4 billion relating to the Debtor's alleged failure to maintain and guarantee Downey Bank's capital at appropriate levels. (Proof of Claim at 3-4 (Summary of FDIC-Receiver's Claims), ¶¶ 7-11.) That "capital maintenance claim" is purportedly made pursuant to Section 507(a)(9) of the Code, which provides that "allowed unsecured claims based upon any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution" are to be given ninth priority. 11 U.S.C. § 507(a)(9).

11.     The FDIC-Receiver's capital maintenance claim is premised on the existence of a supposed obligation on the Debtor's part to "maintain and guarantee" Downey Bank's capital. (*Id.* ¶ 7.) As explained below, however, none of the FDIC-Receiver's purported bases for imposing a capital maintenance obligation on the Debtor are valid.

A.     The Debtor Had No Capital Maintenance Obligation Under Banking Law.

12.     The first ground on which the FDIC-Receiver bases its capital maintenance claim is the federal banking laws, 12 U.S.C. § 1831o, 12 U.S.C. § 1464(s) and 12 C.F.R. § 225.4. (Proof of Claim ¶ 7(a).) However, nothing in these or any other laws or regulations provides that a holding company is the guarantor of its subsidiary's capital.

13.     Section 1831o, the Prompt Corrective Action ("PCA") provisions of the Federal Deposit Insurance Act ("FDIA"), describes certain "prompt corrective actions "that

- 4 -

federal banking agents are required to take "to resolve the problems of insured depository institutions," 12 U.S.C. § 1831o(a)(2). These actions include requiring a bank to obtain a guarantee of its capital plan from its parent under certain specified circumstances.

14. In particular, an insured depository institution that has become "undercapitalized" is required to submit an "acceptable capital restoration plan" to its federal regulators. 12 U.S.C. § 1831o(e)(2). Each company that controls the undercapitalized institution must "guarantee[] that the institution will comply with the plan until the institution has been adequately capitalized on average during each of 4 consecutive quarters; and provide[] appropriate assurances of performance." 12 U.S.C. § 1831o(e)(2)(C)(ii). Nothing in the statute provides that a holding company is obligated to guarantee its subsidiary's performance absent undercapitalization and the resulting requirement to submit a capital restoration plan.

15. Here, the FDIC-Receiver points to no such guarantee. Indeed, the FDIC-Receiver does not even establish that Downey Bank was undercapitalized, which is a predicate for a federal regulator requiring the submission of a capital restoration plan and accompanying guarantee. In fact, OTS, Downey Bank's regulator, did not require the Bank to submit a capital restoration plan and, perforce, the Debtor did not guarantee Downey Bank's compliance with any such capital restoration plan. Accordingly, the FDIC-Receiver's reliance on 12 U.S.C. § 1831o as a basis for imposing a capital maintenance obligation on the Debtor is misplaced.

16. Nor does 12 U.S.C. § 1464(s) impose such an obligation on the Debtor. Section 1464(s) authorizes the Director of OTS to impose minimum capital standards on savings associations and describes actions that the Director may take to ensure compliance with those standards. Nothing in the statute requires a parent company to guarantee that the savings association will meet the minimum capital standards. What is more, the only action taken by

OTS with respect to the Debtor was the issuance of a cease and desist order which, as described below, did not impose any capital maintenance obligation on the Debtor.

17. Likewise, 12 C.F.R. § 225.4 does not impose a capital maintenance obligation on the Debtor. That regulation sets forth the "source-of-strength" doctrine, that a bank holding company shall "serve as a source of financial and managerial strength to its subsidiary banks and shall not conduct its operations in an unsafe or unsound manner." 12 C.F.R. § 225.4(a)(1) (2010). However, that regulation applies only to banks and holding companies that are regulated by the Federal Reserve Board, not to thrifts (like Downey Bank) and their holding companies (like the Debtor), which are regulated by OTS. *See* 12 C.F.R. §§ 225.1, 500.1. The source-of-strength doctrine was not adopted by OTS, and accordingly is inapplicable. Moreover, even if the source-of-strength doctrine did apply, it does not mean that a holding company is a guarantor of its subsidiary's capital requirements or that it is required to make contributions to its subsidiary's capital. *See MCorp Fin. Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 900 F.2d 852, 863 (5th Cir. 1990), *rev'd on other grounds*, 502 U.S. 32 (1991) (source of strength doctrine does not require a bank holding company to make capital contributions to its subsidiaries); *In re The Colonial Bancgroup, Inc.,* 436 B.R. 713, 731 n.15 (M.D.Ala. 2010) (same) (citing *MCorp*).

18. Thus, the FDIC-Receiver cannot assert a capital maintenance claim against the Debtor based on the federal banking laws.

B. The Debtor Did Not Otherwise Commit To Maintain Downey Bank's Capital Levels.

19. Another asserted ground for the Debtor's purported capital maintenance obligation is Downey Bank's capital plan (the "Capital Plan") adopted by the Board of Directors of the Debtor (the "Board") on June 27, 2008. (Proof of Claim ¶ 7(b), Exhibit A (Capital Plan).) Contrary to the FDIC-Receiver's claim, the Capital Plan created no obligation that the Debtor

contribute any capital to Downey Bank.  The Capital Plan provided that Downey Bank would "execute a capital strategy" to achieve various goals, including to "augment[] its capital base" with an infusion of $350 million of capital.  (Capital Plan § I, § IV, ¶ 3.)  The Capital Plan's only mention of a Debtor contribution toward this $350 million is a statement that the Board had "recently directed the contribution of $50 million by the [Debtor] into the bank's capital," which the Capital Plan acknowledges the Debtor did in June 2008.  (*Id.* at § IV, ¶ 3.)  Indeed, the Capital Plan affirmatively states that "at least $300 million [was to] come from *other* sources," which the Board had already directed its advisors to explore.  (*See id.* (emphasis added).)

20. Moreover, the Board resolution adopting the Capital Plan provided that it was subject to "further approval of the Board (and to the extent required, the stockholders) as to the actual terms and conditions selected to raise the capital described in the Capital Plan."  (Proof of Claim, Exhibit A (Board Resolution).)  The FDIC-Receiver has cited no terms and conditions obligating the Debtor to provide capital and the Indenture Trustee is aware of no such terms and conditions.

21. In addition, the FDIC-Receiver references the Debtor's "internal capital management policies and procedures" as a source of the purported capital maintenance commitment.  (Proof of Claim ¶ 8.)  Specifically, the FDIC-Receiver alleges that the Debtor's internal policies and procedures provided that the Debtor would "monitor regulatory capital and . . . ensure that Downey Bank maintained sufficient capital to be classified as 'Well Capitalized,' as defined by OTS regulations."  (*Id.*)  However, the FDIC-Receiver identifies no actual Debtor policies or procedures, much less any that provide a guarantee of Downey Bank's capital.  (*Id.*)

22. Regardless, internal policies by their very nature do not create an obligation or commitment to anyone else.  Section 507(a)(9) of the Code applies only to

- 7 -

commitments to a "Federal depository institutions regulatory agency." 11 U.S.C. § 507(a)(9). Thus, even if the Debtor did have internal policies and procedures or a Capital Plan that called for the Debtor to infuse capital into Downey Bank, they would not constitute a capital maintenance commitment under Section 507(a)(9).

23. The FDIC-Receiver also asserts that the C&D Order issued by OTS, and the Debtor's stipulation and consent to the issuance of the C&D Order, obligate the Debtor to maintain and guarantee Downey Bank's capital. (Proof of Claim ¶ 7(c).) Although the C&D Order provides that the Debtor's Board shall ensure that Downey Bank complies with the terms of the September 5, 2008 Cease and Desist Order issued by OTS to Downey Bank (*id.*, Exhibit B, ¶ 6), neither the C&D Order nor the Debtor's stipulation and consent to that Order includes language of guarantee or commitment. In fact, neither of those documents makes any mention of capital maintenance by the Debtor. (*Id.*, Exhibits B, C.)

24. In cases where capital maintenance obligations by bank holding companies have been found, the holding companies expressly committed to maintain their banks' capital levels and to contribute equity to that end if need be. *See, e.g., Office of Thrift Supervision v. Overland Park Financial Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d 1246, 1249 (10th Cir. 2001) (holding company committed that it would "cause the net worth of [the bank] to be maintained at a level consistent with [specific regulation], and where necessary, that it will infuse sufficient additional equity capital to effect compliance with such requirement."); *Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 964 (9th Cir. 2008) (commitment by holding company to "absolutely, unconditionally and irrevocably guarantee[] the performance of [subsidiary] under the terms of the Capital Plan and … pay the sum demanded to [subsidiary] or as directed by the [FDIC] in immediately available funds.");

*Resolution Trust Corp. v. Firstcorp, Inc. (In re Firstcorp, Inc.)*, 973 F.2d 243, 244 (4th Cir. 1992) (agreement that "the regulatory net worth of [the bank] shall be maintained at the greater of (1) three percent of total liabilities …, or (2) a level consistent with that required by [specific regulation] … and where necessary, to infuse sufficient additional equity capital … to effect compliance with such requirement."); *Franklin Savings Corp. v. Office of Thrift Supervision*, 303 B.R. 488, 491 (D. Kansas 2004) (agreement to cause the net worth of [the bank] to be maintained at a level consistent with that required of institutions insured twenty years or longer by [specific regulation] …, infusing sufficient additional equity capital to affect [sic] compliance with such requirement whenever necessary.").

25. In this case, there is no such language. As the recent decision in *In re The Colonial Bancgroup, Inc.,* made clear in denying a capital maintenance claim by the FDIC, the absence of language that actually makes a capital commitment is fatal to a claim that there was such a commitment. 463 B.R. at 733.

26. Moreover, even if the Debtor had made a commitment to federal banking regulators that it would contribute equity to Downey Bank to maintain requisite capital levels, there is no evidence that Downey Bank has third-party beneficiary standing to enforce any such commitment. Because the FDIC-Receiver's rights are limited to those held by Downey Bank, the FDIC-Receiver also would have no standing to enforce any such commitment.

27. The FDIC-Receiver also states that it is "investigating" whether the Debtor provided accurate information to federal and state regulators regarding the "value of Downey Bank's assets and investments and the amount of its potential losses, risks, loan defaults and reductions," and whether Downey Bank was appropriately accounting and reserving for anticipated losses (Proof of Claim ¶¶ 9, 11.) The Indenture Trustee is not aware of any basis to

- 9 -

900200.00001/40192627v.1

conclude that this is the case, and reserves its right to object to any claims that may be asserted by the FDIC-Receiver based thereon. Moreover, even if it were the case that Downey Bank was not appropriately accounting and reserving for its anticipated losses, it would not give rise to a capital maintenance claim entitled to priority under the Code.

28. Finally, the FDIC-Receiver alleges generally that the Debtor's capital maintenance obligations arise "otherwise under law or equity," asserts at various points that it is only citing "examples" of the bases for its claims, and reserves the right to assert other claims based on its investigation. (*Id.* ¶¶ 7, 10.) The Indenture Trustee is not aware of *any* basis for imposing a capital maintenance commitment on the Debtor, and reserves its right to object should the FDIC-Receiver attempt to assert any additional ground for its capital maintenance claim.

## II. The FDIC-Receiver's Tax-Related Claims.

29. The FDIC-Receiver's Proof of Claim also includes a $198 million claim for tax refunds that the Chapter 7 Trustee has received or will receive from the Internal Revenue Service and other taxing authorities. (Proof of Claim at 4, ¶¶ 12-23.)[2] The FDIC-Receiver claims that these amounts are not property of the Debtor's estate, and rightfully belong to the FDIC-Receiver, because they relate to taxes that Downey Bank paid or remitted to the Debtor for payment, and/or to losses incurred by Downey Bank. (*Id.* ¶ 12.) These tax-related claims are the subject of a separate adversary proceeding by the Chapter 7 Trustee against the FDIC-Receiver, *Montague S. Claybrook v. FDIC* (Adversary Proceeding 10-53731 (CSS)).

---

[2] Since the FDIC-Receiver filed its Proof of Claim, the amount of the aggregate tax refunds payable to the Chapter 7 trustee has increased to close to $400 million. (*See* Chapter 7 Trustee's Complaint Seeking Declaratory Judgment Regarding Ownership of Tax Refunds Under Section 541 of the Bankruptcy Code and for Violation of the Automatic Stay, Adversary Proceeding 10-53731 (CSS) ("Tax Adversary Complaint") (Doc. No. 1) ¶ 24.)

- 10 -

30. As explained in the Tax Adversary Complaint, the Debtor and Downey Bank were parties to a Tax Sharing Agreement, pursuant to which Downey Bank "irrevocably appointed [the Debtor] as its agent and attorney-in-fact to take any necessary actions, including the right to file, prosecute, compromise or settle any claim for a refund." (Tax Adversary Complaint ¶¶ 10, 12, 17-18.) Under the terms of the Tax Sharing Agreement, which has not been repudiated by the Chapter 7 Trustee, the tax refunds received or to be received by the Chapter 7 Trustee are the property of the Debtor's bankruptcy estate and do not belong to the FDIC-Receiver (*Id.* ¶¶ 13, 25.)

31. The FDIC-Receiver also would not have a general unsecured claim based on the Tax Sharing Agreement. That is because, on the consolidated tax return filed by the Chapter 7 Trustee on behalf of the Debtor and the consolidated tax group for the year ended December 31, 2008, the Debtor claimed a worthless stock deduction of approximately $1.75 billion arising from its investment in Downey Bank. Accordingly, any tax refund received would be attributable to the Debtor, not Downey Bank. (*See also* Complaint: (1) Objecting to the Claim of the FDIC in its capacity as Receiver for Downey Savings and Loan Association, F.A.; (2) Seeking Equitable Subordination of any Claim of the FDIC in its capacity as Receiver for Downey Savings and Loan Association, F.A.; and (3) Counterclaiming for Certain Relief (Adv. Pro. No. 10-55567 (CSS) ("Adversary Complaint Objecting to FDIC Claim") ¶¶ 65-71.)

32. For all the reasons set forth in the Tax Adversary Complaint and in the Adversary Complaint Objecting to the FDIC's Claim, the FDIC-Receiver does not have a right to the tax refunds, or any claim with respect thereto, included in its Proof of Claim.

900200.00001/40192627v.1

**III. Intercompany Claims**

33. In addition, the Proof of Claim asserts a claim for amounts "due and payable by the Debtor" under a January 23, 1995 Inter-Company Administrative Services and Corporate Separateness Agreement or any other system of intercompany settlement of accounts in place prior to the FDIC's appointment as receiver (the "Intercompany Claims"). (Proof of Claim ¶ 24.)

34. The FDIC-Receiver includes in this category a claim of $20.7 million, which it asserts relates to amounts due to Downey Bank for payments to the Debtor under the Tax Sharing Agreement, without providing any factual support for that assertion. (*Id.* ¶ 25.) The Indenture Trustee objects to this claim, and reserves the right to object further if and when the FDIC-Receiver provides additional information as to the basis for the claim.

35. The FDIC-Receiver also states that it is still investigating whether it has additional Intercompany Claims, and reserves its rights with respect to such claims. (*Id.* ¶¶ 24-25.) The Indenture Trustee reserves its rights to object to any other Intercompany Claims that may be asserted by the FDIC-Receiver. In addition, the Inter-Company Administrative Services and Corporate Separateness Agreement and other relevant documents will need to be reviewed to determine whether, in fact, the Debtor has intercompany claims against Downey Bank thereunder.

**IV. Deposit Fund Claims**

36. The FDIC-Receiver also asserts a claim with respect to funds in the approximate amount of $13.4 million (the "Deposit Funds") that the Debtor had on deposit at Downey Bank at the time the Debtor filed its petition, and which were subsequently transferred to the Chapter 7 Trustee and deposited in his Chapter 7 account. (Proof of Claim ¶ 26.) The FDIC-Receiver states that it is investigating the account documentation with respect to these

funds and reserves its rights to assert claims with respect to these funds. (*Id.* ¶ 27.) The Indenture Trustee reserves all rights to object to any claim that may be asserted by the FDIC-Receiver with respect to the Deposit Funds.

37. Separately and in the alternative, the FDIC-Receiver asserts and reserves its purported claims and rights of setoff under 11 U.S.C. § 553, 12 U.S.C. § 1821(d) [3] and other applicable law with respect to the Deposit Funds. The law with respect to setoff is clear. In order to maintain a right of setoff, a creditor must establish that (1) a debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case; (2) the creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case; and (3) the debt and the claim are mutual obligations. *Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 262-63 (3d. Cir. 2000) (citing *Braniff Airways, Inc. v. Exxon Co., USA. (In re Braniff)*, 814 F.2d 1030, 1035 (5th Cir. 1987)); *see also B.F. Goodrich Employees Fed. Credit Union v. Patterson (In re Patterson)*, 967 F.2d 505, 509 (11th Cir. 1992) ("In preserving the right of setoff, Section 553 requires that the obligation between the debtor and creditor arose before filing the bankruptcy petition and that mutuality of obligation exists."). Debts entitled to setoff are mutual only when "they are due to and from the same persons in the same capacity." *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009) (BLS) (citing *Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 149 (2d Cir. 2002)).

38. The Proof of Claim asserts the right to set off (i) alleged and disputed pre-petition claims that the FDIC-Receiver has against the Debtor (*e.g.,* the Capital Maintenance Claims and Tax-Related Claims discussed above), against (ii) the Deposit Funds. However, as

---

[3] 12 U.S.C. § 1821(d) does not provide any setoff rights. It describes the FDIC's powers and duties as conservator or receiver, and authorizes the FDIC to adopt regulations regarding the conduct of receiverships and conservatorships.

- 13 -

the FDIC-Receiver acknowledges in its Proof of Claim, the Deposit Funds have already been transferred to the Chapter 7 Trustee, and are held in his Chapter 7 account with respect to the Debtor. (Proof of Claim ¶ 26.) Accordingly, those funds are not "debts" of Downey Bank or the FDIC-Receiver to the Debtor. The mutuality requirement of Section 553 of the Code is thus utterly lacking, and there are no grounds for the FDIC-Receiver's assertion of setoff rights.

**V.     Other Claims**

39.     The remainder of the FDIC-Receiver's Proof of Claim is likewise without merit. Those include claims based on various fraudulent conveyance theories (under Title 12 of the United States Code, state law, actual fraud and constructive fraud) as to which the FDIC-Receiver alleges it "may" have claims, which it reserves its rights to assert based on the results of its ongoing investigation. (Proof of Claim at 4, ¶30-36.) The Indenture Trustee reserves its right to object to any claims that the FDIC-Receiver decides to assert in this regard.

40.     The FDIC-Receiver also asserts "Litigation Recovery Claims" for amounts that the Debtor may recover in litigation, including in a derivative action currently pending in state court in California to the extent that it is based on acts or omissions affecting Downey Bank's assets or causing harm to Downey Bank. (Proof of Claim ¶¶ 37-38.) The FDIC-Receiver asserts that Downey Bank is the real party in interest in that lawsuit and that, accordingly, the proceeds of any such litigation belong to Downey Bank and are not property of the Debtor's Chapter 7 estate. (*Id.*) The FDIC-Receiver demands that the Chapter 7 Trustee turn over all such amounts or the right to receive payment from defendants and, in the alternative, asserts a claim for any and all recoveries in the litigation. (*Id.* ¶ 38.) However, the FDIC-Receiver provides no facts in support of its assertions that Downey Bank is the real party in interest in that litigation and that the recoveries are not property of the Debtor's estate, and the

Indenture Trustee knows of no basis for such assertions. The Indenture Trustee objects to the FDIC-Receiver's Litigation Recovery Claims and reserves the right to object further if and when the FDIC-Receiver articulates a basis for its claims.

41. In addition, the FDIC-Receiver asserts claims for insurance proceeds ("Insurance Proceeds Claims") that may be paid on claims for covered losses under insurance policies of which Downey Bank was a named insured or intended beneficiary. (Proof of Claim ¶¶ 39-41.) The FDIC-Receiver does not identify any specific proofs of loss that have been or may be filed to which it claims it is entitled. Similarly, the FDIC-Receiver reserves other rights under those insurance policies without identifying specific claims or matters to which they relate. (*Id.* ¶¶ 42-43.) The Indenture Trustee reserves its rights to object to any specific Insurance Proceeds Claims that the FDIC-Receiver may assert.

42. The FDIC-Receiver also asserts a right to insurance premium refunds that the Chapter 7 Trustee received upon termination of the insurance policies and deposited into the escrow account, pursuant to Court Orders. (Proof of Claim ¶¶ 44-46.) The FDIC-Receiver reserves its right to petition a court for release of those insurance premium refunds. (*Id.* ¶ 46.) The FDIC-Receiver fails to provide any basis for such a petition and the Indenture Trustee does not believe there is one, and reserves its right to object thereto.

43. The Proof of Claim also includes a claim for matters relating to a November 21, 2008 Purchase and Assumption Agreement, pursuant to which the FDIC-Receiver sold substantially all of the assets of Downey Bank to U.S. Bank National Association. (Proof of Claim ¶ 47.) As with other FDIC-Receiver's claims, the FDIC-Receiver does not specify the amount of this claim or any specific bases for the claim. The Indenture Trustee does not believe

there is any basis for a claim under the Purchase and Assumption Agreement, and reserves its right to object to any claim that the FDIC-Receiver may assert falls within this category.

44. The Indenture Trustee also reserves its right to object to any other claims the FDIC-Receiver reserves rights to assert based upon its investigations (Proof of Claim ¶¶ 48-51) or on any other bases, including the statutory protections under the FDIC's governing statute, and to object to any other defenses and claims that the FDIC-Receiver may assert in the future (*Id.* ¶¶ 52-59).

## VI. Equitable Subordination

45. Upon information and belief, the FDIC-Receiver knowingly and repeatedly has been engaging in unfair and inequitable conduct toward the Debtor, its creditors and shareholders, including but not limited to, by (i) filing Forms 56-F with the Internal Revenue Service ("IRS") in which the FDIC-Receiver knowingly misrepresented that it was acting on behalf of the Debtor, (ii) failing to provide the Chapter 7 Trustee with a copy of those Forms 56-F, as required by IRS Regulations (*see* 26 C.F.R. § 301.6402-7(d)(2(iii)), and (iii) writing three letters to the IRS in September 2010 after the Court directed the FDIC-Receiver not to share any documents with the IRS other than tax returns that it was specifically authorized to file by Court Order. The FDIC-Receiver's inequitable conduct has resulted in injury to the Debtor, its creditors and shareholders and conferred unfair advantages upon the FDIC-Receiver. Accordingly, to the extent the Court allows any portion of the FDIC-Receiver's Proof of Claim, the Indenture Trustee respectfully submits that such claims should be equitably subordinated to all other general unsecured claims against the Debtor pursuant to Section 510(c) of the Code. 11 U.S.C. § 510(c).

## CONCLUSION

WHEREFORE, the Indenture Trustee respectfully requests that the Court sustain the Objection, disallow and expunge the FDIC-Receiver's Proof of Claim in its entirety, and grant the Indenture Trustee such other and further relief as is just and necessary.

Dated: Wilmington, Delaware
December 21, 2010

**SCHULTE ROTH & ZABEL LLP**

　　/s/ *Brian D. Pfeiffer*
Adam C. Harris
Brian D. Pfeiffer
Alan R. Glickman
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*Counsel to Indenture Trustee Wilmington Trust Company*