IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| DOWNEY FINANCIAL CORP., | ) | |
| | ) | Case No. 08-13041 (CSS) |
| Debtor. | ) | Jointly Administered |
| _____ | ) | |
| ALFRED T. GIULIANO, in his capacity | ) | |
| as interim Chapter 7 Trustee for | ) | |
| DOWNEY FINANCIAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | Adv. Proc. No. 10-53731(CSS) |
| | ) | |
| WILMINGTON TRUST in its capacity as | ) | RE: Adv. Docket Nos.: 79 and 81 |
| Indenture Trustee, as Intervening | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION, in its capacity as Receiver | ) | |
| For Downey Savings & Loan Association, | ) | |
| F.A., | ) | |
| Defendant. | ) | |

## OPINION[1]

| | |
|---|---|
| FOX ROTHSCHILD LLP | OTTERBOURG, STEINDLER |
| L. John Bird | HOUSTON & ROSEN, P.C. |
| 919 North Market Street | Melanie L. Cyganowski |
| Suite 1300 | Peter Feldman |
| Wilmington, DE  19899 | 230 Park Avenue |
| -and- | New York, New York 10169 |
| | -and- |

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

Michael G. Menkowitz
William H. Stassen
2000 Market Street, 10th Floor
Philadelphia, PA  19103-3291
        -and-
Raymond M. Patella
1301 Atlantic Avenue
Midtown Building – Suite 400
Atlantic City, NJ  08401

Attorneys for Alfred T. Giuliano
as interim Chapter 7 Trustee for the Estate
of Downey Financial Corp.

BLANK ROME LLP
Michael D. DeBaeke
Victoria Guilfoyle
1201 Market Street, Suite 800
Wilmington, DE  19801
        -and-
SCHULTE ROTH & ZABEL LLP
Alan R. Glickman
Brian D. Pfeiffer
William H. Gussman, Jr.
919 Third Avenue
New York, NY  10022

Counsel to Wilmington Trust Company
As Indenture Trustee

McCARTER & ENGLISH, LLP
William F. Taylor, Jr.
Kate R. Buck
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE  19801

FEDERAL DEPOSIT INSURANCE
CORPORATION
Federal Deposit Insurance Corporation
Legal Division
Kathryn R. Norcross
Sonya L. Levin
3501 Fairfax Drive
Arlington, VA  2226

Counsel for the Federal Deposit
Insurance Corporation, in its
Capacity as Receiver

Dated:  October 8, 2013

Sontchi, J. _____

## INTRODUCTION

This matter requires the Court to determine whether a substantial tax refund is property of the estate due to a tax sharing agreement between the debtor, Downey Financing Corp. ("DFC" or the "Debtor"), and its non-debtor subsidiary, Downey

Savings and Loan Association, F.A. ("Downey Bank").  The tax sharing agreement established a method for (i) allocating the consolidated tax liability, (ii) reimbursement and payment of such tax liability, and (iii) establishing procedures for filing tax returns. The Debtor and its affiliates, including Downey Bank, acted pursuant to the tax sharing agreement under which the Debtor filed returns, paid taxes, received refunds, etc. for many years prior to the Debtor's bankruptcy in November 2008.  At or around the time of the Debtor's bankruptcy, the Federal Deposit Insurance Corporation was appointed as receiver ("FDIC-R") for Downey Bank.

After the Debtor's bankruptcy, the Trustee for the Debtor's estate filed various tax returns that resulted in a substantial tax refund due from the carry-back of Downey Bank's net operating losses.  Under the normal course of the tax sharing agreement, the Debtor would file the return and allocate the liability and/or refund relating to its various subsidiaries.  In an instance such as this, the Debtor would then transfer to Downey Bank the amount of the refund allocated to it.  The question here is whether the Debtor holds Downey Bank's (substantial) share of the refund in trust; thus, entitling Downey Bank to the entirety of the tax refund allocable to it, i.e., the *res* of the trust, or whether the refund is property of the estate and Downey Bank has a claim for its unpaid share of the refund.  Such a claim would share *pro rata* with the Debtor's other liabilities, including a $200 million claim filed by Wilmington Trust Company as Indenture Trustee under certain Notes issued by the Debtor.  Not surprisingly, the

Trustee and the Indenture Trustee asserts that the tax refund is property of the estate and the FDIC-R argues to the contrary.  As a result of the dispute, the Trustee filed a declaratory judgment action in this Court regarding, among other things, the ownership of the tax refunds.

Pending before the Court are two motions for summary judgment regarding the ownership of the tax refund.  The resolution of the motions hinges on the language of the tax sharing agreement and, as mentioned above, whether it creates a debtor-creditor relationship between the parties or whether the tax sharing agreement creates an agency or trust relationship.  Based upon the plain, unambiguous language of the tax sharing agreement, the Court finds, as a matter of law, that the tax sharing agreement creates a debtor-creditor relationship.  Additionally, the Court finds that no resulting trust was created between the parties.  As a result, the tax refund is property of the Debtor's estate.  Summary judgment will be entered in favor of the Trustee and the Indenture Trustee.[2]

## JURISDICTION

The Court has jurisdiction over the motions pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a

---

[2]  As discussed below, the movants also seek summary judgment on FDIC-R's (alleged) violation of the automatic stay.  The Court will deny the motions, without prejudice, regarding whether FDIC-R violated the automatic stay.

"core" proceeding as that term is defined in 28 U.S.C. § 157(b).  This Court has the judicial power to enter a final order.

## BACKGROUND

**A.**    **The Parties**

  1.    **Downey Financial Corp.**

DFC is a bank holding company.  On or about January 23, 1995, DFC acquired all of the outstanding shares of Downey Bank, a federal chartered bank under the regulation of the Office of Thrift Supervision ("OTS").  Prior to the Receivership Date (described *infra*), DFC was the parent corporation for its subsidiaries, including Downey Bank (collectively, the "Affiliated Group").  Other than its investment in Downey Bank, DFC had little other assets and a majority of its revenues were also generated by Downey Bank.

In DFC's own words:

> We are a holding company and we conduct substantially all of our operations through . . . [Downey] Bank and its subsidiaries, DSL Service Company.  We derive substantially all of our revenues from, and substantially all of our ongoing operating assets are owned by . . . [Downey] Bank.  As a result, our cash flow and our ability to service our debt, including the notes, depend primarily on the results of . . . [Downey] Bank and upon the ability of . . . [Downey] Bank to provide us cash to pay amounts due on our obligations, including the notes.[3]

---

[3]  Declaration of Peter Feldman in Support of the FDIC-R's Memorandum of Law in Opposition to the Motions for Partial Summary Judgment of the Trustee and Wilmington Trust Company ("Feldman

### 2.    The Trustee

On November 25, 2008, DFC filed a voluntary petition under Chapter 7 of Title 11 of the United States Code.   The Office of the United States Trustee appointed Montague S. Claybrook as the Chapter 7 Trustee; thereafter Mr. Claybrook resigned and the Office of the United States Trustee appointed Alfred T. Giuliano as interim successor trustee[4] (hereinafter, the "Trustee").

### 3.    The Indentured Trustee

Wilmington Trust Company is the indenture trustee (the "Indenture Trustee") with respect to certain 6 ½% Senior Notes due on July 1, 2014 issued by DFC under that First Supplemental Indenture, dated as of June 23, 2004 (the "Notes").   The Indenture Trustee has filed a proof of claim on behalf of the Noteholders asserting, among other things, a claim for $200 million in principal amount outstanding under the Notes.   The Noteholders' collective claim comprises substantially all of the Debtor's undisputed general unsecured claims.

### 4.    The FDIC-R and Downey Bank

The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized and existing pursuant to the Federal Deposit Insurance Act.[5]   The FDIC acts in two

---

Declaration") Exh. 4 (Risks Relating to the Notes section of Prospectus Supplement to Downey Financial Corp. $200,000,000 6½ % Senior Notes Due 2014, at S-13).

[4]  D.I. 973.  Thereafter, the Court entered an order substituting Mr. Giuliano as plaintiff in this adversary action.  Adv. Pro. No. 10-53731 D.I. 133 (Docket items in the adversary action are referred to herein as "Adv. D.I. #").

[5]  12 U.S.C. § 1811, *et seq.*

capacities: in its corporate capacity as a regulator (FDIC) and in its capacity as a receiver for failed financial institutions (FDIC-R).  In this action, FDIC-R has been sued in its capacity as receiver for Downey Bank.

On November 21, 2008 (the "Receivership Date"), the Director of Thrift Supervision appointed FDIC-R as the receiver of Downey Bank.  Upon its appointment, FDIC-R sold substantially all of the former assets of Downey Bank to U.S. Bank National Association ("U.S. Bank") under a purchase and assumption agreement dated November 21, 2008.

FDIC-R has filed a "protective" claim against DFC in an unliquidated amount for, among other things, its allocation of the Tax Refund.

**B.    Procedural Background**

In October 2010, the Trustee commenced this adversary proceeding by filing a complaint (the "Complaint") against FDIC-R seeking declaratory judgment regarding ownership of tax refunds under section 541 of the Bankruptcy Code.[6]  Thereafter, FDIC-R filed an answer and counterclaims, which were subsequently amended (the "Counterclaims").[7]  The Trustee filed its answer and affirmative defenses to FDIC-R's

---

[6] Adv. D.I. 1.

[7] Adv. D.I. 29.

answer.[8]  On January 28, 2011, this Court allowed the Indenture Trustee to intervene as

a plaintiff.[9]

The Indenture Trustee and the Trustee filed motions for summary judgment as to

the ownership of the Tax Refund and as to their allegations that FDIC-R violated the

automatic stay.[10]  In addition, they seek summary judgment on FDIC-R's counterclaims

seeking ownership of the Tax Refund.[11]  The motions for summary judgment have been

fully briefed[12] and are ripe for the Court's consideration.

## C.    Factual Background

### 1.    The Tax Sharing Agreement.

On or about February 29, 2000, the Debtor and its affiliates, including Downey

Bank, executed a Termination and Amendment Number 1 to Tax Sharing Agreement

(hereinafter the "TSA").[13]  The TSA allowed the Debtor and Downey Bank to take

---

[8]  Adv. D.I. 35.

[9]  Adv. D.I. 42.

[10]  More specifically, the movants seek summary judgment on Count I of the Complaint for declaratory judgment under section 541 of the Bankruptcy Code relating to ownership of the tax refunds and Count II of the Complaint for violation of the automatic stay.  *See* Adv. D.I. 1, 79 and 81.

[11]  More specifically, the movants seeks summary judgment on FDIC-R's First Counterclaim, which also seeks declaratory judgment under section 541 of the Bankruptcy Code relating to the ownership of the tax refunds, and its Tenth Counterclaim, which seeks a declaration that the Trustee is not entitled to and is barred from seeking any or all of the tax refunds.  *Id*.

[12]  In addition to the motions and supporting memoranda,  FDIC-R's opposition thereto, and movants' reply briefs (Adv. D.I. 79, 80, 81,  82, 92, 94, and 95); the parties have filed ten (10) additional sets of supplemental briefing (Adv. D.I. 106, 107, 108, 109, 111, 112, 114, 115, 116, 117, 119, 120, 122, 123, 124, 125, 128, 128, 130 and 131).

[13]  Declaration of William H. Gussman, Jr. in Support of Plaintiff Wilmington Trust Company's Motion for Partial Summary Judgment (there "Gussman Declaration"); Exhibit 1 (Termination and Amendment

advantage of the beneficial tax treatment afforded to affiliated corporations that file consolidated tax returns, and to address inter-corporate tax policies and procedures. Consolidated tax returns permitted the Debtor to utilize losses by one group member to reduce the consolidated group's overall tax liability.

The TSA states:

> It is the desire and intent of the parties to this [TSA] to establish a method for allocating the consolidated tax liability of each member among the Affiliated Group . . . for reimbursing Financial[14] for payment of such tax liability, for compensating members of the Affiliated Group for use of their losses or tax credits, and to provide for the allocation and payment of any refund arising from a carry back of losses of tax credits from subsequent taxable years.[15]

The TSA creates a system of payment obligations between the Debtor and the Affiliated Group members.

Historically, the Debtor and Downey Bank adhered to the process established by the TSA. As required by the TSA, estimated taxes were calculated on a stand-alone basis and reflected the amount that each Affiliated Group member would have owed to the IRS had it filed separately.[16] The Affiliated Group members would then pay their

---

Number 1 to Tax Sharing Agreement among Downey Financial Corp. and Affiliates, dated February 29, 2000). Adv. D.I. 80. The TSA makes reference to an earlier tax sharing agreement, dated December 1, 1998.

[14] The Debtor is referred to as "Financial" in the TSA.

[15] TSA, § 2.1(a).

[16] TSA, § 2.1(d) ("In no instance shall the allocation of tax liability to any member of the Affiliated Group pursuant to this [Tax Sharing] Agreement be less favorable than the tax liability which would result from such member filing a separate tax return.").

estimated tax payments to DFC.[17]   When DFC received estimated tax payments from

the Affiliated Group members, it would deposit them into its operating account,

commingling them with its existing funds.   Thereafter, DFC paid the consolidated taxes

electronically to the IRS and other taxing authorities.[18]   The Affiliated Group's year-end

tax returns were similarly calculated on a stand-alone basis as required by the TSA.

Although, the tax liability for each member of the Affiliated Group was calculated on a

stand-alone basis, each member's taxable income was reported to the IRS on a

consolidated scheduled submitted with the Affiliate Group's consolidated return.

The TSA gives broad authority to the Debtor regarding the preparation, filing,

and manner in which the tax returns are prosecuted.   The TSA states, in relevant part:

> [The Debtor] shall have the right, in its sole discretion: (i) to
> determine (A) the manner in which such returns shall be
> prepared and filed, including, without limitation, the
> manner in which any item of income, gain, loss, deduction
> or credit shall be reported; provided, however, that [the
> Debtor] shall consider in good faith any treatment proposed
> by the Affiliated Group members, (B) whether any
> extensions of the statute of limitations shall be granted and
> (C) the elections that will be made pursuant to the Code on
> behalf of any member of the consolidated group (it being
> agreed, however, that [the Debtor] shall not unreasonably
> withhold its consent to any elections which members of the
> Affiliated Group desire to make); (ii) to contest, compromise
> or settle any adjustment or deficiency proposed, asserted or
> assessed as a result of any audit of any such returns; (iii) to
> file, prosecute, compromise or settle any claim for refund;

---

[17] TSA, § 2.1(e).

[18] *Id.*

> and (iv) to determine whether any refunds to which the consolidated group may be entitled shall be paid by way of refund or credited against the tax liability of the consolidated group.[19]

Furthermore, if the Debtor determines that an Affiliated Group member made an overpayment of its estimated taxes, the Debtor has a contractual obligation to refund the overpayment to the group member.[20]  In such a case, the Debtor has to make the payment "within seven (7) business days of the earlier of 1) the receipt of such overpayment from the taxing authorities, or 2) at such time as, and to the extent that, the overpayment is reflected in reduced quarterly installments of taxes due."[21]

The TSA further provides that if adjustments of the consolidated tax liability occur as a result of the filing of an amended return, claim for a refund or an audit, "the liability of the Affiliated Group members shall be recomputed by [the Debtor] to give effect to such adjustments.  In the case of a refund, [the Debtor] shall make payment to each Affiliated Group member for its share of the refund . . . within seven (7) business days after the refund is received by [the Debtor]."[22]  Besides the payment obligation, there are no further restrictions on the Debtor's use of any such refund (i.e. no requirements that the refund be held in escrow or segregated from other funds).

---

[19] TSA, § 2.4(a).

[20] TSA, § 2.1(e).

[21] *Id*.

[22] TSA, § 2.1(h).

Refund checks received from the IRS were made payable to DFC.[23]  However, prior refund checks, even though made payable to DFC, were deposited directly into one of Downey Bank's accounts (and in turn, Downey Bank distributed the respective portions of the refund to other members of the Affiliated Group).[24]

### 2.    The Anticipated Tax Refund.

On September 15, 2009, the Trustee, on behalf of the bankruptcy estate and the Affiliated Group, filed a 2008 consolidated tax return (the "2008 Tax Return").  As a result of the sale of substantially all of the former assets of Downey Bank to U.S. Bank, the value of the Debtor's interest in the stock of Downey Bank became "worthless" under the Internal Revenue Code.  Accordingly, in the 2008 Tax Return, the Trustee, on behalf of the Debtor's estate, claimed an ordinary loss attributable to the worthlessness of its investment in Downey Bank of approximately $1.7 billion (the "Worthless Stock Deduction") with respect to all of the Debtor's issued and outstanding stock in Downey Bank.

Shortly thereafter, the Trustee filed a Form 1139, Corporate Application for Tentative Carryback Refund, for a tentative carryback refund claim (the "Tentative Carryback Refund").  The Tentative Carryback Refund sought to carryback the losses

---

[23]  *See* Gussman Declaration, Exh. 10.

[24]  *See* Declaration of Stephan H. Wasserman, CPA/ABV, CFF ("Wasserman Declaration"), Exh. D.

claimed in the 2008 Tax Return and sought a tax refund of approximately $145 million for the tax years ending December 31, 2006 and 2007.

By letter dated October 26, 2009, the IRS refused to process the Trustee's Form 1139 because FDIC-R had filed a Form 56-F with the IRS without informing the Trustee or seeking leave of this Court, as explained *infra*.

On December 31, 2009, the Trustee filed amended tax returns asserting claims for refunds for the tax years 2003-2007 (the "Amended Tax Returns").[25]  The Amended Tax Returns claimed refunds, including statutory interest, of $314,335,197.20.

On September 10, 2010, the Trustee supplemented the claims asserted earlier in the Amended Tax Returns to claim a total refund of $373,791,733 (the "Second Amended Tax Returns"), and an entitlement to statutory interest (this amount, or such other amount as may be due to the Debtor, the "Tax Refund").  For the purposes of these motions, the parties concede that the overpayments arise from the carryback of Downey Bank's net operating losses in 2008 to the taxable income reported by the Affiliated Group with respect to the tax years 2003 through 2007.[26]

---

[25]  On November 6, 2009, the Worker, Homeownership and Business Assistance Act was signed into law permitting the Trustee to carryback losses for up to five years, instead of the former two year carryback rule.  26 U.S.C. §§ 6511 & 172(b)(1)(H) (as amended by § 13 of the Workers, Homeownership, and Business Assistance Act of 2009 (Pub. L. No. 111-92, 123 Stat. 29840) (the "2009 Act")).

[26]  The Trustee has already received approximately $17 million in tax refunds related to overpayments of taxes paid in 2007, which are being held in the Trustee's escrow account pursuant to Stipulations approved by this Court.  *See* D.I. 67 and 347.  The remainder of the Tax Refund is being sought in litigation pending before the United States Court of Federal Claims, discussed *infra*.

FDIC-R filed competing tax returns on behalf of the Debtor and the entire Affiliated Group. Downey Bank (and its subsidiary DSL Service Company) claims that it generated substantially all of the taxable income reported by the Affiliated Group to the IRS between 2003 and 2007. As a result, Downey Bank was the source (through the TSA) of substantially all of the tax payments made to the IRS in the years at issue.[27] As such, FDIC-R's competing tax return seeks the same amount of refund sought in the returns filed by the Trustee.

Thereafter, on October 29, 2010, the Trustee commenced an action in the United States Court of Federal Claims against the United States seeking, among other things, to liquidate the amount of the Tax Refund.[28] The Court of Federal Claims action is currently pending. This Court understands that the matter is settled in principle, although approval from the requisite governmental agencies has not been obtained to

---

[27] Payment of Taxes by Downey Bank:

| Tax Year | Amount of taxes funded by Downey Bank (through the TSA) ($ 000) | % of Total Paid to the IRS |
|----------|----------------------------------------------------------------|----------------------------|
| 2003 | 54,162 | 93.1 |
| 2004 | 67,218 | 100.0 |
| 2005 | 124,398 | 97.8 |
| 2006 | 149,395 | 97.8 |
| 2007 | 14,000 | 98.6 |
| **Total** | **409,173** | **97.5** |

*See* Wasserman Declaration at p. 11, ¶17.

[28] Fed. Cl. Case No. 10-734T.

date.  The litigation in the Court of Federal Claims has been effectively stayed pending

the outcome of the settlement process.  Although the full amount of the Tax Refund has

not been liquidated, for the purposes of this Opinion, there is a Tax Refund.

### 3.    Post-Petition Actions by FDIC-R

After the Petition Date, the Trustee alleges that FDIC-R has violated the

automatic stay by asking the IRS repeatedly to freeze the processing of the Debtor's Tax

Refund and to reject the Trustee's returns in favor of those filed by FDIC-R.

On November 28, 2008, three days after the Petition Date, and again in October

2009, FDIC-R filed a Form 56-F "Notice Concerning Fiduciary Relationship of Financial

Institution" (the "Form 56-F") with the IRS.[29]  One purpose of the Form 56-F is, FDIC-R

states, "to notify the IRS of a fiduciary relationship only if the relationship is with

respect to a financing institution (such as a bank or thrift)."[30]  Furthermore, a Form-56

may "secure [FDIC-R's] position with respect to any refund which may be available to a

consolidated group."[31]  FDIC-R filed the Form 56-F in support of its claim for the Tax

Refund.[32]

Although the Form 56-F represents that FDIC-R was providing notice of its filing

to the Debtor, FDIC-R did not notify the Debtor that it had filed the Form 56-F until

---

[29]  Gussman Declaration, Exh. 11.

[30]  *Id.*, Exh. 12, p.2 "Purpose of Form."

[31]  *Id.*

[32]  *Id.*, Exh. 13.

March 2009.[33]  Furthermore, the Trustee asserts that FDIC-R advocated directly to the

IRS (without the Trustee's knowledge) that the Chapter 7 Trustee's tax returns should

be rejected in favor of the returns to be filed by FDIC-R.   In October 2009, James

Vordtriede, a senior member of FDIC-R's Division of Resolutions and Receiverships,

Tax Unit, wrote to Le Hashimoto, a revenue agent at the IRS, requesting a freeze of the

Debtor's IRS accounts:

> The FDIC has requested . . . a freeze on the 2005-8 CYE 1120
> accounts for Downey Financial Corporation . . . currently in
> bankruptcy . . . . The FDIC as receiver for [Downey Bank]
> has a definite interest in filing claims for refund under
> Section 6402(k).   Leo asked me to contact you; he said a
> bankruptcy freeze was already in place, but to request
> through you for the freeze to be maintained and not lifted . .
> . I am going to send a fresh Form 56-F to your attention
> regarding this, and please let me know if you need anything
> else.   As per the attached, we are expecting the trustee for
> the parent to file a Form 1139 which we view is based on an
> inaccurate 2008 1120.[34]

In Mr. Vordtriede's deposition he confirmed that he knew that the Debtor was in

bankruptcy and that he was requesting that the IRS not pay any tax return to the

Trustee until FDIC-R could assert its own claim for the funds.[35]

In early January 2010, the Debtor's filed a motion against FDIC-R for violation of

the automatic stay.   Thereafter, FDIC-R sent an e-mail to the IRS advocating that "the

---

[33]  *Id.*, Exh. 14.

[34]  *Id.*, Exh. 13.

[35]  *Id.*, Exh. 15 (Vordtriede Dep. at 146:9-10; 146:17-147:0; 147:14-148:7).

trustee's claim's can be rejected on technical grounds alone" and therefore, "the freeze of Downey Financial Corporation's group 1120 accounts [should] remain in place pending submissions by the FDIC of its own set of claims allowed under Reg. 301.6402-7(e)(1)."[36] Later, FDIC-R attempted to clarify its position and said that it was not taking any formal position or requesting any action.[37] However, Mr. Vordtriede stated at the end of this "clarifying" e-mail: "My [previous] e-mail was to outline for you the FDIC's technical grounds for its position and update you."[38] As such, FDIC-R in no way withdrew its position regarding the freeze on the accounts.

This Court demanded that all *ex parte* communications with the IRS be stopped. On September 13, 2010, this Court advised FDIC-R that it "will not allow any sharing of documents with the IRS without further order of the Court or consent of the parties. And that goes – that's designed to – hopefully, to the extent a well has been poisoned, to keep it from getting any worse."[39] The very same day as this Court's ruling, FDIC-R had additional *ex parte* communications with the IRS, in which it requested "that the refunds be made payable to the FDIC and forwarded to our attention pursuant to IRC Reg. 103.6402-7."[40] This Court held a further hearing regarding the violation of this

---

[36] *Id.*, Exh. 16.

[37] *Id.*, Exh. 17.

[38] *Id.*

[39] D.I. 468 (Transcript of Sept. 13, 2010 Hearing at p. 36).

[40] Gussman Declaration, Exh. 19.

Court's ruling.[41]   The Court again ordered that FDIC-R stop communicating with the

IRS.[42]   Thereafter, to the Court's knowledge, the parties have abided by the automatic

stay as the litigation continued here and in the Court of Federal Claims.

## LEGAL DISCUSSION

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c), made applicable to these proceedings

pursuant to Federal Rule of Bankruptcy Procedure 7056, provides that summary

judgment should be granted if the movant shows that "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law,"[43] after

considering the "pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits."[44]

In deciding a motion for summary judgment, all factual inferences must be

viewed in the light most favorable to the nonmoving party.[45]   After sufficient proof has

been presented to support the motion, the burden shifts to the nonmoving party to

show that genuine issues of material fact still exist and that summary judgment is not

---

[41]  D.I. 608 (Transcript of Nov. 17, 2010 Hearing at p. 6); D.I. 552 (Transcript of Dec. 1, 2010 Hearing at p. 11).

[42]  D.I. 552 (Transcript of Dec. 1, 2010 Hearing at p. 11).

[43]  Fed. R. Civ. P. 56(a).

[44]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[45]  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–588 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

appropriate.[46]   A genuine issue of material fact is present when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[47]

In order to demonstrate the existence of a genuine issue of material fact in a jury trial, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant.[48]  The same principles apply in a bench trial where the judge is the ultimate trier of fact; the nonmovant must obviate an adequate showing to the judge to find for the nonmovant.[49]   In a situation where there is a complete failure of proof concerning an essential element of the nonmoving party's case, Rule 56(c) necessarily renders all other facts immaterial and mandates a ruling in favor of the moving party.[50]

## B.    The Parties' Positions

The Trustee and the Indenture Trustee (collectively, the "Movants") argue that the tax refunds are property of the Debtor's estate because (i) affiliated companies are free to allocate their ultimate tax liability among themselves pursuant to the TSA; (ii) the TSA creates a debtor-creditor relationship and not a trustee-beneficiary relationship; (iii) the TSA does not establish a trust relationship; (iv) the Affiliated

---

[46]  *Id.* at 587.

[47]  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

[48]  *Olson v. Gen. Elec. Astrospace,* 101 F.3d 947, 951 (3d Cir. 1996).

[49]  *In re Broadstripe, LLC,* 444 B.R. 51, 76-77 (Bankr. D. Del. 2010) (citing *Leonard v. General Motors Corp. (In re Headquarters Dodge),* 13 F.3d 674, 679 (3d Cir. 1993).

[50]  *Id.* at 77-78 (citing *Celotex Corp.,* 477 U.S. at 317-18).

Group's course of dealings confirmed the debtor-creditor relationship; and (v) no grounds exist for the imposition of a constructive trust.

FDIC-R responds that the Tax Refund is property of Downey Bank receivership estate because (i) the TSA does not expressly transfer ownership of the Tax Refund to DFC; (ii) the Movant's interpretation of the language of the TSA would render the TSA internally inconsistent, ambiguous and unlawful; (iii) the course of performance among the Affiliated Group members established that the funds were, in fact, property of Downey Bank; and (iv) the Trustee (as successor to DFC) holds the Tax Refund as FDIC-R's agent and in trust for FDIC-R.

## C.    Property of the Debtor's Estate

On November 25, 2008, when DFC filed a chapter 7 petition, a bankruptcy estate was created to hold "all legal or equitable interests of the debtor [DFC] in property as of the commencement of the case."[51]   The Petition Date sets a "date of cleavage" and "establishes the moment at which the parties' respective rights in property must be determined."[52]   The scope of an estate's property interests is broad.[53]

---

[51]   11 U.S.C. § 541(a)(1).

[52]   *In re IndyMac Bancorp, Inc.,* 2:08-BK-21752-BB, 2012 WL 1037481, *12 (Bankr. C.D. Cal. Mar. 29, 2012) report and recommendation adopted sub nom. *In re IndyMac Bancorp Inc.,* CV 12-02967-RGK, 2012 WL 1951474 (C.D. Cal. May 30, 2012) (citations omitted).   Hereinafter, the *IndyMac Bancorp* bankruptcy court report and recommendations (which were accepted by the District Court) will be referred to herein as "*IndyMac Bancorp.*"   When the Court refers to the district court's opinion, it will be indicated as the "*IndyMac Bancorp* District Court Opinion."

[53]   *Id.* (citing *United States v. Whiting Pools, inc.,* 462 U.S. 198, 204 (1983) and *In re Central Ark Broad. Co.,* 68 F.3d 213, 214 (8th Cir. 1995)).

Estate property includes all of a debtor's rights and expectancies and is a concept that "has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966); see also, e.g., 11 U.S.C. § 541(c)(1)(A) (providing that assets become estate property notwithstanding any provision of nonbankruptcy law that would prevent their being liquidated or transferred by the debtor); H.R. REP. No. 95–595, at 175–76 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6136 (making clear that "property of the estate" includes all "contingent interests and future interests, whether or not transferable by the debtor").[54]

"In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of [section] 541."[55]

## D.    The TSA is Not Ambiguous.

The crux of the dispute is the interpretation of the TSA and the facts surrounding the TSA to the extent that there are ambiguities in the TSA's language.  Interpreting the terms of the TSA is essential in establishing who owns the Tax Refund.  To begin, the TSA states that this Court should interpret the TSA in accordance with the laws of the State of California.[56]  Furthermore, this matter is appropriate for summary judgment because "the determination whether contract language is ambiguous is a question of law."[57]

---

[54] *Id.*

[55] *Matter of Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993) (citations omitted).

[56] TSA, § 3.3.

[57] *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1135 (E.D. Cal. 2001).

1.      **Contract Interpretation**

Generally, "[w]hen interpreting a contract, the plain language within the four corners of the contract must first be examined to determine the mutual intent of the contracting parties."[58]  "In cases of contracts, language is to be given, if possible, its usual and ordinary meaning.  The object is to find out from the words used what the parties intended to do."[59]  "In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.  Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs."[60]  If terms are "susceptible to more than one reasonable interpretation," then they are ambiguous.[61]  "The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous."[62]  In other words, "for there to be an ambiguity both interpretations must be reasonable."[63]

---

[58]  *Westlands Water Dist.*, 134 F. Supp. 2d at 1134 (citing *United States v. Clark*, 218 F.3d 1092, 1096 (9th Cir. 2000)).

[59]  *Id.*  (citations and internal quotation marks omitted).

[60]  *Giove v. Dep't of Transp.*, 230 F.3d 1333, 1340-41 (Fed. Cir. 2000) (citations and internal quotation marks omitted).

[61]  *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citations omitted).

[62]  *Westlands Water Dist.*, 134 F. Supp. 2d at 1135 (citations and internal quotation marks omitted).

[63]  *Giove*, 230 F.3d at 1341.  Thus, if the "provisions are clear and unambiguous, they must be given their plain and ordinary meaning, and the court may not resort to extrinsic evidence to interpret them." *McAbee Const. Inc.*, 97 F.3d at 1435 (citations and internal quotation marks omitted).

## 2.    The TSA

"A significant amount of case law has emerged in determining ownership of tax refunds between parents and their subsidiaries arising from consolidated tax returns filed on behalf of the group."[64]

The Ninth Circuit case of *Bob Richards Chrysler-Plymoth Corp., Inc.*[65] establishes that in the **absence of a written agreement** expressly stating the rights and obligations of parties filing a consolidated tax return, a tax refund resulting solely from offsetting losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member.[66] Without a written agreement, the party receiving the refund from the government receives the refund in its capacity as "agent" for the consolidated group.[67] "The absence of an express or implied agreement that the agent had any right to keep the refund meant the agent was under a duty to return the tax refund to the party that incurred the loss."[68]

FDIC-R urges that the TSA does not change the "ownership rules" set forth in *Bob Richards*. The Court, however, disagrees. If an express written agreement is in

---

[64]  *In re Vineyard Nat. Bancorp*, 2:10-BK-21661RN, 2013 WL 1867987, *7 (Bankr. C.D. Cal. May 3, 2013).

[65]  *Western Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plmouth Corp., Inc.)*, 473 F.2d 262 (9th Cir. 1973) (hereinafter "*Bob Richards*").

[66]  *Id.* at 265.

[67]  *Id.*

[68]  *Vineyard Nat. Bancorp*, 2:10-BK-21661RN, 2013 WL 1867987 at *7 (interpreting *Bob Richards Chrysler-Plymouth Corp.*, 473 F.2d at 265).

effect then the agreement controls the disposition of the tax refund.[69]  To that extent, the

Court will look at the four-corners of the TSA to determine whether the agreement

created an agency or debtor-creditor relationship between the Debtor and Downey

Bank.

### E.    The TSA Establishes a Debtor-Creditor Relationship Between DFC and Downey Bank.

The bankruptcy court in *IndyMac Bancorp* examined three key factors when

considering whether a particular document or transaction establishes a debtor-creditor

relationship or a different relationship (such as trust, mere agency, or bailment

relationship).[70]  The three factors are whether (1) the TSA creates fungible payment

obligations among the parties; (2) there are no escrow obligations, segregation

obligations nor use restrictions under the TSA; and (3) the TSA delegates the tax filer

---

[69]  *Id.* (citations omitted). *See, e.g., Bob Richards*, 473 F.2d at 265 ("**Since there is no express or implied agreement** that the agent had any right to keep the refund, we agree with the referee and the district court that WDM was acting as a trustee of a specific trust and was under a duty to return the tax refund to the estate of the bankrupt." (emphasis added)); *Capital Bancshares, Inc. v. Fed. Deposit Ins. Corp.*, 957 F.2d 203, 208 (5th Cir. 1992) holding that "the refund is the property of the Bank **in the absence of a contrary agreement**." (emphasis added)); *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d 54, 58 (3d Cir. 1990) ( holding that "the parties specified by **explicit contractual language** that the Treasury Bond coupon interest and the GNMA principal and interest payments would be the property of AMC." (emphasis added)); *Vineyard Nat. Bancorp*, 2:10-BK-21661RN, 2013 WL 1867987 at *7 (finding that "if an express written agreement is in effect, such **an agreement controls** the disposition of the tax refund." (emphasis added)); *F.D.I.C. v. AmFin Fin. Corp.*, 490 B.R. 548, 551 (N.D. Ohio 2013) (holding that "the Court finds no merit in the FDIC's contentions that the tax sharing agreements do not fully address the rights and obligations of the entities.  Accordingly, the Court declines to adopt and rely upon the *Bob Richards* rule to create an agency or trust as an operation of law."); *Team Financial, Inc. v. FDIC (In re Team Financials, Inc.)*, 09-10925, 2010 WL 1730681, *8 (Bankr. D. Kan. Apr. 27, 2010) ("The parties to the TAA [tax allocation agreement] in this case made a 'differing agreement,' taking this case out of the *Bob Richards* general rule.").

[70]  *IndyMac Bancorp*, at *13.  *See also F.D.I.C. v. AmFin Fin. Corp.*, 490 B.R. 548, 554 (N.D. Ohio 2013) ("The Court adopts the *IndyMac* analysis in its entirety.").

under the agreement with sole discretion regarding tax matters.  Each of these factors,

which are discussed at length below, favor a finding under the unambiguous terms of

the TSA of a debtor-creditor relationship between the Debtor and Downey Bank.

>     1.    **The TSA Creates Fungible Payment Obligations Unrelated to Any Refunds.**

As set forth in the *IndyMac Bancorp* decisions:

> [C]ourts have repeatedly found that the use of such terms as "reimbursement" or "payment" in a tax sharing agreement evidences a debtor-creditor relationship.  The reason is that such terms create "ordinary contractual obligations" or "an account, a debtor-creditor relationship, which is the quintessential business of bankruptcy."  This precept fully accords with the Ninth Circuit's application of California law in the bankruptcy context to "conclude that as a matter of law a debtor-creditor relationship" exists when the parties' prepetition agreements create fungible payment obligations.[71]

As in *IndyMac Bancorp*, the TSA creates a system of intercompany "payments" and

"reimbursements" that may differ materially from the amount of any tax refund

actually received by DFC.  For example:

> Payment of the consolidated tax liability for a taxable period shall include the **payment** of estimated tax installments due for such taxable period, and members of the Affiliated Group **shall pay** to Financial their estimated tax payments no earlier than ten (10) days prior to the due date for the payment, and in no event later than such due date. Overpayments of estimated tax by members of the Affiliated Group **as determined by Financial** shall be **refunded** to the appropriate members of the Affiliated Group within seven (7) business days of the earlier of 1) the receipt of such

---

[71] *Id.* (citations omitted).

overpayment from taxing authorities, or 2) at such time as, and to the extent that, the overpayment is reflected in reduced quarterly installments of taxes due.[72]

The TSA further provides that if adjustments of the consolidated tax liability occur as a result of the filing of an amended return, claim for a refund or an audit, "the liability of the Affiliated Group members shall be **recomputed by Financial** to give effect to such adjustments.  In the case of a refund, Financial shall make **payment** to each Affiliated Group member for its share of the refund . . . within seven (7) business days after the refund is received by Financial."[73]  The TSA continues:

> Financial shall have the right, **in its sole discretion**: (i) to determine (A) the manner in which such returns shall be prepared and filed, including, without limitation, the manner in which any item of income, gain, loss, deduction or credit shall be reported; provided, however, that Financial shall consider in good faith any treatment proposed by the Affiliated Group members, (B) whether any extension of the statute of limitations may be granted and (C) elections that will be made pursuant to the Code on behalf of any members of the consolidated group (it being agreed, however, that Financial shall not unreasonably without its consent to any elections which members of the Affiliated Group desire to make); (ii) to contest, compromise or settle any adjustments or deficiency proposed, asserted or assessed as a result of any audit of any such returns; (iii) to file, prosecute, compromise or settle any claims for refund; and (iv) to determine whether any refunds to which the consolidated group may be entitled shall be paid by way of refund or credited against the tax liability of the consolidated group.[74]

---

[72] TSA, § 2.1(e) (emphasis added).

[73] TSA, § 2.1(h) (emphasis added).

[74] TSA, § 2.4(a) (emphasis added).

So not only does the TSA create a system of intercompany "payments," the TSA also makes DFC responsible to prepare and file the consolidated tax return, as well as, responsible for making all tax payments.  As in *IndyMac Bancorp*, the TSA expressly authorizes DFC, in its "sole discretion," to determine whether any tax refunds to which the Affiliated Group is entitled will be paid or credited against future tax liabilities of the Affiliated Group.[75]    Furthermore, the TSA says that DFC will "refund" overpayments.[76]

In a similar case to that *sub judice*, the District Court for the Southern District of California held in *Imperial Capital Bancorp, Inc. v. FDIC (In re Imperial Capital Bancorp, Inc.)*[77] that:

> This Court agrees with Imperial that the TAA [tax allocation agreement] clearly creates a debtor/creditor relationship. The TAA contemplates that Imperial prepares and files all tax returns on behalf of the consolidated group, and requires that Imperial pay all of the group's tax liability.  The Bank, in turn, is required to pay to Imperial the amount of its hypothetical stand-alone tax liability, calculated as if the Bank had filed a separate federal or state income tax return. If the consolidated group is entitled to a refund, the appropriate governing tax authority pays such refund directly to Imperial.[78]

---

[75]  TSA, § 2.4(a). Compare *IndyMac Bancorp,*  at * 14.

[76]  TSA, § 2.1(e).

[77]  492 B.R. 25 (S.D. Cal. 2013).

[78] *Id*. at 30 (citations to the tax allocation agreement omitted).

The terms "refund" and "payment," along with the terms of the TSA, are indicative of a debtor-creditor relationship and, in comparison, are completely inconsistent with the existence of a trust or agency relationship.[79]

Recently, however, the Circuit Court of Appeals for the Eleventh Circuit has issued two seemingly contrary opinions.[80]  Notwithstanding that neither is binding precedent upon this Court, the cases are readily distinguishable.

(a) Zucker v. FDIC (In re BankUnited Fin. Corp.)

In *BankUnited,* the Eleventh Circuit looked at the narrow and seemingly identical issue of whether a tax refund was property of the holding company or its subsidiary bank.  The *BankUnited* tax sharing agreement,  however, differed significantly from the TSA in the following ways: (i) the *BankUnited* tax sharing agreement provided that the *bank*, not the holding company, pay taxes to the government; (ii) it described the process and accounting methods in which members of the *BankUnited* group determine their individual income tax liabilities; (iii) it described how the individually determined income tax liability for each member of the group was aggregated and adjusted for the preparation of a consolidated tax return; (iv) it used different terms for intercompany obligations – "income tax payable" to refer to the amount that a member owed to the

---

[79]  *IndyMac Bancorp* at *14.  *See also In re Imperial Capital Bancorp, Inc.*, 492 B.R. 25, 30 (S.D. Cal. 2013); *In re Team Financials, Inc.*, 09-10925, 2010 WL 1730681, *10 (Bankr. D. Kan. Apr. 27, 2010); *In re First Cent. Fin. Corp.*, 269 B.R. 481, 497 (Bankr. E.D.N.Y. 2001) *subsequently aff'd*, 377 F.3d 209 (2d Cir. 2004).

[80]  *Zucker v. FDIC (In re BankUnited Fin. Corp.)*, 12-11392, 2013 WL 4106387 (11th Cir. Aug. 15, 2013) (hereinafter, "*BankUnited.*") and *FDIC v. Zucker (In re NetBank, Inc.)*, No. 12-13965, 2013 WL 4804325 (11th Cir. Sept. 10, 2013) (hereinafter, "*NetBank*").

bank as reimbursement for the bank paying its share of the taxes owed to the government and "income tax receivable" to refer to the amount to which a member is entitled from the bank as a result of a tax refund from the government; (v) it provided that within 30 days of the bank paying the consolidated tax liability to the government, the other members of the group would reimburse the bank; and (vi) although the *BankUnited* holding company filed the consolidated tax return and received the refund, the bank remained obligated to distribute any tax refunds that the holding company received to the group members.[81]   Ultimately, the Eleventh Circuit found that the *BankUnited* tax sharing agreement was *ambiguous* because the agreement did not state *when* the holding company must forward a tax refund to the bank and because the agreement did not explain whether the holding company "owned" the refund before forwarding it to the bank.[82]

The *BankUnited* Court also held that there was no language in the tax sharing agreement from which it could reasonably infer that the parties agreed that the holding company "would retain the tax refunds as a company asset and, in lieu of forwarding them to the [b]ank, would be indebted to the [b]ank in the amount of the refunds."[83]

---

[81]  *Id.* at *2-4.

[82]  *Id.*

[83]  *Id.* at *5.

Nor could the Court find "any words from which the terms of the indebtedness could

be inferred."[84]

> A debtor-creditor relationship is created by consent, express
> or implied.  We find no words in the [tax sharing agreement]
> from which it could reasonably be inferred that the parties
> agreed that the Holding Company would retain the tax
> refunds as a company asset and, in lieu of forwarding them
> to the Bank, would be indebted to the Bank in the amount of
> the refunds.  Nor do we find any words from which the
> terms of the indebtedness could be inferred.  If, as the
> Bankruptcy Court concluded, the parties created a debtor-
> creditor relationship, we would expect to find some means
> of protection for the creditor that would help guarantee the
> debtor's obligation, such as a fixed interest rate, a fixed
> maturity date, or the ability to accelerate payment upon
> default.[85]

Ultimately, the *BankUnited* Court held that the *purpose* of the tax sharing agreement was

to "ensure that the tax refunds [were] delivered to the [g]roup's members in full and

with dispatch."[86]

The *BankUnited* Court's chief concern appears to have been that the *bank* paid the

tax liability and the *bank* was liable to the other members of the consolidated group for

any tax refunds, while the *holding company* filed the return and received the actual tax

refund.  That is not the case here.  In this case, Downey Bank (and other members of the

Affiliated Group) paid their estimated tax liability to DFC (the holding company), DFC

---

[84] *Id.*

[85] *Id.*

[86] *Id.*

had the sole discretion to prepare and file the tax returns, the Tax Refund was paid by

the taxing authorities to DFC, and then DFC would recomputed each member's tax

liability, and DFC could retain any refund for seven business days (and in the event of

tax overpayments, DFC, in its sole discretion, would determine whether to refund the

overpayments to the members of the Affiliate Group or credit the overpayment against

the tax liability of the Affiliated Group).   Ultimately, DFC paid all taxes, received the

Tax Refund *and* remained liable to the other members of the Affiliated Group for their

respective portions.

    *(b)  FDIC v. Zucker (In re NetBank, Inc.)*

    In *NetBank*,[87] the Eleventh Circuit, reversing the lowers courts' decisions, held

that a tax sharing agreement was ambiguous.

> Based on the language of the TSA and the Policy Statement,
> we conclude that the parties intended to establish an agency
> relationship with respect to refunds from the IRS
> attributable solely to the Bank.   Specifically, our conclusion
> is based on the language of the TSA (e.g., the indication in
> Section 9 that NetBank acts in an agency capacity with
> respect to tax refunds, and the expressly stated intent of the
> parties in Section 10(a) to comply with the Policy Statement)
> and on the language of the Policy Statement that a parent
> company such as NetBank should be deemed to receive tax
> refunds in an agency capacity.[88]

    The *NetBank* tax sharing agreement contained the following language: "This

Agreement is intended to allocate the tax liability in accordance with the Interagency

---

[87]  *NetBank*, No. 12-13965, 2013 WL 4804325.

[88]  *Id.* at *5.

Statement on Income Tax Allocation in a Holding Company . . . ."[89]  The Interagency

Statement on Income Tax Allocation in a Holding Company (the "Interagency Policy

Statement") counsels against entering into a tax allocation agreement that would grant

ownership to the parent of refunds attributable to the bank.[90]  The *NetBank* court found

that this reference was a clear indication of the parties' intention.  *NetBank*, however, is

factually distinguishable from this case.  Here, the parties did not reference the

Interagency Policy Statement, even though the Interagency Policy Statement was issued

in 1998 and the latest iteration of the TSA was entered into in February 2000.

Furthermore, unlike in *NetBank*, the TSA does not contain language stating that DFC

acts in an agency capacity with respect to tax refunds.[91]  Although there are many

similarities between the *NetBank* tax sharing agreement and the TSA, the *NetBank* tax

sharing agreement contained language that the TSA does not.

    Although the *BankUnited* and *NetBank* cases seem to offer contrary decisions to

the cases discussed above, they are factually distinguishable and do not persuade this

Court that DFC and Downey Bank had anything other than a debtor-creditor

relationship.

---

[89]  *Id.* at *3.

[90]  Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure, 63 Fed.Reg. 64757, 64759 (Nov. 23, 1998).

[91]  *See NetBank* at *3 and 5.

2.      **The TSA Contains No Escrow, Segregation Requirement, or Use Restrictions on Any Refund that DFC Receives.**

The second factor to consider in determining if the Debtor and Downey Bank have a debtor-creditor relationship is whether the TSA contains any escrow requirements, segregation requirements and/or use restrictions in connection with the Tax Refund.  More specifically, as set forth in *IndyMac Bancorp*:

> courts have repeatedly found that the lack of provisions requiring the parent to segregate or escrow any tax refunds and the lack of restrictions on the parent's use of the funds while in the parent's possession further evidences a debtor-creditor relationship.[92]

"It is a firmly established principle that if a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists."[93]  As set forth in *IndyMac Bancorp*, the Court will look at the broader range of actions that are permitted or forbidden by the TSA.[94]

The TSA contains no escrow provisions, segregation requirements or restrictions on DFC's use of any tax refund that the government pays to DFC.  Nothing in the TSA imposes any duty upon DFC to hold these funds in trust or to treat them as trust funds for the benefit of any other parties.  Prior to the payment of any tax refund to the Affiliated Group members, DFC has complete dominion and control over the monies

---

[92] *IndyMac Bancorp,* at *15 (citations omitted).

[93] *In re Black & Geddes, Inc.,* 35 B.R. 830, 836 (Bankr. S.D.N.Y. 1984).  *See In re Coupon Clearing Serv., Inc.,* 113 F.3d 1091, 1101 (9th Cir. 1997) (*quoting In re Black & Geddes, Inc.,* 25 B.R. at 836); *Lonely Maiden Prods., LLC v. GoldenTree Asset Mgmt., LP,* 201 Cal. App. 4th 368, 380 (2011) (*quoting In re Black & Geddes, Inc.,* 25 B.R. at 836).

[94] *IndyMac Bancorp,* at *15.

received from the governmental authorities for over a week.[95]  Furthermore, Downey

Bank's rights (and those of the other Affiliated Group members) are limited to the

expectancy of payment of a sum at future date.[96]

FDIC-R argues that because the TSA does not explicitly discuss ownership of the

Tax Refund, that the Court should rely on the following language:

> In no instance shall the allocation of tax liability to any
> member of the Affiliated Group pursuant to this [Tax
> Sharing] Agreement be less favorable than the tax liability
> which result from such member filing a separate tax return.[97]

The above-quoted language is contained in several places is the TSA.  More specifically,

it arises in relation to computing tax liability;[98] the payment of estimated tax liability;[99]

an increase in tax liability from recomputed tax liability (in the case of an amended tax

return, claim for refund, or tax audit);[100] and state and other taxes.[101]  As stated in

*IndyMac Bancorp*, the separate-return language is a right "to receive fungible 'payments'

---

[95]  TSA, § 2.1(h) (proscribing seven business days for DFC to pay the Affiliated Group member's refund). The FDIC-R relies on In *BSD Bancorp, Inc v. FDIC*, No. 93-12207-A11 (S.D. Cal. Feb. 28, 1995) (Feldman Declaration, Exh. 57), however, the *BSD Bancorp* opinion does not set forth terms of tax sharing agreement; so it is impossible to compare that tax sharing agreement to the one *sub judice*.  Regardless, the *BSD Bancorp* court concluded that the parent was required to give subsidiary its share of the refund in cash and immediately; as discussed, here, no such requirement exists (Debtor controls the amount it determines to pay its subsidiary for 7 business days, if at all.  *See* TSA, §2.h.).

[96]  *See IndyMac Bancorp,* at *16.

[97]  TSA, § 2.1(d).

[98]  *Id.*

[99]  TSA, § 2.1(e).  The TSA also refers to a "separate-return basis" when discussing unused losses.  TSA, § 2.1(g).

[100]  TSA, § 2.1(h).

[101]  TSA,  §§ 2.2 and 2.3.

using a formula calculated as if the Bank were a separate tax filer is meaningfully different from the right to receive any specific *refunds* upon receipt."[102]

The Court finds that the stand-alone language refers to the *amount* of tax liability to be paid by the members of the Affiliated Group and does not create a trust or agency relationship or ownership of any refund. Nothing herein affects the *amount* of FDIC-R's claim against DFC – this Opinion relates solely to who "owns" the Tax Refund.

Here, the debtor-creditor relationship is created by the lack of segregation provisions or use restrictions.[103] When DFC receives the tax refund, DFC stands as a future debtor of Downey Bank (after the passage of seven business days) and not as trustee or agent.[104]

### 3. The TSA Delegates Complete and Unrestrained Decision-Making to DFC Regarding All Tax Matters.

The last factor to consider in determining whether a debtor-creditor relationship exists between the parties is whether contractual provisions give "a parent sole discretion to prepare and file consolidated tax returns and to elect whether or not to receive a refund."[105]

---

[102] *IndyMac Bancorp*, at *14 (emphasis supplied).

[103] *Id. at* *16 (finding that "a debtor-creditor relationship is created because lack of segregation provisions or use restrictions undermines the direction and control necessary to establish an agent or trustee relationship."(citations omitted)).

[104] *See id.*

[105] *Id.* at * 16 (citations omitted).

Section 2.4 of the TSA gives DFC "sole discretion over (1) the manner in which tax returns are prepared and filed, (2) whether any tax refund should be paid or credited against future tax liability, and (3) how to resolve disputes with the taxing authorities."[106]  In fact, the TSA provisions in this matter are almost identical to those in *IndyMac Bancorp*.[107]  This Court agrees with *IndyMac Bancorp* and finds that this language does not subject DFC to the direction or control of any member of the Affiliated Group and does not establish a principal-agent relationship between the members of the Affiliated Group and DFC.[108]

FDIC-R argues that the "mere use of certain words" should not over-ride the *intention* of the parties.[109]  However, the preliminary consideration of extrinsic evidence does not trump the TSA's clarity.[110]  For example, FDIC-R submits (and the Movants do not dispute) that prior tax refund checks were deposited directly into Downey Bank's accounts (rather than first being deposited into DFC's accounts).[111]  This practice,

---

[106]  TSA, § 2.4(a).

[107]  *IndyMac Bancorp*, at * 16.

[108]  *Id*.

[109]  *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 38, 442 P.2d 641 (1968) ("A court must ascertain and give effect to this intention by determining what the parties meant by the words they used.  Accordingly, the exclusion of relevant, extrinsic, evidence to explain the meaning of a written instrument could be justified only if it were feasible to determine the meaning the parties gave to the words from the instrument alone.").

[110]  *Zenger-Miller, Inc. v. Training Team, GmbH*, 757 F. Supp. 1062, 1068 (N.D. Cal. 1991).

[111]  Feldman Declaration, Exh. 15, Buck Tr. 152:4-153:12.  *See* also Feldman Declaration, Exh. 23.

however, only reinforces the debtor-creditor relationship because DFC had to consent and direct the deposit of the check into Downey Bank's account.[112]

As set forth herein, it is beyond the "mere words."  The Court is persuaded by (i) the absence of a precise provision establishing a trust or agency relationship; (ii) DFC's sole discretion to prepare and file the consolidated tax return, including "the manner in which any item of income, gain, loss, deduction or credit shall be reported;" (iii) DFC's sole discretion to determine whether any overpayments to which Downey Bank may have been entitled to be paid by way of refund or credited against the tax liability of the consolidated group; and (iv) DFC's ability to hold any refund for more than a week. These provisions giving complete discretion to DFC along with the specific words of "payment" and "reimbursement," leads this Court to find that DFC owns any Tax Refund.  And, consequently, FDIC-R has a claim against DFC's estate for the amount of its separate-return basis.[113]

In conclusion, all three of the *Indy Mac* Bancorp factors favor, as a matter of law, a finding that under the unambiguous terms of the TSA the relationship of the Debtor

---

[112] *See, e.g.  Unlimited Adjusting Grp., Inc. v. Wells Fargo Bank, N.A.*, 94 Cal. Rptr. 3d 672, 676-77 n. 6 (2009) ("When a payee receives a check, the payee becomes its holder.  The payee may negotiate the check by indorsing it and transferring it to another person, who then becomes its holder." (citations and internal quotation marks omitted)); *Pac. Indem. Co. v. Sec. First Nat. Bank*, 56 Cal. Rptr. 142, 150 (1967) ("Where a depositor issues a check instructing the drawee bank to make a payment from his funds on deposit to a specified person, his account may not be charged for this amount unless this person actually endorses and negotiates this check.").

[113] *See generally* TSA, § 2.4(a).

and Downey Bank in connection with the Tax Refund is that of a debtor and a creditor, respectively.[114]

E.      **Course of Performance**

Notwithstanding that the parties have a debtor-credit relationship under the unambiguous terms of the TSA, FDIC-R argues that the Affiliated Group's course of performance indicates that Downey Bank owns the tax refund.   In support of its position, FDIC-R submitted (along with other evidence) both a factual declaration and an expert declaration.   As such, the Court must first determine whether it should consider these declarations.

1.      **Extrinsic Evidence**

FDIC-R has submitted the declaration of Donald E. Royer, the former Executive Vice President, General Counsel and Corporate Secretary for Downey Bank and DFC ("Royer Declaration") and the declaration of William Lesse Castleberry, Esq., an attorney who specializes in federal income taxation (the "Castleberry Declaration"). The Castleberry Declaration was submitted as an expert opinion regarding the TSA. The Movants object to the Royer Declaration and the Castleberry Declaration on the basis that these declarations are impermissible extrinsic evidence.

---

[114]  *IndyMac Bancorp* at *2.

California law allows the admission of parol evidence only if it is (1) "relevant" to prove (2) "a meaning to which the language of the instrument is reasonably susceptible."[115]  "California recognizes the objective theory of contracts, under which it is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation.   The parties' undisclosed intent or understanding is irrelevant to contract interpretation."[116]

> [However, in California,] rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties.  Such evidence includes testimony as to the circumstances surrounding the making of the agreement * * * including the object, nature and subject matter of the writing * * * so that the court can place itself in the same situation in which the parties found themselves at the time of contracting.  If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, is fairly susceptible of either one of the two interpretations contended for * * *, extrinsic evidence relevant to prove either of such meanings is admissible.[117]

The Royer Declaration states that the TSA "intended to provide a mechanism by which DFC would act as agent for the consolidated group members, including [Downey

---

[115]  *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 938 (9th Cir. 2002) (citations and internal quotation marks omitted).

[116]  *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505, 514 (2003) (citations and internal quotations marks omitted).  *See also Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 836 (9th Cir. 1996) (citations omitted) (holding that "[c]ontract interpretation is governed by the objective intent of the parties as embodied in the words of the contract. . . . However, evidence of the "subjective, uncommunicated intent of one of the parties" cannot be used to contradict the express terms of the contract.").

[117]  *Pac. Gas & Elec. Co.*, 442 P.2d at 645-46 (citations, footnotes and internal quotation marks omitted).

Bank], with respect to tax matters.   The TSA was not intended to grant to DFC ownership of any tax refunds to which another member of the consolidated group was entitled, either because it acted as agent for the group or otherwise."[118]   Although Mr. Royer states that he was one of the drafters of the TSA, he is not a signatory to the TSA; so in effect, his "intent" as one of the drafters, cannot be the "intent" of the signatories to the TSA.   Furthermore, Mr. Royer did not submit any evidence in support of this conclusory statement made over 13 years after the TSA was executed;[119] nor did he claim that his alleged "intent" was discussed among or communicated to the parties to the TSA.   Indeed, the TSA, an integrated contract,[120] states that the "intent" of the parties is:

> to establish a method for allocating the consolidated tax liability of each member among the Affiliated Group . . . for reimbursing Financial for payment of such tax liability, for compensating members of the Affiliated Group for use of their losses or tax credits, and to provide for the allocation and payment of any refund arising from a carryback of losses or tax credits from subsequent taxable years.[121]

Nothing therein suggests an agency or trust relationship.   As such, Mr. Royer's conclusory statements do not override the "intent" expressly stated in the TSA.   As a

---

[118]  Royer Declaration, ¶ 8.

[119]  *Heston v. Farmers Ins. Grp.*, 160 Cal. App. 3d 402, 413, 206 Cal. Rptr. 585 (Ct. App. 1984) ("A dispute over the terms of the Agreement clearly had arisen at the time the January 25 letter was sent, even if no dispute between Heston and Farmers had yet occurred.  Farmers cannot impose its own interpretation six years after the signing of the Agreement, after it had become apparent that paragraph H presented a problem . . .").

[120]  TSA, § 3.1.

[121]  TSA, § 2.1(a).

result, the Royer Declaration is impermissible extrinsic evidence and will not be considered by the Court.

The Castleberry Declaration, submitted as an expert declaration, will similarly not be considered.  In California, the "interpretation of contractual language is a legal matter for the court . . . expert opinion on contract interpretation is usually inadmissible." [122]  As interpretation of the TSA is a legal matter and the Court has found that the TSA is unambiguous, the Court will not consider the testimony of Mr. Castleberry.[123]

### 2.    The Course of Performance

In addition to the declarations discussed (and disposed of) above, FDIC-R asserts that three elements of the performance of the parties, i.e., the Debtor, Downey Bank and their affiliates, under the TSA support a finding that Downey Bank owns the Tax Refund.  None of these arguments, however, are persuasive.  First, FDIC-R argues that the parties historically treated tax refunds as property of Downey Bank.  The prior tax

---

[122] *In re Tobacco Cases I*, 111 Cal. Rptr. 3d 313, 320 (2010) (citations and internal quotations omitted); *Oceanside 84, Ltd. v. Fid. Fed. Bank*, 66 Cal. Rptr. 2d 487, 494 (1997)("The interpretation of a written instrument, even though it involves what might properly be called questions of fact, is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. . . . It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. (internal citations and quotation marks omitted)).

[123] Similarly, the *IndyMac Bancorp* court similarly rejected the use of a similar Castleberry Declaration. *IndyMac Bancorp,* at *10 ("[T]he TSA is not ambiguous, and thus parol evidence such as the Castleberry Declaration is not relevant to its interpretation. Moreover, opinion or "expert" testimony about legal issues is not admissible evidence.  Because the interpretation of a contract such as the TSA is a legal issue for the Court, Mr. Castleberry's testimony would be inadmissible as evidence even if the Court believed the TSA is ambiguous (which the Court does not)." (citations omitted)).

refund checks were deposited directly into Downey Bank's accounts and Downey Bank remitted payments to the other members of the Affiliated Group for their portion of the tax refund. FDIC-R argues that the tax refund money was never comingled in DFC's accounts because the tax refunds were deposited directly into Downey Bank's accounts. FDIC-R continues that according to IRS regulations that, as between the IRS and the Affiliated Group, for the convenience of the IRS, the parent acts as the agent for the Affiliated Group on "all matters relating to tax liability."[124]

Second, FDIC-R asserts that the books and records of Downey Bank and DFC reflect that the parties recorded transactions relating to payment of taxes in a manner inconsistent with the debtor-creditor relationship because their books and records were maintained exactly as one would expect if Downey Bank filed its tax returns on a separate return basis.

---

[124] Section § 1.1502-77(a) states in part:

> (a) Scope of agency--(1) In general--(i) Common parent. . . . the common parent (or a substitute agent described in paragraph (a)(1)(ii) of this section) for a consolidated return year is the sole agent (agent for the group) that is authorized to act in its own name with respect to all matters relating to the tax liability for that consolidated return year, for--
>
> > (A) Each member in the group
>
> ***
>
> (2) Examples of matters subject to agency. With respect to any consolidated return year for which it is the common parent— . . .
>
> > (v) The common parent files claims for refund, and any refund is made directly to and in the name of the common parent and discharges any liability of the Government to any member with respect to such refund;

26 C.F.R. § 1.1502-11 (a).

Third, FDIC-R asserts that in filings with the SEC and the OTS parties understood that Downey Bank owned any refunds arising from overpayment of taxes.[125]  Each of these arguments fail.

### a.    Deposit of the Refund Checks into Downey Bank's Account

FDIC-R asserts that, in the parties' course of performance, tax refund checks were deposited directly into Downey Bank's account (and not comingled with DFC's funds).  And, as such, all the parties considered the refunds to "belong" to Downey Bank.[126]  This argument fails for several reasons.

(i)    The refund checks were made payable to DFC.[127]  It would be impossible for Downey Bank to deposit the refund checks without the consent and direction of DFC.[128]

---

[125]  FDIC-R, relying wholly on the Royer Declaration, asserts that the TSA was not supposed to transfer ownership of the tax return (based on the statement in the Royer Declaration that the TSA was not supposed to transfer ownership of the tax return).  As stated above, the Court considers the Royer Declaration extrinsic evidence and, as a result, this argument by FDIC-R will not be considered herein.

[126]  FDIC-R also asserts that the fact that DFC issued the consolidated tax payment to the IRS is immaterial.  *See Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*, 264 B.R. 790, 810 (Bankr. E.D. Va. 1999). However, the tax allocation agreement in *In re Nelco, Ltd.* did not "not address the allocation of tax refunds among the consolidated group." *Id.* at 809.  As a result the *Nelco* court, following the *Bob Richards* progeny of cases,  without a written agreement "a member of a consolidated group can participate in a tax refund only to the extent of tax payments made by that member." *Id.* at 810.  Here, the parties are governed by the TSA; as such the holding in *Nelco* is not applicable.

[127]  FDIC-R argues that the receipt by DFC from the U.S. Treasury of the refund check is not relevant, because all the members assumed the Downey Bank owned the refunds.  The Court disagrees, the fact that the consolidated return check is made payable to DFC is, in fact, relevant considering the facts of this case.  The refund checks made payable to DFC could **not** be negotiated without the direction and consent of DFC.  If the parties did not want DFC to have that control then the TSA would have been drafted accordingly.

[128]  *See, e.g., supra* at n. 112.

(ii)    DFC deposited the entire tax refund for the consolidated group into Downey Bank's account and Downey Bank, in turn, sent checks to other members of the Affiliated Group for their individual refund amount.  If the money "belonged" to the other members of the Affiliated Group, why would DFC deposit it into Downey Bank's account?[129]  If DFC considered the refund "owned" by Downey Bank – it would have had to consider each member's refund "owned" by that member and DFC would be breaching its duties to the other members by depositing the check into Downey Bank's account.  The IRS only issued *one* check and the refunds had to be given to each member of the Affiliated Group – the *only* way to accomplish this task is to deposit the check into one of the member's accounts and then send each member their portion of the refund.  DFC directing Downey Bank to do this ministerial task cannot create some sort of agency or trust relationship.

(iii)    This deposit process only enforces the Court's finding that DFC was to have the entire tax refund and then had a contractual duty to deliver each member their allocated portion.  Again, nothing herein affects FDIC-R's *claim* against DFC.  Indeed, per the terms of the TSA (as discussed above) and the course of

---

[129]  On at least one occasion, Downey Bank remitted a portion of the refund to DFC.  *See* Wasserman Declaration at ¶ 24 and Exh. D.  If the Court were to accept Downey Bank's argument, then DFC would have given "ownership" of its own refund to Downey Bank – this would not make logical sense. Logically, DFC was delegating a ministerial task of depositing the refund check and then distributing the allocated refund to the other members of the Affiliated Group.

performance, it appears to the Court that the FDIC-R *does* have a claim against the Debtor's estate based on DFC's contractual relationship with Downey Bank.

(iv)    The consolidated tax return regulations "are basically procedural in purpose and were adopted solely for the convenience and protection of the federal government."[130]  "Federal law does not govern the allocation of the [Affiliated] Group's tax refunds; hence, a parent and its subsidiaries are free to provide for the allocation of tax refunds by contract."[131]   As such, the tax return regulations do not alter the relationship the parties created in the TSA.

### b.    Books, Records and Public Filings

FDIC-R next argues that DFC's books and records do not reflect a debtor-creditor relationship.  FDIC-R asserts that if there was a debtor-creditor relationship then DFC's books would reflect a receivable and corresponding payable in the full amount of Downey Bank's tax liability and/or refund.   Furthermore, FDIC-R continues that in filings with the SEC and the OTS, the parties recognized that Downey Bank owned refunds arising from overpayment of taxes.   In support, FDIC-R submitted the declaration of accountant Stephan Wasserman.

---

[130]  *BankUnited*, 12-11392, 2013 WL 4106387 at *1 n. 2 (citations and internal quotation mark omitted); *In re First Cent. Fin. Corp.*, 269 B.R. 481, 489 (Bankr.E.D.N.Y.2001) ("[U]nder applicable I.R.S. regulations, a parent company acts as agent for the consolidated group in filing consolidated tax returns [but] this agency is purely procedural in nature, and does not affect the entitlement as among the members of the Group to any refund paid by the I.R.S.").

[131]  *BankUnited*, 12-11392, 2013 WL 4106387 at *1.

The Wasserman Declaration states that DFC did not treat the payment to the U.S. Treasury as its own expense.[132]

> In DFC's instance, when consolidated taxes became due, DFC would collect a payment from Downey Bank and the other subsidiaries for their separate return tax liability. DFC would deposit the checks into its bank account, thereby recording an increase to cash (a Debit entry) and record the corresponding payable to the U.S. Treasury for Federal taxes (a Credit entry which increased the corresponding payable).[133]

The declaration continues that DFC recorded the tax payments to the taxing authorities as a reduction of *its* cash and a reduction of *its* taxes payable account.[134]  However, this accounting method (and as reflected in various public filings) appears consistent with the TSA's mandate that taxes be calculated on a stand-alone basis, as well as, in compliance with the policies issued by the OTS, among other federal agencies.[135] Furthermore, the Movants concede that the Tax Refund is generated from the carry-back of Downey Bank's net operating losses.   Contractually, the Affiliated Group members calculated their tax liability on a stand-alone basis (and indicated such in

---

[132]  Wasserman Declaration § 20(B)(iv).

[133]  *Id*. at ¶ 20(B)(iii).

[134]  *Id*. at ¶ 20(B)(iv), n. 11.

[135]  Interagency Policy Statement 63 FR 64757-01 (Nov. 23, 1998) ("Regardless of the method used to settle intercorporate income tax obligations, when depository institution members prepare regulatory reports, they must provide for current and deferred income taxes in amounts that would be reflected as if the institution had filed on a separate entity basis.").

public filings).  However, in practice to the TSA governed the tax filings, payments and returns – and, ultimately, the ownership of the Tax Refund.

**F.      Trust Relationship**

FDIC-R's final argument is that the TSA did not transfer ownership of any tax refunds from Downey Bank to DFC.  Rather, a trust relationship was created where the Debtor held any tax refunds in trust for Downey Bank.  FDIC-R's argument fails as an initial matter because, as discussed above, and for the sake of clarity below, the TSA does not contain any trust language.

Nonetheless, FDIC-R argues that *Bob Richards* and the resulting progeny of cases make clear that DFC would have received such funds as an agent of Downey Bank and, as such, would hold the Tax Refund in trust for the benefit of FDIC-R, as successor to Downey Bank.  FDIC-R claims that the TSA limited DFC's actions by the provisions about separate filing, and requiring consideration in good faith any treatment proposed by the Affiliate Group member, and requiring that DFC had to make refund payments to the Affiliated Group members within seven business days.  All of these TSA provisions highlighted by FDIC-R are discussed above.  But, to reiterate, this Court agrees with *IndyMac Bancorp* and finds that this language does not subject DFC to the direction or control of any member of the Affiliated Group and does not establish a principal-agent relationship between the members of the Affiliated Group and DFC.[136]

---

[136] *IndyMac Bancorp*, 2:08-BK-21752-BB, 2012 WL 1037481 at * 16.

Furthermore, as discussed above, *Bob Richards* and its progeny of cases *only* applies

when there is no express agreement between the parties, which is not the case here.[137]

FDCI-R continues that, even if this Court finds that *Bob Richards* and its progeny

do not apply,[138] a trust relationship exists under state law.  In order to establish a trust,

the burden is on FDIC-R to identify some factual disagreement[139] to "(1) demonstrate

that the trust relationship and its legal source exist, and (2) identify and trace the trust

funds if they are commingled."[140]  Furthermore, this Court must look California state

law to determine whether FDIC-R has established a trust relationship.[141]

### 1.    Express Trust

Under California law, a voluntary trust is created by acts or words of the trustor

which indicate: "(1) an intention to create a trust and (2) the subject, purpose, and

---

[137] *See, supra,* n. 69.

[138]  FDIC-R also points to several other cases that also are not applicable here: (i) In *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.),* 264 B.R. 790, 805 (Bankr. E.D. Va. 1999), the court found the tax allocation agreement ambiguous and, as a result, looked to the economic realities and intention of the parties.  Here, the TSA is not ambiguous.  (ii) In *BSD Bancorp, Inc v. FDIC,* No. 93-12207-A11 (S.D. Cal. Feb. 28, 1995) (Feldman Declaration, Exh. 57), the tax allocation agreement contained language that allowed the holding company, in unusual circumstances, to "borrow" the refund from the subsidiary (and specified the any loan would be subject to regulations governing loans to affiliates), and absent those "unusual" circumstances the holding company had to pay the refund to the Bank immediately.  This is distinguishable from the present case where no such language exists.  (iii) In *Lubin v. F.D.I.C.,* 10-CV-00874, 825751, *5 (N.D. Ga. Mar. 2, 2011), was based upon precise language in the tax sharing agreement that created agency, specifically stating that funds were "obtained as agent" for the group members.  No such language exists in the case *sub judice.*

[139] *Mesnick v. General Electric Co.,* 950 F.2d 816, 822 (1st Cir. 1991), *cert. denied,* 504 U.S. 985 (1992) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)) ("In order to continue, the burden shifts to the nonmovant to identify "some factual disagreement sufficient to deflect *brevis* disposition.").

[140] *City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 95 (3d Cir. 1994) (citations omitted).

[141] *Id.*

48

beneficiary of the trust.  A trust is established where the trustee's acts or words express (1) his acceptance of the trust, or his acknowledgment, made upon sufficient consideration, of its existence, and (2) the subject, purpose, and beneficiary of the trust."[142]

> If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created.  If the intention is that the person receiving the money shall have the **unrestricted use** thereof, being liable to pay a similar amount whether with or without interest to the payor or a third person, a debt is created." Whether a debt or trust is created by payment of money depends on circumstances surrounding the transaction, including: (1) the presence or absence of an agreement to pay interest; (2) the amount of money paid; (3) the time to elapse before the payee must perform his agreement; (4) the relative financial positions of the parties; (5) the relationship between the parties; (6) the custom in similar transactions. [143]

As set forth above in more detail, there was nothing express in the TSA that created a trust relationship; furthermore, DFC's unrestricted use of any tax refund for seven business days also leads this Court to find that no express trust was created.

### b.    Constructive Trust

A constructive trust remedy exists to prevent unjust enrichment realized through acts of wrongdoing.[144]  There have been no allegations or evidence to support a finding

---

[142] *Weststeyn Dairy 2 v. Eades Commodities Co.*, 280 F. Supp. 2d 1044, 1075 (E.D. Cal. 2003) (footnote omitted) (*citing Abrams v. Crocker-Citizens Nat. Bank*, 41 Cal.App.3d 55, 59, 114 Cal.Rptr. 913 (1974)).

[143] *Id.* at 1075-76 (emphasis added) (*quoting Abrams*, 41 Cal.App.3d at 59 (*citing* Restatement (Second) of Trusts § 12, cmt. g)).

[144] *Id. at* 1083-84 ("One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary

of wrongdoing on behalf of DFC; therefore, no constructive trust was created between

DFC and Downey Bank.

### 3.    Resulting Trust

A resulting trust is an equitable remedy[145] that differs from an express trust.

> A resulting trust arises by operation of law from a transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest. Such a resulting trust carries out and enforces the inferred intent of the parties.  It has been termed an "intention-enforcing" trust, to distinguish it from the other type of implied trust, the constructive or "fraud-rectifying" trust. The resulting trust carries out the inferred intent of the parties; the constructive trust defeats or prevents the wrongful act of one of them.  It differs from an express trust in that it arises by operation of law, from the particular facts and circumstances, and thus it is not essential to prove an express or written agreement to enforce such a trust. The trustee has no duties to perform, no trust to administer and no purpose to carry out except the single task of holding onto or conveying the property to the beneficiary.[146]

---

trustee of the thing gained, for the benefit of the person who would otherwise have had it." (citations and internal quotation marks omitted)).

[145] *In re Foam Sys. Co.*, 92 B.R. 406, 409 (B.A.P. 9th Cir. 1988) *aff'd*, 893 F.2d 1338 (9th Cir. 1990) and *aff'd sub nom. Ins. Co. of the W. v. Simon*, 893 F.2d 1338 (9th Cir. 1990) ("If the only parties to be considered were Insurance Co. and the debtor, then the equities might favor the imposition of a resulting trust. However, in light of the Bankruptcy Code's strong policy of ratable distribution among all creditors, the bankruptcy court properly declined to exclude the funds in the account from the debtor's estate by imposing a resulting trust." (citations omitted)); *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1420 (9th Cir. 1985) (holding that the bankruptcy code has a "strong policy in favor of ratable distribution among all creditors" (citations omitted)).

[146] *Fid. Nat. Title Ins. Co. v. Schroeder*, 101 Cal. Rptr. 3d 854, 864 (2009) (citations and internal quotation marks omitted).

The burden is on FDIC-R to establish **unequivocally** that there is no genuine dispute as to any material fact[147] that the parties intended to establish a trust.[148]

However, there is nothing in the TSA that indicates that DFC and Downey Bank intended to create a trust.[149]   Here, DFC had duties to file consolidated tax returns (prepared in their "sole discretion").   Furthermore, DFC remained responsible to contest, compromise, and settle any adjustments or deficiencies as a result of any tax authority audit.   DFC also decided if estimated tax overpayments were to be returned or reflected in reduced quarterly installments of taxes due.   The TSA gave DFC sole authority to manipulate the funds and the tax returns, and DFC had the discretion to use any tax refunds for seven business days.

---

[147] Fed. R. Civ. P. 56(a).

[148] *Weststeyn Dairy 2*, 280 F. Supp. 2 at 1086. *Aikin v. Neilson (In re Cedar Funding, Inc.)*, 08-52709-MM, 2009 WL 2849122, *5 (Bankr. N.D. Cal. July 20, 2009) *vacated and remanded*, C 09-4311 RMW, 2012 WL 1110023 (N.D. Cal. Mar. 31, 2012) ("When evidence establishes that both parties to a transaction intended that the holder of the property was to hold it in trust for another, the court may use a resulting trust to accomplish that goal.  The resulting trust enforces a relationship that was always intended to be that of trustee and beneficiary.")

[149] In *NetBank*, the Eleventh Circuit held that is does "not believe that the absence of language requiring a trust or escrow has much persuasive value.  That factor is offset entirely by the similar absence of any language indicative of a debtor-creditor relationship-e.g., provisions for interest and collateral." *NetBank* at *6 (footnote omitted). *See also BankUnited Fin. Corp.*, 12-11392, 2013 WL 4106387 at *5.  However, absent language creating an express trust, the FDIC-R has the burden to show the parties unequivocally intended to establish a resulting trust – and *even if* this Court were to adopt the Eleventh Circuit's finding, if the absence of trust language is a "wash" due to the absence of debtor-creditor language – the FDIC-R cannot meet its burden of showing unequivocal intent.  *See Weststeyn Dairy 2*, 280 F. Supp. 2d at 1086 (holding that a "resulting trust is inapplicable because the evidence does not show the parties unequivocally intended to establish a trust").

FDIC-R cites to this Court's decision in *In re Catholic Diocese of Wilmington, Inc.*,[150] where the Court was faced with an unsecured creditors' committee who sought a declaration under Delaware law (which is not controlling here) that no trust relationship existed between a diocese and individual parishes who had delivered funds to the diocese to invest pursuant to the diocese's pooled investment program. The funds were deposited into the diocese's operating account and comingled with the diocese's own funds before being placed into the investment pool where they were again commingled.   The Court found that a resulting trust was established by the actions and intent of the parties.   However, as the funds were comingled with the diocese's general funds and then again in the investment account, the funds were not traceable.   As such the parishes could not identify their specific property placed in trust, even though the diocese meticulously recorded the investors' shares of the funds in the investment account.

Importantly, unlike here, in the *Catholic Diocese* case there was no written agreement governing the parties' rights to the funds at issue.   This Court found that the relationship between the parties was "akin to that between an investor and a broker,"[151] which is not the relationship among the Affiliated Group members.   Furthermore, the whole purpose of the TSA was to consolidate and commingle funds by creating one tax

---

[150] *In re Catholic Diocese of Wilmington*, 432 B.R. 135 (Bankr. D. Del. 2010).

[151] *Id.* at 148.

return and one tax payment to and from the taxing authorities, thereby reducing the consolidated group's overall tax liability.[152]

Furthermore, the tax refund checks here were made payable to DFC.[153] Although FDIC-R asserts that the tax returns were deposited directly into Downey Bank's accounts which would indicate "ownership" of the refunds, such deposit could *only* occur with the consent and direction of DFC;[154] as such, the "economic reality" is that DFC had complete dominion and control over the tax payments and tax refunds and was empowered to satisfy its contractual payment obligation by authorizing Downey Bank to deposit the check.

As a resulting trust would be an equitable remedy, *even if* FDIC-R could claim that the Debtor is being unjustly enriched – "[e]nrichment alone will not suffice to invoke the remedial powers of a court of equity. The inquiry is whether, as between the two parties to the transaction, the enrichment be unjust."[155] There is nothing "unjust"

---

[152] *See* TSA, § 2.1(a).

[153] Furthermore, any reliance on *BSD Bancorp, Inc v. FDIC,* No. 93-12207-A11 (S.D. Cal. Feb. 28, 1995) (Feldman Declaration, Exh. 57), would be unfounded because therein the parent received the tax refund it placed them in a segregated account. *Id.* at p. 12. Furthermore, in *BDS Bancorp* the tax allocation agreement provided various circumstances where the parents could "borrow" refunds which could not be fully funded when due. When the parent deposited the refund into the segregate account the requirement that the refunds could "not be fully funded" was not met; as such, the parent had no right to borrow the refund under the tax allocation agreement, and therefore held the fund in trust for the subsidiary bank. *Id.* In the case *sub judice,* there is no such ability to "borrow" language in the TSA nor was the refund deposited into a segregated account.

[154] *See, supra* n. 112.

[155] *McGrath v. Hilding*, 41 N.Y.2d 625, 629, 363 N.E.2d 328, 331 (1977) (*citing* Restatement (First) of Restitution § 1 (1937), Comments a and c).

about enforcing the parties' contractual obligations set forth in the TSA.  Furthermore,

as set forth in *IndyMac Bancorp*:

> [T]he Court does not perceive any equitable rule requiring the Court to protect the FDIC fully at the great expense of Bancorp's other creditors; the equities, as well as the principles underlying the bankruptcy laws, point in the other direction.  Thus, because there will be no unjust enrichment if the Trustee retains the tax refunds for the benefit of Bancorp's estate, there is no factual basis for imposing the quasi-contractual remedy of *Bob Richards*.[156]

The Ninth Circuit, in discussing imposition of a constructive trust, has stated:

> We necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws.[157]

This policy is equally applicable to resulting trusts.[158]   Here, FDIC-R provides no

evidence to support its resulting trust theory and "[i]f such an intention existed, then

evidence of such intent should be readily available . . . . "[159]   As in *IndyMac Bancorp*,

FDIC-R provided the Court with no contemporaneous documents or any other material

showing any intent by anyone to create any sort of "trust" or similar relationship.  In

---

[156] *IndyMac Bancorp,* at *28 (citations and internal quotations marks omitted).

[157] *In re N. Am. Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 amended, 774 F.2d 1390 (9th Cir. 1985) (while balancing the request to impose a constructive trust) (citations omitted).  *See In re Visiting Home Servs., Inc.*, 643 F.2d 1356, 1360 (9th Cir. 1981) ("The purpose of the bankruptcy law is to establish a uniform system to place the property of the bankrupt, wherever it is, under the control of the court for equal distribution among creditors.").

[158] *IndyMac Bancorp,* at *29  (holding that "a resulting trust is an equitable remedy subject to the same strict limitations imposed on constructive trusts in bankruptcy." (citations and footnote omitted)).

[159] *Id.*

fact, the TSA indicates by the "sole discretion" to file returns and negotiate with the taxing authority, as well as, the seven day delay in payment that the parties *intended* that DFC obtain beneficial interest in the refunds it received.

As a result, FDIC-R has not unequivocally established, i.e., it could not demonstrate the existence of a genuine issue of material fact,[160] that a resulting trust was formed between and among the Affiliated Group members.

## G.    Violations of the Automatic Stay.

Finally, as noted above, the Movants also seek for summary judgment regarding their allegations that FDIC-R willfully violated the automatic stay in section 362(a) of the Bankruptcy Code, which the FDIC-R refutes.  As this Court understands that a settlement in principle has been reached in the Court of Federal Claims action (although approval from the requisite governmental agencies has not been obtained to date) and the Movants have not asserted that the (prospective) Tax Refund was somehow diminished by FDIC-R's (alleged) actions, the Court finds that while the violation of the stay arguments are very strong, they are, effectively, moot.  As such, for the purposes of

---

[160] *United States v. Jamas Day Care Ctr. Corp.*, 152 Fed.Appx. 171, 173 (3d Cir. 2005) (quoting *Olson v. GE Astrospace*, 101 F.3d 947, 950 (3d Cir. 1996) (citing *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993)) (In order to demonstrate the existence of a genuine issue of material fact in a jury trial, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant.)). *See also Mesnick*, 950 F.2d at 822. ("… 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law").

clarity of the record, the Court will deny, without prejudice, the motions for summary judgment regarding FDIC-R's (alleged) violations of the automatic stay.

## CONCLUSION

At its core, this is a case of contract interpretation. Under the plain, unambiguous language of the TSA, the Court finds, as a matter of law, that the TSA creates a debtor-creditor relationship and, as a result, the Tax Refund is property of the Debtor's estate. The Court further finds that FDIC-R did not meet its burden in showing that a resulting trust was intended by the parties; nor that the parties' course of performance indicates a trust or agency relationship. Lastly, the Court finds that the allegations of violations of the automatic stay are moot.

As such, summary judgment will be granted as to Count I of the Complaint, and denied, without prejudice, as to Court II of the Complaint. Furthermore, summary judgment will be entered in movant's favor on FDIC-R's First and Tenth Counterclaims. An order will be issued.